KNISKERN and others v. THE LUTHERAN CHURCHES OF ST. JOHN'S AND ST. PETER'S, PHILIP WIETING, and others.

The jurisdiction of courts of equity, in cases of charities directed to religious pur-
poses, proceeds upon the ground of a trust. In such charities, as well as in those
for purposes purely civil, it is the duty of the courts to give effect to the intent
of the founder, if that be legal. To that end, their aim is to ascertain the
scope and objects of the charity, and then to enforce its proper and faithful
administration.

The difficulties which environ the subject of religious charities, arising from the
lapse of time since the foundation, and from the subtleties involved in the alleged
perversion of the trust, are not permitted to prevent the proper exercise of this
jurisdiction.

Where a trust is created by deed, for the use of a congregation of Christians, desig-
nating such congregation by the name of a sect or denomination, without any
other specification of the religious worship intended, the intent of the donors or
founders in that respect, may be implied from their own religious tenets, from the
prior and contemporary usage and doctrines of the congregation, and from the
usage, tenets, and doctrines of the sect or denomination to which such congrega-
tion belongs.

In ascertaining the early and contemporary usage and doctrines of such sect, resort
may be had to history, and to standard works of theology of an era prior to the
existence of the dispute or controversy.

When it is shown what such prior usage and doctrines were, it is incumbent on
those who allege a departure therefrom in the founders of the particular congre-
gation, or the donors of its temporalities, to prove such departure.

Where a church is endowed with property for the support of a particular faith, and
is subsequently incorporated, it is not competent for a majority of the church,
the congregation, or the corporators, or of a majority of each combined, to appro-
priate such property for the maintenance of a different faith.

The question of the particular religious faith or belief is not material in such cases,
except so far as the court is called upon to execute the trust, and to that end it
merely inquires what was the faith or belief, to maintain which the fund was
bestowed. The court does not animadvert upon the religious belief of either
party, or assume to determine that either is in itself right or wrong.

A grant of lands was made in 1789 to the trustees of an evangelical Lutheran con-
gregation, consisting of two churches, "for the common use and benefit of the
said Lutheran congregation forever."

Prior to 1800, with other donations, a house of worship was erected by each church,
and other temporalities were acquired. Each church became incorporated under
the general statute. At the time of these endowments, their standard of faith
and doctrine was the Augsburgh Confession of Faith. In 1830, they became a

Kniskern *v.* The Lutheran Churches of St. John's and St. Peter's, and others.

part of the Hartwick Synod of the Evangelical Lutheran Church. In 1837, the trustees of the two churches, in connection with the pastor and the church councils, dissolved their connection with the Hartwick Synod, and united with other churches in forming a new synod, which adopted a declaration of faith, essentially variant in three principal and cardinal doctrines, from the Augsburgh Confession.

*Held,* that these proceedings of the trustees were a perversion of their trust, and an unlawful diversion of the property of the churches from the objects and purposes for which it was originally contributed. And they were decreed to account for the rents and income thus perverted.

*Held* also, that those members of the congregations who adhered to the Augsburgh Confession, and continued their connection with the Hartwick Synod, were entitled to have such trustees removed, and to have a decree for the application of the property to the objects for which it was given. And the corporate organization of such members having been continued, pending the suit, their trustees were held entitled to receive the temporalities of the churches.

Whether the separation from the Hartwick Synod alone was ground for relief. *Quere.*

The court of chancery in this state has not under the statute relative to corporations, any visitorial power over religious corporations. But it retains the common law jurisdiction of chancery over the subject of charitable uses, which existed prior to the Statute 43 Eliz. ch. 4, of Charitable Uses, and continued, independently of that statute.

The court has power to remove trustees of religious charities, who are guilty of a breach of trust, and direct the election of others, excluding as incompetent the guilty trustees and their adherents in the perverted use of the trust funds.

Examination of the alleged departures in doctrine from the creed of the Founders, in respect of the Trinity, the Divinity of our Saviour, and original or inherited sin; and inquiry into the history of the Augsburgh Confession, and its authority in the Evangelical Lutheran Church, from the time of the reformation in Germany; in the opinion of the court.

Decree, declaring a perversion of the trusts of a religious corporation, removing the trustees, directing an account, and providing for new trustees to administer the fund according to the designs of the donors.

Albany, January 13, 15 and 16, 1844; New-York, July 17, 1844.

THE bill in this cause was filed on the 23d day of March, 1839, by Philip Kniskern and Daniel Angle, two members of the Lutheran Church and Congregation, or Society of New Rhine-beck, in the town of Sharon, Schoharie County, known by the corporate name of "The Ministers and Trustees of the Lutheran Church in Rhinebeck," commonly called St. Peter's, or New Rhinebeck Church; and Marcus Brown, one of the trustees, and David Sommer, a member of the Lutheran Church or Society at Durlach, in Sharon, known by the corporate name of "The Evangelical Lutheran Congregation of St. John's

Church at Durlach, in Sharon;" in behalf of themselves and such other members of those churches and congregations, as adhere to the faith, doctrines, ordinances, discipline, and government of the Lutheran Church as declared, established and promulgated, by the confession and declaration of faith commonly called the Augsburgh Confession of Faith.

The bill set forth, that according to the history of the Lutheran Church, on the 25th of June, 1530, the sect of Protestant Christians known as Lutherans, presented to a general diet then assembled at Augsburgh in Germany a written explication of their religious system or articles of faith, which has ever since been known as the *Augsburgh Confession of Faith,* and religiously observed, regarded and adopted by the Lutheran Church, as containing the fundamental rules of the faith, practice, discipline and government of that church, and is the confession of faith of the church and of its adherents, and all departures from it are considered by the said church as heresies, or departures from its true faith, practice, discipline and government.

That this Confession of Faith was principally drawn up by Martin Luther, and consisted of 28 articles, the first 21 of which represented their religious opinions or faith; the others pointed out the errors and abuses which had occasioned their separation from the church of Rome, and are not generally contained in the Confession of Faith of the modern Lutheran churches; the 21 articles being all to which the members are required to conform.

That the persons professing Lutheran tenets in America are commonly known and designated in their collective capacity, as the Evangelical Lutheran Church.

The judicatories of the church consist of, 1st, the vestry of the congregation, commonly called the church council; 2d, the district or special conference; 3d, the synod; 4th, the general synod. The vestry or church council, consists of the pastor and of all the elders and deacons of a particular church. The special conferences are parts of the District Synod, formed by the synod dividing itself into two or more districts, for the purpose of increased care and vigilance over the spiritual welfare

and condition of the churches within its district. The synod consists of all the ministers and an equal number of lay delegates within a certain district. It also comprises within itself a ministerium, composed of ministers only. The synod directs the external affairs of the church, while the ministerium regulates the internal or spiritual affairs, such as judging in doctrinal controversies, and licensing and ordaining ministers. The General Synod is denominated the Evangelical Lutheran General Synod of the United States of North America, and is composed of deputies of ministers and lay members from the several synods or synodical conventions.

That by the constitution and' government of the said church every member has the right of appeal from any decision of the church council, or of the special conference, to the synod ; and from that to the General Synod.

The church council has the direction and control of all the temporalities, as well as of the spiritual concerns of the particular church, and elects the lay deputy to represent such church in the annual synodical meeting.

That long prior to 1789, there was a congregation in what is now Schoharie County, called " The Lutheran Congregation of Cobleskill and New-Durlach," which was duly organized as an Evangelical Lutheran Church, in which its sacraments and ordinances were canonically dispensed according to the Augsburgh Confession of Faith, and the constitution and government of the Lutheran Church. That the Augsburgh Confession was adopted and received by the said church and congregation, as its confession of faith ; and the doctrine taught, preached and inculcated by its clergyman, was in conformity with, and founded upon the Augsburgh Confession ; and its temporal and spiritual government, conformed in all respects to that of the Evangelical Lutheran Church as before stated ; and that said church was founded by its members and founders, as the professors and followers of the doctrines, and tenets of the Evangelical Lutheran Church, as declared and expressed by the Augsburgh Confession of Faith, and for the sole purpose and object of having the said faith and doctrine, and no other, preached and

taught, and the sacraments and ordinances administered, according to its provisions.

That the Lutheran Congregation of Cobleskill and New-Durlach, in the year 1789, included the two churches in question ; and also the church now known as the Evangelical Lutheran Church of Cobleskill, commonly called the Cobleskill Church.

That on the 9th of March, 1789, the Rev. Peter Nicholas Sommer, the pastor of those chuches, and Hendrick Heens, Johannes Lawyer and Johannes Borst, being seised in fee of the equal westerly half of a lot of land situate in New-Durlach, known as lot 11 in a patent granted to Jacob Borst and others, in consideration of £110 to them paid by the trustees of the Lutheran Congregation of Cobleskill and New-Durlach, by deeds of lease and release, conveyed to them and their successors the said land, containing 150 acres, *" for the common use and benefit of said Lutheran Congregation forever."* That the consideration for the land was raised and paid by the members of that church, for the purpose of maintaining a Lutheran Church, in which the doctrines and tenets declared by the Augsburgh Confession of Faith, and no other, should be preached, taught and disseminated.

That the Lutheran congregation of Cobleskill and New-Durlach, covered a large territory, and subsequently was divided into three churches, viz., the church at New-Rhinebeck, which was incorporated on the 13th of June, 1799, under the act of 1784; the church at New-Durlach, which was incorporated on the 8th of June, 1808, under the act of March, 1801 ; and the church at Cobleskill, which was also incorporated separately.

That the three churches being tenants in common of the real estate before mentioned, amicably partitioned the same in the year 1808; fifty acres being released to the church at Cobleskill, in severalty, and the residue was retained for the other two churches, and by them has been since enjoyed in common.

That these two churches have by subscriptions among their members, and by other donations obtained by them, erected a church edifice in each congregation, and have acquired other property to a small amount, the income of which is appropri-

ated towards paying the salary of a minister, who has preached alternately at each church. All the property of these churches was obtained and given for the sole and only purpose of founding and establishing churches in which the doctrines and tenets of the Evangelical Lutheran Church, as then established and declared by the Augsburgh Confession of Faith, should be preached, taught and inculcated, and such doctrines were preached from the pulpit, and disseminated in the congregations respectively, until in the month of May, 1837 ; under which preaching great harmony prevailed in those churches.

That on the 27th of October, 1830, the Hartwick Synod was organized, composed of these two, and thirty other Lutheran churches ; and from thence these two churches continued to be members of that Synod, until May, 1837, when its connection therewith was illegally and forcibly terminated by the unlawful, and heretical acts of the defendants in this suit, contrary to the will and against the remonstrances of all the members who adhered to the Evangelical Lutheran faith as expressed in the Augsburgh Confession.

That the Hartwick Synod on the 27th of September, 1831, with the approbation of all its churches, connected itself with the General Synod, and still continues the connection, and both Synods adhere to, and teach, the doctrines of the Evangelical Lutheran faith, as declared in the Augsburgh Confession.

That in 1805, the Rev. Henry Mœller was chosen pastor of these two churches, his salary being paid by subscription of the members and congregation ; and he officiated as such until 1821 or 1822, and all that time preached and taught the doctrines of the Evangelical Lutheran Church as declared in the Augsburgh Confession of Faith. In 1823, the Rev. Adam Crownse was elected pastor, and officiated until in the year 1828, during all which time he preached and taught the same doctrines and tenets.

That in 1833, these two churches elected as their pastor and minister the Rev. Philip Wieting, one of the defendants, who at that time professed to be a minister, teacher and preacher of the doctrine of the Evangelical Lutheran Church as declared in the Augsburgh Confession, and an upholder and supporter

of the established constitution, government and usages of that church in all its connections and relations, temporal and spiritual; and had it been suspected that he entertained contrary opinions or belief, or that he would teach or preach any other doctrine, or rule of faith or practice, or that he would attempt to sever their connection with the Hartwick Synod, he would not have been elected as such minister.

That by the agreement with Wieting, he was to be their pastor for ten years, unless the relation was sooner dissolved by the trustees on six months notice, and the subscriptions to pay the salary were for annual payments for ten years unless the relation of pastor was sooner dissolved, and were made upon the full faith and belief, as to the complainants and the others, that during his ministry he would preach and inculcate the doctrines of the Evangelical Lutheran faith, according to and as declared by the Augsburgh Confession, and uphold the connection of their churches with the Hartwick Synod, and through it, with the General Synod, and conform to, and support the ancient constitution, government and usages of the Evangelical Lutheran Church.

That on the 10th of May, 1837 Mr. Wieting, claiming to represent these churches as their pastor, and Martin Marcley and John C. Shultz, as lay delegates from the church at New Rhinebeck, with other persons claiming to represent ten other Lutheran Churches, organized a new Synod, called the Franckean Synod; and abandoned the Augsburgh Confession of Faith, as a rule or standard of faith or practice, and adopted a constitution for the government of the Synod containing a new declaration or confession of faith, declaring the points or articles of belief of the Synod and its churches, to be adopted by them in the place of the Augsburgh Confession. The constitution contains rules and restrictions for the government of its churches, and tenets of faith and practice, unknown to the Augsburgh Confession and to the Lutheran Church. By this constitution it is declared, that the church council is independent of any Synod or other superior control; thereby making its decisions final and conclusive, and depriving the members of the right of appeal to the Synod and General Synod, guaran-

teed by the usages and constitution of the Evangelical Luthe-
ran Church; it is provided that a slaveholder, or person engaged
directly or indirectly in the manufacture or traffic of any intoxi-
cating liquors to be used as a beverage, is ineligible to represent
any church in the Synod, as a lay delegate; and every minis-
ter is precluded from a seat in the Synod who has not signed
the pledge of total abstinence from intoxicating liquors as a
beverage, who is a slaveholder, or who advocates the system of
slavery as it exists in, and is authorized by the constitution and
laws of the United States.

That the Confession of Faith adopted by the Franckean
Synod, and which its churches are required to adopt, differs
from the Augsburgh Confession in these three, among other
particulars:

First. By the Augsburgh Confession, the doctrine of the Trin-
ity in its fullest extent is clearly and unequivocally adopted
and inculcated, and is a standard doctrine of the Evangelical
Lutheran Church, as declared in the first article of the said con-
fession, as follows: (The article was here quoted at large, as it
appears in the opinion of the court, *post.*)

That the faith and doctrine of the Franckean Synod are es-
sentially Unitarian, and are stated in its Confession of Faith in
such equivocal language, that the strictest Unitarian might adopt
it. Its faith and doctrine in relation to God and the Godhead are
thus set forth in the 2d subdivision of article 12 of the Franckean
Constitution, entitled " Declaration of Faith. (This is also quo-
ted at large in the opinion, *post.*)

The bill submits that this does not recognize or declare the
existence of three persons in the Godhead, but declares there is
but one person constituting the Divinity, which Divine Being is
called and made known by revelation under or by three differ-
ent names.

Second. The divinity of Jesus Christ and his equality in
power, dominion and glory with God, the Father, is also a car-
dinal doctrine of the Evangelical Lutheran Church, and is
adopted and thus set forth in the third article of the Augsburgh
Confession. (The third article was here quoted in full. See it
in the opinion, *post.*)

That the Franckean declaration of faith neither declares or admits the divinity of Jesus Christ, nor his equality with God the Father in any respect, but thus sets forth the nature and attributes of the Redeemer. (This will be found at large in the opinion, *post.*)

Which doctrine, the bill charges, is essentially Socinian, which sect admits Jesus Christ to be the Son of God, and the only Redeemer, yet denies his divinity. The Franckean declaration, although not denying the divinity of the Redeemer, does not affirm it ; whereas this affirmative declaration forms a conspicuous feature in the Augsburgh Confession.

Third. That original sin condemns all who are not born again of water and the Holy Ghost ; that man is not only depraved, but is conceived and born in sin, and cannot see God without repentance ; is also a cardinal doctrine and point of faith of the Evangelical Lutheran Church, and is thus declared in the second article of the Augsburgh Confession. (Quoted at large, as it is in the opinion, *post.*)

The doctrine and faith in regard to original sin, is thus set forth in the Franckean declaration of faith. (See it quoted at large in the opinion, *post.*)

The consequences or effect of such depravity or sin, not being expressed, but leaving those who adopt this doctrine at liberty to preach and teach that man will not be condemned to punishment in a future state for original sin alone, although not repented of.

That the persons and churches who thus severed their connection with the Hartwick, and established the Franckean Synod, and this declaration of faith ; particularly Mr. Wieting, and those adhering to him in these two churches did so, because, as Wieting publicly declared, they did not and could not believe the doctrines of the Augsburgh Confession; and that their principal objection to the Hartwick Synod was that it adopted and held that Confession for its creed. That since the formation of the Franckean Synod, Mr. Wieting has not preached or taught the doctrine and faith of the Evangelical Lutheran Church as declared in the Augsburgh Confession, although he still officiates as pastor, against the wishes and in defiance of

the rights of all the members who adhere to that doctrine and faith.

That the trustees, elders, and deacons of the new Rhinebeck church adhere to Mr. Wieting and the Franckean Synod, and exclude the other members who adhere to the Augsburgh Confession and the Hartwick Synod, from employing a pastor or preacher in connection with that synod, and divert and pervert the church edifice from the purpose and object for which it was founded, to a place in which the doctrine declared by the Franckean Synod is taught and preached; and they appropriate all the property and funds of the church to support such teaching and preaching, and continue Mr. Wieting as the pastor, in defiance of the rights of the complainants and other members who adhere to the Augsburgh Confession, and in violation of their duty as trustees and officers, and having no right thus to appropriate any of the said funds and property.

That all except two of the trustees, elders, and deacons of St. John's Church, adhere to Mr. Wieting and the Franckean Synod, with the like exclusion of the other members, and the like diversion and perversion of the church edifice, and appropriation of its funds from its original purpose and objects, in defiance of their rights, and with the same effect as in the case of the Rhinebeck Church.

That these two churches were respectively founded and organized by persons who professed the Evangelical Lutheran faith, as declared in the Augsburgh Confession, for the sole purpose of having such faith preached and promulgated therein, and that the members thereof should be governed and controlled by the ancient constitution, usages, and formula of the Evangelical Lutheran Church. And the bill charged, that the incorporations and their property could not be diverted or appropriated to other uses than those for which they were created and intended by the founders thereof; that the trustees were bound to appropriate them to such original uses and purposes; and that it is a violation of such uses and objects, to apply or appropriate them to the support of any other church, or of a church in which any other principles, doctrine, or faith than those declared in the Augsburgh Confession, are taught, preached, or

inculcated, or whose discipline and practice is governed by any other constitution, usage, formula or rules, than those adopted for the Evangelical Lutheran Church, at the time those two churches were founded. That the complainants had frequently applied to the defendants in behalf of themselves and the other members adhering to the Augsburgh Confession and Hartwick Synod, and requested them to employ and call, or permit to be employed and called, a pastor for the said churches, in full communion with that synod, and adhering to that confession, and to apply the property for that object, and to permit the churches to be re-united to the Hartwick Synod, and to be governed in their practice, discipline, and church government according to the ancient constitution, usages, and formula of the Evangelical Lutheran Church, as adhered to by that Synod and the General Synod ; to refrain from diverting the church edifices and property to any other use, and to dissolve the pastoral connection with Mr. Wieting, inasmuch as he had abjured the doctrines of the Augsburgh Confession, and seceded from the Hartwick Synod, with which they of right should be still united.

The bill prayed for a decree compelling the defendants to employ and call, or permit the complainants to employ a pastor accordingly, to officiate as the preacher and spiritual teacher in the church edifices, and to apply the property of the churches for the purposes before stated, and no other ; that the defendants suffer the churches to be re-united to the Hartwick Synod, and governed in their practice, discipline, and church government by and according to the ancient faith, constitution, usages and formula of the Evangelical Lutheran Church, as adopted and still adhered to and observed by that Synod and the General Synod ; that they desist and refrain from diverting and appropriating the two church edifices, and the other property of the corporations, for any other use or purpose whatsoever ; and to dissolve the connection of church and pastor between those two churches and Philip Wieting ; that he desist from preaching, or in any way officiating as minister or pastor in those church edifices, and that the other defendants desist and refrain from permitting him to preach or officiate in any manner in the

churches or either of them ; that the trustees account for the property of the churches, and the proceeds and income thereof, since and during the time they have directed' the same ; and that they be removed from their offices, to the end that others may be appointed who will direct, control, and administer the two corporations and their property, according to the trusts, uses and purposes originally designed.

The bill also prayed for further or other relief, for an injunction in the mean time, and for process of subpœna against the two corporations, Mr. Wieting, and against all the trustees, elders and deacons of the two churches, except the complainant Brown, and one other who acted with the complainants.

To this bill all of the defendants joined in an answer, which set forth that, according to the history of the Lutheran Church, on the 25th of June, 1530, John, the Elector of Saxony, and the other princes, and the states of Europe, who had embraced the principles of the Reformation, (naming them,) delivered to the Diet assembled at Augsburgh in Germany, the confession of their faith, commonly called and known as the Augsburgh Confession. It was not presented by the sect known as Lutherans, or as a written explanation of their system or articles of faith, but it was afterwards adopted as a system or summary of doctrines and faith of the Protestant denomination called Lutherans, together with the defence of the Augsburgh Confession ; the Smalcald Articles written by Luther in 1537, the Shorter and Larger Catechism of Luther written in 1529, and the Formula Concordiæ, composed in 1576, after the death of Luther ; and they are together called the Symbolical Books of the Lutheran Churches. That the Bible is the sole standard of the faith, practice, discipline and government of the Lutherans, and the defendants deny that all departures from the Augsburgh Confession were ever considered heretical, or a departure from the true faith or system of doctrines embraced by the Lutheran Churches in Europe or America.

That the Confession was principally drawn up by Martin Luther ; but not wholly so as presented at Augsburgh. That it consisted of 17 articles as drawn up by him, called the Tor-

gau Articles. It was afterwards enlarged by Melanchthon, and consisted of 28 articles, which represented the religious opinions and faith of the princes and states who presented it at the Diet. The seven articles concerning the abuses and errors which occasioned the separation from the Church of Rome are contained in all the genuine confessions; and the confession in all its articles, is by some Lutheran Churches held as important and necessary as the first 21 articles; and there are several of the Lutheran Churches and Synods in modern times, in the United States, as well as in Germany and other countries in Europe, that have adopted and adhered to the said Confession in all its parts as contained in the 28 articles; among which, in the United States, are the German Synod and English Synod of Ohio, and the churches of the Tennessee Lutheran Synod. But that many of the Evangelical Lutheran Churches in America have never formally adopted the Augsburgh Confession of Faith, nor received it as containing their fundamental rules or principles of faith, practice, discipline and government, nor required an assent to it in all its parts and doctrines.

The answer denied that the persons professing Lutheran tenets in America, are commonly known and designated in their collective capacity, as the Evangelical Lutheran Church; but they are known as Evangelical Lutheran Churches, and the ministers and churches associated in synod, as Evangelical Lutheran Synods.

That the only judicatory known and acknowledged and practiced by the Lutheran Churches of America, consists of the vestry or church council, which acts as the representative of the people. The members and pastor of each individual church, possess all power of government and discipline, and the jurisdiction of each is final; that the whole church as a body, that is, the minister and members of each church, in some cases personally, in others by the church council, possess the power to execute government and discipline. That the special conferences, the synods, and the general synod, are not judicatories, according to the form of government among the Evangelical Lutheran Churches in the United States; special conferences are not generally known among the synods; and the General Synod

does not represent in one body all the synods or particular churches of the Lutheran denomination. The vestry or church council consists of the pastor and all the elders and deacons of a particular church; in some cases the trustees are added, as has always been the case with the churches of New Rhinebeck and Durlach in Sharon. Special conferences are known only among some synods, and are not practiced generally even by those synods which have united with the Evangelical Lutheran General Synod, as is the case with the New-York Ministerium. And when adopted, they are merely for the "purpose of holding stated protracted meetings," and may only give advice on business voluntarily referred to them. The synods of New-York, the two synods of Ohio, the Evangelical Lutheran Synod of Pennsylvania, and the Synod of the West, do not by their constitutions recognise special conferences. A synod is composed of ordained ministers, candidates, and an equal number of lay delegates, and is a voluntary union or association of ministers and churches. That the ministers and churches composing a particular synod, need not be contained within any particular limits or district; but those residing and located in several different states, in several instances belong to the same synod. And there is no power or authority to constitute a synod within a certain district or limit; and any minister and church may unite with such synod as they deem proper.

The General Synod is constituted as stated in the bill. It was organized on the 20th of October, 1820, by a convention of deputies from the Pennsylvania Synod, the New-York Ministerium, the Synod of North Carolina, and the Synod of Maryland and Virginia. Of these, the Pennsylvania Synod and New-York Ministerium did not adopt the constitution, nor send representatives to it at its first convention. Several synods have never united with it. It is not a judicatory, and is not known as a tribunal of appeal; but merely advises, and that only when complaints are brought before it by whole synods, ministeriums, congregations, or individual ministers, concerning doctrine or discipline; and its advice is applicable only to such as have voluntarily united with it. It has no supervising power or control over church councils, or individual churches or

synods. The Augsburgh Confession of Faith is not a part of its constitution. The " Formula for the Government and Discipline of the Evangelical Lutheran Church," was first adopted and recommended by it, several years after its organization, and was unknown before such adoption, and several of the said Evangelical Lutheran churches and synods have never adopted it.

The answer denied that a member of those churches has the right of appeal, as stated in the bill, or that such appeal has been commonly exercised, or been the general practice ; or that such right exists in all cases where his synod belongs to the General Synod.

The answer admitted that the council has the control of the temporalities as well as the spiritual concerns of its church, and elects the lay deputy to represent such church in the annual synod. But previous to the adoption of the " Formula" by the General Synod, no uniform system of discipline prevailed in the Evangelical Lutheran churches in America, but each church made its own rules and regulations for its government, and such is now the case with all churches not connected with synods joined to the General Synod. And the "Formula" is an attempt to alter and change the ancient usages, government and discipline of said churches, and set up an ecclesiastical power or authority, which has never been acknowledged or submitted to by said churches or all of them.

That as early as 1789, there was a society of Lutherans in Schoharie, called " The Lutheran Congregation of Cobleskill and New-Durlach," organized as an Evangelical Lutheran Church. But the defendants are ignorant whether the Augsburgh Confession of Faith was adopted, or the sacraments or ordinances dispensed according to it, or its doctrines preached and inculcated by the clergyman who officiated, or whether the church or society was founded by the members thereof, as the professors of the doctrine or tenets declared by the Augsburgh Confession, or for the sole purpose of having the faith, doctrine, and tenets expressed in that Confession, and no other, taught or inculcated, and the sacraments and ordinances administered, according to the same. But they believe, from the

known practice in the said church, and from the doctrines taught therein for the last twenty years, that the Augsburgh Confession of Faith was never formally adopted by said church, or its members, or received by it or them as containing the fundamental rules and principles of the faith, practice, discipline, and government of the said church, nor assented to by it or the members thereof, in all its parts and doctrines.

That the church in 1789 embraced the churches now known as the Rhinebeck Church, the Church at Durlach, and the Cobleskill Church, and now designated by the corporate names stated in the bill. The answer also admitted the conveyance of the 150 acres of land and its partition, as is set forth in the bill. The grantees in the deed are described, with the addition, " entrusted as trustees of the Lutheran Congregation of Cobleskill and New-Durlach, of the second part." The incorporation of the churches was admitted, but not the precise period. Also, the erection, by donation and subscriptions among the members thereof, of church edifices for each of the two congregations in question, and the acquisition of other property, the income of which is appropriated towards the salary of a minister to preach alternately at each church. And that the consideration paid for the land was raised by the members of the Lutheran Congregation of Cobleskill and New-Durlach, for the purpose of maintaining and supporting such congregation. The answer denied that it was raised and paid, or that the land was conveyed, for any other use or purpose than what is expressed in the conveyance. And it denied that the real estate or any property or funds were obtained, given, or bestowed, with the intent, or upon the understanding or consideration that the doctrines or tenets declared by the Augsburgh Confession, in all its parts, should be preached or taught in the two churches. The answer alleged that the doctrines and tenets, as therein declared, in all its articles, have never been preached or inculcated from the pulpit of either of the churches, or disseminated in the congregations.

That the system of doctrines and tenets inculcated and professed by the Evangelical Lutheran denomination in the United States, has always been preached, and inculcated in the two

churches at Rhinebeck and New Durlach in Sharon, from 1828 and long before, to the present time. In 1828, Philip Wieting was duly elected and called to their pastoral charge. He then was and hitherto has been, a regular minister and preacher of the doctrines and tenets as they are taught and professed by the Evangelical Lutheran denomination. From 1828 to 1837, he was their pastor, and preached and taught during all that time the same doctrines as he preached in 1837, and ever since has done, being the fundamental doctrines of the bible as taught, believed and inculcated by the Evangelical Lutheran Churches in the United States, and which is the system or summary of doctrines contained in the Augsburgh Confession of Faith.

That in or before 1796, an ecclesiastical organization or association took place, consisting of ministers or representatives of the Lutheran churches in the state of New-York and other states and countries, called " The Evangelical Lutheran Ministerium of the state of New-York and adjacent states and countries." A constitution was adopted by it. This was the first one organized in the state, and the only one previous to the year 1830. It was composed of Lutheran ministers and churches, and was to meet annually. The two churches in Sharon have always belonged to and associated with this Ministerium until the year 1830, and have been represented by their ministers and delegates in the Synods of the Ministerium, and have conformed to its government and discipline. All the Evangelical Lutheran Churches in New-York previous to 1830, and before the formation of the Hartwick Synod, were in connection with the Ministerium. It never was a tribunal of appeal; and it never reviewed the adjudications of the church councils of the churches in connection with it. Neither of these churches, nor any other, ever had guaranteed to them the right of appeal whilst so in connection with the Ministerium; and it never claimed or exercised the right of appellate jurisdiction over the church councils. Its powers are defined by its constitution to be, " the examining, licensing or ordaining of candidates for the ministry, the admission of ministers into the said Ministerium, or their exclusion from it, also weighty matters of faith, or cases of conscience, may receive a

friendly discussion." Mr. Wieting was licensed to preach by. it in 1825, and ordained by it in 1826, at Cobleskill. No person to be ordained, is required to make any other engagement than this, "that he will faithfully teach as well as perform all other ministerial duties, and regulate his walk and conversation according to the Gospel of our Lord and Saviour Jesus Christ, ascertained in the Holy Scriptures, and that he will observe" the constitution of the Ministerium while he is a member thereof. This was all he was required to promise at his ordination; he was not, nor is any one, required to subscribe to the Augsburgh Confession of Faith, or preach its doctrines or tenets as literally contained in all its articles. Those two churches and the complainants knew all this in 1828, when he was elected pastor, and that he did not believe the Augsburgh Confession in all its articles, but only as a system of doctrines, and so far as they agreed with the Holy Scriptures. At that time neither these churches or their members, or the complainants, held or pretended to hold, the Augsburgh Confession as a standard of faith and doctrine, or to have adopted it as such. By the constitution of the Ministerium, every church managed its own affairs spiritual and temporal; and this form of government was observed by all the Lutheran Churches in the United States, until the adoption and recommendation by the General Synod of the "Formula," before mentioned.

The answer admitted the organization of the Hartwick Synod, composed of these two churches in Sharon, with others, and that these two remained members of that synod, from its organization to May, 1837, and until they united with the Franckean Synod, as charged in the bill. It denied that the connection with the Hartwick Synod was illegally or forcibly terminated or broken off, or by any unlawful or heretical acts, or contrary to the will or against the remonstrance of any member of those churches. The answer stated, that shortly previous to the organization of the Franckean Synod, and early in 1837, the members of the churches were notified and assembled for the express purpose of dissolving their connection with the Hartwick Synod, and to appoint delegates to attend a

convention to form another Evangelical Lutheran Synod, which they had a perfect and legal right to do. The members so notified and assembled, without a dissenting voice, appointed delegates to meet in convention, with a view to the forming and organizing another synod.

That in 1831, the Hartwick Synod became a member of the General Synod, and has ever since been a member thereof. It united in pursuance of a resolution passed September 27, 1831, by which it adopted the "Formula recommended by the General Synod." Until this time, the "Formula" was unknown among the churches of the Hartwick Synod. The answer denied that this connection was with the approbation of all the churches under the Hartwick Synod, or that any church gave its individual consent or approbation thereto.

The answer admitted the ministry of Henry Moeller and Adam Crownse in the two churches, as stated in the bill. But it alleges that they preached and taught the same doctrines and tenets preached and taught by Philip Wieting during his ministry, from the year 1828 to the present time.

Mr. Wieting was first elected pastor for five years, and he was re-elected in 1833. He did not, at or previous to his re-election, profess to preach or teach other doctrines than he had theretofore preached and taught in those churches, and while a member of the New-York Ministerium, and his doctrines were conformable to those taught by Lutheran churches in the United States. Previous to his re-election, he openly declared, and it was well known to all the members of the churches, and to the complainants, that he did not believe or profess to believe or preach the Augsburgh Confession of Faith in all its parts and articles ; and with their knowledge, he also altered certain articles in copies of the Augsburgh Confession, and circulated the same among the members of these churches. He has, during his pastoral charge, always upheld and supported the known and established constitution, government, and discipline of said two churches, according to those of the Evangelical Lutheran churches in the United States. The answer admitted the agreement between the two churches and Wieting, as stated in the bill. It denied that the subscriptions to pay

his salary were made upon the belief that he should preach or teach the doctrine or tenets according to the Augsburgh Confession in all its parts, or that he would maintain the connection between the churches and the Hartwick Synod, or the General Synod, or that he was to preach any other doctrines than he had preached or taught during his five years previous charge, which are the fundamental doctrines of the bible, and are the principles and system of faith declared in the Reformation. His ministry, preaching, and doctrines met with decided and unusual approbation of the complainants, as well as the other members of the churches.

On the 24th of May, 1837, at a convention held pursuant to regular previous notice, composed of ministers and delegates representing the two churches in Sharon, and several other churches, a synod was organized by the name of the Franckean Synod of the Evangelical Lutheran Church, Mr. Wieting as pastor, and two lay delegates representing the church at New Rhinebeck, represented these two churches in that convention. The synod was organized according to the usage and practice of forming synods among Lutheran churches in the United States ; and is composed of ordained ministers, licentiates and delegates of the churches united with it. It adopted a constitution, containing a declaration of faith. Nothing was said at the convention about the Augsburgh Confession ; and neither the synod or its members have abandoned said Confession any more than they had done before. They did then, and do now, believe it as far as it agrees with the bible, and they never disputed it as a system or summary of doctrine. The defendants denied that the declaration of faith in the said constitution, is a new declaration of faith, or has been adopted in the place or stead of the Augsburgh Confession.

It exhibits a system or summary of fundamental and evangelical doctrines, and was never intended to set forth all the different points or views of doctrine which are professed and believed by the ministers and churches in connection with the synod. They denied that it was a rule or standard of faith or practice, or possessing any authority over, or required to be subscribed by, any minister or adopted by any church in the synod,

or to be subscribed to by any minister on being licensed or ordained, or in the admission or reception of members in the churches. It is considered and received "as a summary exhibit of the system of doctrines" held to and inculcated by Lutheran churches. They denied that it contained any thing contrary to the summary of doctrines contained in the Augsburgh Confession ; or that the constitution contains any rules or restrictions different from, or wholly unknown to the long established constitution, government or usages of the Evangelical Lutheran churches in the United States, unless in so far as it discountenances intemperance and the traffic in human flesh. That the " Formula" was unknown until 1820, and is an innovation.

It is provided in the Franckean Constitution, that no minister shall be a member of the synod who shall not sign the pledge of total abstinence from intoxicating liquors as a beverage, or who is a slave-holder, or traffics in human beings, or advocates the system of slavery as it exists in these United States. The defendants denied that it said any thing relative to slavery as authorized by the constitution and laws of the United States ; and they said they do not admit that slavery is authorized by the constitution or laws of the United States.

The defendants say they fully believe and acknowledge the doctrine of the Trinity in its fullest extent, according to the views of the Reformers, and as it is inculcated in the first article of the Augsburgh Confession, which article is correctly stated in the bill. That the 2d subdivision of the 12th article of the constitution of the Franckean Synod is not essentially variant therefrom, and is as follows : (See this article quoted at large in the opinion, *post.*)

This the answer insisted was essentially the doctrine of the Trinity, believed by the whole denomination of Lutherans. They denied that their declaration is essentially or otherwise Unitarian, or that a Unitarian could adopt it without a deviation from his principles.

They admitted that the divinity of Jesus Christ is a cardinal and fundamental doctrine of christianity, as professed and taught by Evangelical Lutheran churches. They aver that it

is professed, believed and taught by the ministers and churches of the Franckean Synod; that the 2d and 4th subdivisions of the 12th article of its constitution, taken together, fully declare and inculcate the divinity of Jesus Christ and his equality in power, dominion and glory with God the Father; and its declaration of faith is essentially opposed to the system of doctrines professed and taught by the Socinians. And taken as a whole, it expressly affirms and declares not only the divinity of Jesus Christ in its fullest extent, but inculcates and teaches the great fundamental and cardinal doctrines of the atonement and justification by faith, which are essentially opposed to the doctrines of the followers of Socinius.

That although the 4th subdivision of the 12th article does not in terms contradict any point of doctrine contained in the 3d article of the Augsburgh Confession, they admit that it does not affirm and declare all that is contained in that 3d article. In declaring the great and cardinal doctrines of redemption, atonement and justification by faith, as set forth and inculcated in their constitution, it was intended to avoid the absurd, unscriptural and inconsistent doctrine, taught as they believe by the 3d article of the Augsburgh Confession, that God was crucified, or that Jesus Christ, as well in his divine as in his human nature, suffered, was crucified and died, as a sacrifice for sin. And they admit that so far as the doctrine that Jesus Christ, in his divine nature, " suffered, was crucified, dead and buried," is taught by the said third article, they do not believe it, but they do believe that in his human nature only, Christ suffered, was crucified, dead and buried, as a sacrifice for sin.

They always have believed, and professed to believe, that Jesus Christ, the Son of God, is both God and man, the human nature is man, the divine nature God; that " God was in Christ Jesus, reconciling the world unto himself." And Mr. Wieting has always during his pastoral charge, before, during, and ever since the year 1837, preached and taught the divinity of Jesus Christ, and his equality with the father in its fullest extent, and his preaching, during all his term, has been so received and has been approved of, and was satisfactory to the members of the said two churches.

They denied that Mr. Wieting ever publicly or otherwise declared that he and those who adhered to him, severed their connection with the Hartwick Synod, or formed the Franckean Synod, or adopted the Franckean declaration of faith, because they did not or could not believe the doctrines of the Augsburgh Confession of Faith, or that their principal objection to the Hartwick Synod was that they held that Confession for their creed.

The defendants affirmed that Mr. Wieting officiates as pastor, in accordance with the wishes, approbation and consent, of a large majority of the members of these churches. They denied that either of the two church edifices, or the property or funds of either of them, have been at any time during his pastoral charge, perverted, or diverted from the purposes or objects for which the edifices were originally founded, or the property acquired, or in defiance of the rights of the complainants, or any of the members of those churches.

They denied that the two churches were founded, organized or incorporated, by persons who had adopted the faith and doctrines as they are declared in the Augsburgh Confession in all its parts and articles; or for the sole and only purpose of having such faith and doctrines preached, taught and promulgated therein; or that it is a violation of the uses or objects for which the funds, property or effects of the corporations were originally intended, to permit them or the incorporations to be used as they now are applied and appropriated.

There was a replication to the answer, and the parties proceeded to take proofs.

The complainants proved and read, as a part of their case, "The History, Doctrine and Discipline of the Evangelical Lutheran Church; by George Lochman, A. M., Pastor of the Lutheran Congregation at Harrisburgh," published in 1818. The second Part of Dr. Lochman's work, commencing at page 79, is thus entitled :

"Part II. The Doctrine of the Evangelical Lutheran

462          CASES IN CHANCERY.

Kniskern v. The Lutheran Churches of St. John's and St. Peter's, and others.

Church, containing The Augsburgh Confession, with explanatory notes and remarks."

At page 81, the writer says, "The Lutheran doctrines must therefore be taken only from the latter writings of Luther. Their symbolical books are, The Augsburgh Confession, The Apology of the Confession, The Short and Larger Catechism, and the Smalkalden Articles. See Luther's works and Cyclopædia, art. Luther."

At page 83, Lochman says, "5. The Augsburgh Confession contains twenty-eight chapters or articles. Some of them, however, only point out the errors and abuses that occasioned their separation from the Church of Rome. Presuming that such articles would be of little use to Christians of our days, we have contented ourselves with translating and making remarks on such only as are esteemed essential and necessary to salvation. And as there are some articles not at all mentioned in the Confession, and only to be found in the other symbolical books, it was considered necessary also to lay them before the reader."

Part III. of Dr. Lochman's work is entitled, "The Discipline of the Evangelical Lutheran Church," and it states the Judicatories of the Church, substantially as they are set forth in the bill, except that there is no reference to the General Synod, which was not then in existence.

The complainants also produced in like manner, the printed proceedings of the first session of the Hartwick Synod, held at Johnstown on the 24th of September, 1831. It thereby appeared that Mr. Wieting was present as a member from the Sharon churches, the Rev. John D. Lawyer from Sand Lake, the Rev. Adam Crownse from Guilderland, and the Rev. Thomas Lape from Johnstown, besides others. The Rev. George A. Lintner was elected President, Mr. Lawyer Secretary, and Mr. Wieting Treasurer, for the ensuing year.

The proceedings of the convention by which the Synod was formed, were read to the Synod.

A committee to whom sundry letters were referred, reported that a coalition with the General Synod of the Evangelical Lutheran Church, would be desirable and highly beneficial to

the interests of their Church, and they most earnestly recom-- mended it to the consideration of the synod. A resolution was thereupon offered, and after a discussion and full expression of the views of the members, was unanimously adopted, in these words :

" Resolved, That this synod unite itself with the Evangelical Lutheran General Synod of the United States of North America, and adopt the Formula for the government and discipline of the Evangelical Lutheran Church recommended by said synod."

On motion of Rev. Mr. Wieting, " Resolved, That the Formula for the government and discipline of the Evangelical Lutheran Church, be published by this synod under the direction of the Secretary, and that one thousand copies be printed."

Resolved, That this synod be divided into two conferences, to be called " Eastern and Western Conference."

The Rev. G. A. Lintner, and the Hon. William C. Bouck, were unanimously elected delegates to represent the synod in the next Convention of the General Synod.

Further proceedings were reported as follows :

The ceremony of Licensure was then performed, and two applicants were admitted as Licentiates, on giving their assent to the questions required by the constitution.

" The Rev. Licentiates, Thomas Kilmer and Samuel S. Klein, then presented themselves before the altar for the solemn rite of ordination. The Rev. President gave an impressive charge to the Licentiates, and then proposed the questions required by the constitution; and having solemnly upon the bible, received their answers in the affirmative, they kneeled and were duly set apart and ordained as ministers of the Gospel of our Lord Jesus Christ after the apostolic example, by prayer and the imposition of hands of the ministry."

The pamphlet is authenticated by the certificate of " John Depeyster Lawyer, Secretary."

The complainants also produced in like manner, " The Doctrine and FORMULA for the Government and Discipline of the Evangelical Lutheran Church, published by order of the Hart-

464 CASES IN CHANCERY.

Kniskern v. The Lutheran Churches of St. John's and St. Peter's, and others.

wick Synod, 1832." This book, in the first place, contains the first 21 articles of the Augsburgh Confession, under the head of " Articles of Faith."

The Formula is divided into chapters. The 1st chapter declares that the Evangelic Lutheran Church in America is governed by three judicatories; the council of each individual church, the district synods, and the General Synod. The powers of the latter are only advisory. (Chap. 21 treats further of the General Synod.) The 3d chapter says the pastors are amenable to the synod to which they belong. The church council consists of the pastor, and all the elders and deacons of a church, and it has the superintendence of the temporal as well as spiritual concerns of the church; and provisions are made for an appeal from its decisions to the synod. Pastors are elective by two-thirds of the electors in the congregation.

Special conferences are recommended to be held by district divisions of a synod. Their duties are spiritual and advisory.

In the *Ceremony of Licensure*, (chap. 18,) the candidate is required to declare his belief that the fundamental doctrines of the word of God are taught in a manner substantially correct in the doctrinal articles of the Augsburgh Confession; and to promise submission to the Formula and its rules.

The same profession and promise are required on ordination. (Chap. 19.)

The complainants also produced in like manner a pamphlet entitled, " Minutes of the Fourth Annual Session of the Hartwick Synod and Ministerium of the Evangelical Lutheran Church in the state of New-York, convened in the Lutheran church, Guilderland, Albany county, on the 6th to 10th of September, A. D. 1834."

It appeared, that among the members who took their seats as ordained ministers, were the Rev. Messrs. Lintner, Crownse, Wieting, and Lawyer.

Report No. 2, as it appeared in the minutes, was from the committee appointed to examine the minutes of the seventh session of the General Synod, and contained the following among other things, viz :

" Several valuable publications have lately been issued under

the direction of this Synod." "Schmucker's Popular Theology is a recent work, and indicates great talent, a good judgment, and a penetrating mind; exhibits sound doctrine and a clear and scriptural illustration of the subjects discussed. It ought to be the next in rank to the bible, in the library of every Lutheran."                        P. WIETING, Ch. Com.

"XII. Resolved, That this cheering and interesting report be adopted."

"Report No. 3, on Hartwick Seminary. The committee on Hartwick Seminary beg leave respectfully to report." (After sundry matters, it proceeded thus :)

"Upon the whole, your committee would say that the institution at Hartwick can confidently be recommended to all parents and guardians as a most excellent place to educate their sons.                        "A. CROWNSE, ⎰ Committee."
                        "P. WIETING, ⎱

"XIII. Resolved, That this report be adopted."

It appeared that on the election of delegates, the secretary was chosen the delegate of the body, to attend the next annual meeting of the New-York Synod; and the Rev. Mr. Lawyer and three others were elected delegates to attend the next session of the General Synod.

The pamphlet also contained the following proceedings.

"Licensure and ordination, Wednesday, September 10th, Rev. J. D. Lawyer preached.

"Mr. M. J. Stover presented himself at the altar as a candidate for licensure. Having obtained from the president a knowledge of his duty, receiving at the same time a solemn charge, and having given upon the bible the pledges required by the constitution, he was licensed until the next annual session of the Ministerium.

"Candidates Rev. A. F. A. Rumpf and William H. Watson were next invited to the altar for ordination.

"The Rev. President apprised these brethren," &c., "and then received from them upon the Holy Bible, the sacred pledges required by the constitution."

Appended to the pamphlet is the "Course of classical studies adopted by the Board of Trustees of Hartwick Seminary, Au-

gust, 1834." And in the theological course for the third or Licentiates year, the symbolical books are prescribed for the second and third terms.

The complainants in like manner, proved and read a pamphlet, entitled,

" Proceedings of a Convention of Ministers and Delegates from Evangelical Lutheran Churches in the state of New-York ; convened in the chapel, in Fordsbush, Montgomery county, May 24, 1837." From which the following are extracts, or matters therein appearing.

" Pursuant to a resolution of the Western Conference, the ministers and delegates from a number of the churches in the state of New-York, assembled this day in convention, for the purpose of organizing another synod in the Lutheran Church.

" The following ministers appeared and took their seats as members of the convention, viz., " Rev. Philip Wieting, from Sharon, John D. Lawyer, from Sand Lake, William Ottman, from Canajoharie, L. Swackhamer, from Manheim.

" The following brethren then produced their credentials, were enrolled as delegates and took their seats, viz.,

" New Rhinebeck church, Martin Marcley, John C. Schultz," &c.(*a*)

" The Convention now being ready for business, Brother P. Wieting then read the circular letter which had been sent and addressed by him as chairman of the Western Conference to ministers and churches in this state, by which this Convention was called, and which stated that the object of the same was to take into consideration the expediency of forming a synod in the Lutheran Church, and in which was presented some of the reasons for a new association.

" Resolved, as the sense of this convention, that it is a solemn and imperative duty now to form another synod in the Evangelical Lutheran Church."

A committee consisting of Mr. Wieting and others was thereupon appointed to draft a constitution.

" After recess Br. Wieting, from the committee, reported a

---

(*a*) These persons were defendants in the suit.

constitution for the government of the synod. The report was first read entire, after which the proposed constitution was read and taken up by articles and considered, section by section, and having progressed in the same as far as Article XII. Sec. 6, and the hour of half past six having arrived, it was, on motion,

"Resolved, that the Convention adjourn until to-morrow.

"Thursday, May 25, 1837. The Convention proceeded to the further consideration and discussion of the constitution. And after some time spent, and having been altered and amended in sundry places, the constitution was finished. It was then again read entire, and finally passed and was unanimously adopted as the constitution of the Synod in form as follows :

"Constitution.

"Article 1. The titles and powers of the Synod.

"1. This association shall be called the Franckean Synod of the Lutheran Church."

Then followed the constitution, including the declaration of faith.

On motion, a committee was appointed to prepare and publish in behalf of the convention, an address to the churches. Messrs. Wieting, Schultz, &c., were appointed. The same pamphlet contains the Journal of the First Session of the "*Franckean Synod of the Lutheran Church*, convened at Fordsbush, Montgomery county, N. Y., May 25, 1837."

J. D. Lawyer was chosen chairman, and Philip Wieting appointed secretary.

Mr. Wieting appeared as the minister, and J. C. Schultz as the delegate from Sharon, and Martin Marcley appeared as a commissioner from New Rhinebeck.

On the election of officers for the ensuing year, Mr. Lawyer was chosen President, and Mr. Wieting secretary.

The proceedings of the Convention and Synod were signed by those officers, and 400 copies ordered to be printed and apportioned by the secretary.

The REV. ADAM CROWNSE, a witness for the complainants, testified to the following effect. He is a clergyman of the sect known as Lutherans, and has been such for 17 years. The Augsburgh Confession of Faith, is the known and accepted

creed of the Evangelical Lutheran Chnrch ; and he has never known or heard of any other creed being received or adopted in that church. According to his understanding of the opinions of the church, a departure from the fundamental principles of that Confession, would be considered a heresy. Mosheim's History is regarded as a work of authority in respect of Church History generally. He knows all the parties, and the churches in question ; and he was born and brought up within two miles of St. John's church at Durlach. He was the pastor of those churches from some time in 1823 till April, 1828. During that time, the Augsburgh Confession was regarded as containing the fundamental rules and doctrines adopted by the congregations. It was formally adopted, as translated by Lochman, at a convention of the two congregations in 1825 or 1826 ; and the proceedings annexed to a copy of the Confession were attached to the book of records of each church. It was regarded and adopted prior to this, so far as he knows and believes. The last seven articles of the Augsburgh Confession, contained the reasons for quitting the Romish church, and are not usually published in modern times, it being deemed unnecessary. The first 21 articles contain the religious doctrines of the church. When a member is taken into the Lutheran church, he is required to declare his belief in that Confession as containing the fundamental doctrines of the bible. Lochman's work is a correct general statement of the doctrines and discipline of the Evangelical Lutheran church.

The "*Formula*" contains generally, the doctrines of the church, as adopted by the Hartwick Synod. The copy produced in evidence was published in pursuance of a resolution passed at the first meeting of that synod after its organization.

In 1836, at a meeting of the Hartwick Synod, Mr. Wieting, expressed to the witness, his doubts or disbelief of some of the points in the Augsburgh Confession, and his desire to have it altered at that meeting. He objected to the article concerning original sin, holding forth the idea, that man would not be condemned for original sin alone. He objected also to the articles relative to the Lord's Supper, Baptism, and Auricular Confession,

The Franckean Synod is not in communion with the Hart-wick, or the General Synod. He knows of no church or synod, save the Franckean, claiming to be Lutheran, that has set up or promulgated a new declaration of faith. Mr. Wieting succeeded him as the pastor of these churches; and there has been no other Mr. Wieting attached to the Hartwick Synod.

On his cross-examination, Mr. Crownse testified that he derived his information as to the Lutheran Church, principally from Mosheim's History; and from March's History, a more condensed work.

When the congregations in Sharon adopted the Augsburgh Confession, he was a member of the New-York Ministerium, which had not exhibited it, and did not expressly bind to its articles. He had it adopted in these churches, lest some one unsound in doctrine, might come among them.

The General Synod of the United States was formed October 22d, 1820, and the "*Formula*" was first adopted by the General Synod. The copy of the Augsburgh Confession in the Formula is a correct translation from the original, he believes. He has not compared them of late. In 1837, he was one of a committee of the Hartwick Synod, which published a new edition of the Augsburgh Confession, with notes, which witness identified, and the defendants put it in evidence. This Confession is the same substantially as it is printed in the Formula. The difference in words, is owing to the fact that the original Confession was both in Latin and in German, and each has been translated at different times. The one published in 1837 is as near a verbal translation from the German as can be.

When the Confession was adopted in these churches, it was after public notice, and there was near a majority of the male members present. At that time there were more than 100 communicants in each church; and the witness had circulated in the congregations, copies of Lochman's translation.

The Symbolical Books of the Lutheran Church, are the Augsburgh Confession, with the Apology, Articles of Smalkald, Luther's Larger and Shorter Catechisms, and the Formula of Concord. It was first organized as a church about the

year 1552. It has never, as a church, formally adopted the Augsburgh Confession.

Neither the Pennsylvania Ministerium, or the Tennessee Synod, or those in Ohio, are united with the General Synod. The New-York Ministerium was not, until 1838 or 1839, and they then refused to adopt the Formula. The Tennessee Synod have adopted the whole 28 articles of the Confession.

The witness, as well as Mr. Wieting, was ordained by the N. Y. Ministerium, and neither of them were then required to subscribe to the Augsburgh Confession. One reason assigned for forming the Hartwick Synod, was that the N. Y. Ministerium had no acknowledged confession of faith. Another was, that their ministers were supposed to be tainted with Socinianism, Arianism and Universalism. The ministers who formed the Hartwick Synod, separated from that Ministerium. Mr. Wieting was present when it was formed.

The Unitarians deny the proper deity of Jesus Christ. Lutherans hold that there is one God, in three distinct persons, equally powerful, equally eternal—the Father, the Son, and the Holy Ghost. They believe that the divine nature of Christ, with the human nature, gave efficiency to the work of redemption, comprehending his sufferings, death and resurrection ; but how far the divine nature was connected with the human, and participated in Christ's sufferings, we cannot tell. The Lutherans do not believe, so far as the witness knows, that the divine nature of Jesus Christ died. We believe his two natures were inseparably united, bacause the Scripture so teaches.

They believe the doctrine of original sin, as stated in the Augsburgh Confession. They also believe that infants are saved for Christ's sake, and not for their own sake.

The Lutherans do not believe in Christ's real bodily presence at the communion ; the witness believes Christ is spiritually present.

On being re-examined, the witness testified that he did not, prior to 1830, know of a Lutheran Church or body, which did not regard the Augsburgh Confession as exhibiting the doctrines or faith of their church. There were some ministers in the N. Y. Ministerium who, prior to that time, did not so receive

it. The Rev. Henry Moeller was the pastor of these churches about 16 years before the witness became pastor. When the witness was taken into the church, Mr. Moeller, in his preparatory lectures, referred to the Augsburgh Confession.

The Rev. Thomas Lape, a witness for the complainant, testified that he was a minister of the Evangelical Lutheran Church, and was licensed in 1827.

The Elements of Popular Theology, by S. S. Schmucker, D. D., and Professor of Christian Theology in the Lutheran Theological Seminary at Gettysburgh, Pa., is a standard work in that church.

Mr. Wieting attended the fourth session of the Hartwick Synod.

(In regard to the Augsburgh Confession, its being the creed of the Lutherans, the Symbolical Books, the doctrine of inherited sin, and the salvation of infants, and his mode of licensure in the New-York Ministerium, this witness agreed with Mr. Crownse.)

. At the session of the General Synod, held at Chambersburgh, Pa., in June, 1839, a resolution was adopted, reciting that the persons composing the Franckean Synod were introducing practices which the General Synod considered contrary to the word of God, and thereupon disapproving of the same, and cautioning the Lutheran churches to beware of the efforts of those persons. (A copy of this resolution, certified by the secretary, was proved. The whole testimony was objected to by the defendants, as an ex parte proceeding, and in various respects, improper.)

Cross-examination. Some of the articles of the Augsburgh Confession are deemed non-essential. Among those deemed essential, are the articles relative to the Trinity, the Deity of Christ and of the Holy Ghost, the Fall of Man, the Atonement, and Justification by Faith, &c.

The Lutheran Church was first organized or constituted in 1537.

The New-York Ministerium was formed in 1796, and it was the first ecclesiastical organization of Lutheran churches in this state.

Rev. THOMAS FRASER, a clergyman of the Protestant Reformed Dutch Church, a witness for the complainants, testified that in that church, the doctrines of the Trinity in Unity, the divinity of Jesus Christ, and his equality with God the Father, and that original sin condemneth all unless repented of, are cardinal doctrines.

All the foregoing witnesses testified that the Franckean declaration of faith, adopted in 1837, does not declare or affirm the doctrine of Trinity in Unity, or the divinity of Christ, or his equality with God the Father, or that inherited sin is of itself damning.

MARTIN SIMMONS, a witness for the complainants, testified that he was 70 years of age, and belonged to the Reformed Dutch Church. He was present some 40 or 50 years ago, at the dedication of the church in question, at Durlach. Mr. Krotz was the minister who dedicated it. After he finished his sermon, he stated to the congregation, " Be this house dedicated unto the Lord, an Evangelical Lutheran house of prayer, in which the gospel is to be preached, and the sacraments of baptism and the Lord's Supper to be dispensed, according to the Augsburgh Confession." The dedication service was in German. The house had then been newly built. There were two other ministers present, Mr. Ernest and Mr. Wieting.

JOHN A. STROBECH, testified in behalf of the complainants, that he was 77 years of age, and has been a member of the Rhinebeck or lower church for 47 years. To the best of his understanding, the Augsburgh Confession, was always considered by the members of that church as the ground work of the Lutheran doctrine, and the old members always adhered to it. It was considered the confession of faith of their church at Rhinebeck. The witness was one of the trustees when the church was built. It was raised in 1799. He contributed towards the building, and it was for the purpose of having the Lutheran doctrine preached according to the Augsburgh Confession. The church at Durlach was built the year before the other. Mr. Moeller was first settled over these churches in July, 1806.

On his cross-examination, he testified that in 1805, the Pres-

byterians purchased one half of the Rhinebeck church, and had preaching there half the time for two years and a half, when the Lutherans bought it back. The witness was chosen trustee three times, and served seven years. His means of knowing of the adherence of the members to the Augsburgh Confession, was from instructions he received from his father and old men that belonged to the Lutheran church. His father died in March, 1809. He cannot tell what that Confession is, and he never read it, though he reads German a little. He thinks he heard his father read it, but he did not then understand it. The church was bought back from the Presbyterians, because their minister did not preach Lutheran doctrine, and preached controversial sermons.

GEORGE LONGINHELEDT, a witness for the complainants, testified, that he was 82 years of age, and belongs to the congregation of the upper or St. John's church. He became a member of the Evangelical Lutheran church in Germany in his 13th year, and he has been in this country almost 60 years. He first united with St. John's church, in Mr. Moeller's time, at least 30 years ago, and he has been an elder four years. The Augsburgh Confession was always the confession of faith of that church and the one at New Rhinebeck, and was regarded by the members as containing their fundamental principles. The members, when they were admitted, were required to profess their belief in and adherence to it. He recollects the Rev. Mr. Sommer that preached in the Lutheran church in Schoharie, and has heard him preach. Mr. Sommer adhered to the Augsburgh Confession, and witness heard him explain it to the young people who were going to join the church.

On his cross-examination, he said Mr. Sommer preached a long while at Schoharie. It was from 43 to 50 years ago, when witness heard Mr. S. When he joined the church at Durlach, he was required to declare his assent to the Augsburgh Confession.

JOHN C. MOELLER, testified in behalf of the complainants. He is a physician, is 52 years of age, and a member of St. John's church. His father was formerly the pastor of these churches.

Shortly before the organization of the Franckean Synod, Mr. Wieting stated from the pulpit in St. John's church, his reasons for separating himself from the Hartwick Synod. He said previously, that he did not believe the Augsburgh Confession, it was an antiquated thing, unfit for the present age. He disapproved of its second article, and said he did not consider original sin condemning. He also objected to the article relative to the Lord's Supper. At a subsequent meeting of the church to elect officers, Mr. Wieting said that the Hartwick Synod held to the Augsburgh Confession, and no one could be admitted into that body without subscribing it. On this occasion he objected to the articles of the Confession relative to original sin, baptism, the Lord's Supper, confession and absolution, and the ministry.

In January, 1838, the witness and several others, joined in a protest against separating from the Hartwick Synod, and declaring their adherence to the Augsburgh Confession. This was delivered to Mr. Wieting, or the elder presiding at a church meeting, when it was proposed to take a vote on the separation.

In 1839, Mr. Wieting said he had consented and approved of closing the doors of the lower church against Dr. Lintner, a clergyman of the Hartwick Synod in good standing. The witness has heard three of the defendants, in 1838, express their decided disapprobation of the Augsburgh Confession.

On his cross-examination. Mr. Wieting, in stating his objections to the Augsburgh Confession, did not make any to the first article. His objection to the 2d article was that it condemned infants to everlasting punishment; he did not believe original sin condemning. As to the 10th article, the witness understood him to hold that the bread and wine were emblematical as commemorative of the death and sufferings of Christ.

NICHOLAS RUSSELL, a witness for the complainants, testified, that he has been a member of the Lutheran Church of Cobleskill, since 1811. He has always considered the Augsburgh Confession, as the fundamental doctrines of that church. So far as he knows, it has always been considered as the confession of faith of the Lutheran Church in America. In May,

1840, the defendant, Angle, one of the deacons in the Rhinebeck church, told the witness that the Franckeans had put the Augsburgh Confession entirely aside, and held to the bible, and nothing but the bible.

On his cross-examination, he said he was admitted a member of the Lutheran Church in St. Paul's church, in Schoharie. Nothing was said at that time, about the Augsburgh Confession; but previously on his applying for admission, he asked Dr. Wacherhagen, the then minister, for the articles of faith of the church, and he delivered the confession to the witness as such articles. The witness read them and assented to them, and was thereupon admitted. Ten years before that, when his brother and sister, with others were admitted as members, the Augsburgh Confession was read to them in the church by the minister, as containing the faith of the church.

The defendants proved and read in evidence the printed copy of the Augsburgh Confession, with notes, published in 1837 by a committee of the Hartwick Synod, and mentioned by Mr. Crownse.

The note to the second article insists that it does not apply to infants, and it was never so held by the Lutheran Church. The note to article 9th, declares that it does not say baptism is a saving ordinance, but that it is necessary. Of article 10th, the note says that the Church now holds that the Lord's Supper is a commemoration of the sufferings and death of Christ, and in it every worthy communicant receives the body and blood of Christ, under the emblems of bread and wine.

The defendants also read from the notes of Dr. Lochman on the same points.

They proved and read in evidence the journal of a special meeting of the Franckean Synod, held October 5, 1837. In this it was stated that the word *Evangelic* was omitted by mistake in printing their previous proceedings, and their title is "The Franckean Synod of the Evangelic Lutheran Church."

The President, Mr. Lawyer, delivered an address, extracts from which were published in the journal, pursuant to a resolution of the synod.

The principal causes and objects which led to the formation of the synod, are thus stated.

1. To license pious intelligent men, sound in the faith, although they may not be classically educated, or have pursued a regular theological course.

2. To admit none into the ministry who are unacquainted with experimental religion.

3. To license applicants in the recess of the synod.

4. To prevent the admission of unconverted persons as members of the church.

5. To restore to the churches the ancient form of government and discipline of the Lutheran Church.

In reference to the charge brought against them, of having renounced the Lutheran Confession of Faith, and formed a new declaration of faith in its stead, the address thus speaks :

" I presume by the Lutheran Confession of Faith, our accusers mean that we have rejected the doctrines of the Lutheran Church."    *    *    *    " Let me ask, then, what are the doctrines of the Lutheran Church ? Are they not taught in the Holy Bible ? I believe, they will be found in the following summary statement, viz. : The inspiration of the Holy Scriptures ; one God, in a divine Trinity ; the apostacy and natural depravity of man ; the divinity, incarnation and atoning sacrifice of the Son of God ; the necessity of regeneration and sanctification ; the agency of the Holy Spirit and instrumentality of the word of God, in conversion ; justification by faith ; the purity and obligation of the moral law ; the ordinances of Baptism and Lord's Supper ; the general judgment ; eternal life of the righteous, and the endless punishment of the wicked. These are doctrines taught in the bible. These are fundamental doctrines of the Lutheran Church, and these are the doctrines contained, and clearly and distinctly taught in the declaration of the Lutheran faith, published by this synod, and which we believe and teach. How unjust, then, and unfounded is the charge that we, as a body, have renounced the doctrines of the Lutheran Church.

But this charge is also intended to convey the idea that we have renounced the Augsburgh Confession. This too, we

declare, is entirely destitute of truth. What proof is there to substantiate this point? Where in all our proceedings is there one word found about or against the Augsburgh Confession? Let the place be marked. We have waged no war against that instrument. We have left it where it is, and just as it is. And we do deny that we have *formed* any thing in its *stead*, or as a substitute for it. The declaration of faith, published by this synod, contains doctrines plainly revealed in the bible, and so far as the Augsburgh Confession agrees with the bible, so far it agrees with our declaration. Our declaration contains the doctrines which we believe, and not those *points* which we do not believe; neither do we say that it contains all that we believe, as being taught in the bible.     *     *     *     *

"We must, therefore, deny the charge that it is a *new* declaration of *faith*, unless it can be made to appear, that declaring and publishing the doctrines of the bible are *new*." "Our declaration needs no explanations to be understood, but is plain and explicit. Let it therefore be remembered, that we have *formed* no *new* declaration, and that the declaration of faith of this Synod, is not in the *stead* of the Augsburgh Confession, or any other Confession, but is a summary and perspicuous order of such doctrines of the bible, as are taught and inculcated by the evangelical body of the Lutheran Church.     *     *

"And now, if I am asked whether we believe all that is contained in the Augsburgh Confession, or in the doctrinal articles of the same, in all its points and parts; we do frankly and candidly declare, that we do not. Let me ask do our accusers? Do the great body of Lutheran ministers and people in the United States? So far as that instrument agrees with the bible, we do heartily believe it, and wherever it comes short of, or goes beyond the bible, we, as Protestants, do not receive it."     *     *     "We do therefore again declare, that we do not receive and adhere to the Augsburgh Confession, complete, entire and in *all points* of doctrine. Some are manifestly unscriptural. That Confession inculcates baptismal regeneration; private absolution; baptism a saving ordinance; the real body and blood of Christ present in the Holy Supper."

The address quotes from a sermon preached in 1831, by Dr.

G. B. Miller, a professor in the Hartwick Theological Seminary, the following :

"Speaking of the authority of creeds, he says, page 8 : 'Another course is sometimes pursued ; that is to take the words of the creed, not in the *bona fide* sense which they were *meant* to convey, but as they may be *explained ;* or ought I not rather to say *tortured* to mean. To exemplify my meaning, let me refer you to the Augsburgh Confession. No one, competent to judge, will *deny* that it contains the two following positions : That *no one who should die without having receiving baptism can be saved ;* [art. 9,] and that in the Lord's Supper [art. 10,] we *actually,* not *symbolically,* or *figuratively,* but ACTUALLY receive the body and blood of Christ; *the same body that was slain, the same blood that was shed on the cross.* Now few of our ministers, and few of our people, I am bold to say, in this country at least, hold such a belief. Yet such is the language and *meaning* of the Augsburgh Confession. To say that the words may be differently understood, is only to say that the Augsburgh Confession is not in all its parts the creed of many who yet call themselves LUTHERANS, and *I candidly acknowledge that I am of that number.'* To which we respond, Amen."        *         *         *

The defendants also proved and read in evidence the "Constitution and Standing Ordinances of the Franckean Evangelic Lutheran Synod, together with a Discipline recommended as a guide for the government of Churches," adopted in 1838, and published by order of the Synod in 1839.

The Constitution contained thirteen articles, of which the 12th is entitled, "Declaration of Faith—the Holy Scriptures."

The second section is entitled, "Of God and Creation ;" the third, "Primitive state of man and his apostacy ;" the fourth, "Jesus Christ and Redemption ;" the seventh, "Of the Holy Ghost and Sanctification." (These sections are set forth at large, and stated in the opinion of the court.)

The system of church government and discipline is that of independent churches, the synod being only advisory. The publication set forth a liturgy, or forms for baptism, confirmation, the Lord's Supper, ordination and installation. Also

standing resolutions in favor of *total abstinence* from intoxicating liquors, the *Christian Sabbath, Moral Reform,* and *Peace;* and against *American Slavery,* and the superiority of bishops.

In other respects, the form of government and discipline, was similar to those set forth in the acknowledged publications of the Lutheran Church.

The defendants also read in evidence, from a religious newspaper, printed at Fort Plain by a committee of the Franckean Synod, the extract from Dr. G. B. Miller's sermon, before stated. Also, some of the articles of the constitution of the Franckean Synod, as amended in June, 1838.

The following testimony was given by witnesses for the defendants.

MARCUS SHAFER said he was 82 years of age, and was present at the dedication of St. John's church by the Rev. Mr. Krotz. Heard all that was said, but nothing about the Augsburgh Confession. Does not remember whether the services were in German. On the language being repeated to which Martin Simmons testified, he said Mr. Krotz mentioned it all, except as to the Augsburgh Confession. He is a Methodist now, but was a Lutheran for 40 years. He was taken into the Lutheran Church 50 or 60 years ago, by old Dominie Sommer, at Schoharie. He was not required to subscribe to or profess the Augsburgh Confession, and has no remembrance of any person ever being required to do so when admitted. Mr. Moeller did not require it in St. John's church.

Cross-examined. He does not recollect any particular words in which the dedication of St. John's was performed, or any portion of the sermon. Mr. Ernest, a minister, was there. He does not remember whether there was any sermon besides that of Mr. Krotz. He was required to repeat the catechism, and he and all members admitted, promised to the faith contained in it. The catechism is in German, and is in the hymn book, called the "Marburg Hymn Book." He never heard of any other standard of faith in the Lutheran churches, except that taught in the catechism.

HENRY FRANCE is 74 years of age, and was present at the

dedication. It was 40 years ago, or more. The dedication sermon was preached by Mr. Krotz. He thinks he was present throughout, and heard nothing said about the Augsburgh Confession. He was then a Lutheran. Was taken into the Church by Mr. Sommer, at Cobleskill; was required to learn the catechism, but not to profess the Confession; and nothing was said about it as he remembers, either on his admission, or that of others. He has been present when Mr. Moeller admitted members. He has been a Methodist for about 20 years.

Cross-examined. The dedication sermon was preached in German. He heard no dedication after the sermon, and does not recollect any words of the sermon. There was but one sermon that day. (The witness gave evidence similar to Shafer's, as to the use of the catechism, and professing to believe it, &c.) He has heard his father speak of the Augsburgh Confession, but the witness did not understand it.

ANDREW LOUCKS is 78 years of age, and was present at the dedication of St. John's by Mr. Krotz and Mr. Wieting, (father of the defendant, W.) The latter preached the second sermon, and Mr. Ernest preached the last sermon. It was over 40 years ago. The sermons were in German. He cannot say which of them preached the dedication sermon. He was then a Lutheran, and was present at the whole service. He does not recollect that any thing was said about the Augsburgh Confession. He was admitted a member by Mr. Sommer, in Schoharie, about 55 years ago, and is confident nothing was then said to him about the Augsburgh Confession.

Cross-examined. He cannot say whether he heard a dedication of the church distinct from the sermons. He does not recollect any portion of Mr. Krotz's or Mr. Wieting's, but he does remember some part of Mr. Ernest's. He withdrew from the Lutheran Church 30 to 40 years ago. (He agreed with Shafer, as to professing and learning the catechism on admission.) He has seen a large German bible which contained the Augsburgh Confession, and he has read it.

DAVID FRANCE, is 67 years of age, and was present at the dedication of St. John's. It was upwards of 50 years ago. Mr. Krotz dedicated it, and preached the first sermon. Witness

was present the whole time Mr. Krotz officiated. The Rev. Mr. Wieting and Mr. Ernest were present. There was something said like this, " This house is dedicated to the Lord, and it shall be a house of prayer," but he does not recollect that the Augsburgh Confession was mentioned. He was a Lutheran, and had read that Confession, and been acquainted with it from a boy. The defendant, Wieting, has always administered the ordinances of baptism, and the Lord's Supper, just as Mr. Crownse did previously in these churches ; and witness has observed no difference between his preaching as to doctrines since the Franckean Synod, and that before.

Cross-examined. The dedication sermon was in German. Witness never knew the Augsburgh Confession to be the standard of faith in the Lutheran churches in his vicinity. He always thought the bible was their standard of faith. He studied the catechism in the Marburg Hymn Book, and was examined in it, before his admission into the church, which was by Mr. Krotz in August, 1795.

The Rev. DAVID OTTMAN is 45 years of age, and is a minister of the Lutheran Church in connection with the Franckean Synod. According to the history of that church, it has never formally adopted the Augsburgh Confession as its standard of faith and doctrine ; nor is it the practice of the Lutheran churches in this country to require a belief in it on admission, unless it be in the Tennessee Synod.

Mr. Wieting has preached the same doctrines since, as he did before the foundation of the Franckean Synod. Witness has heard him preach frequently, both before and since. And both in public and private, Mr. Wieting has as well before as since, expressed a firm belief in the doctrine of the Trinity, and in that of the divinity of Christ. The present constitution of the Franckean Synod was adopted in June, 1838.

Cross-examined. The witness was licensed by that synod on its organization in May, 1837, and was ordained in June, 1838. The constitution and declaration of faith adopted in May, 1837, were published by that synod, and were circulated and distributed. Difficulties arose between the members of these two churches, in five or six months after the circulation of

that declaration. Witness does not know that there was any declaration of faith of these churches, except the bible, previous to the Franckean constitution. He thinks the Augsburgh Confession contains the cardinal doctrines of the Evangelical Lutheran Churches. Members on admission, were not required to profess a belief in or adherence to that confession, either by Mr. Moeller, Mr. Crownse or Mr. Wieting. They learned Luther's Catechism, and were questioned upon it.

The doctrine of the Trinity, is one of the cardinal doctrines in the Lutheran Church. Trinitarians believe in three persons in the unity of the Godhead. He thinks that doctrine is implied in the Franckean declaration of 1837, but not expressly declared ; that it does not hold forth a trinity of names only, and that it does distinctly avow that God the Son, and God the Holy Ghost, are equally powerful and eternal with God the Father. There is nothing in that declaration opposed to the doctrine of the trinity. It is not a cardinal doctrine of the Evangelical Lutheran Church, as is set forth in the Augsburgh Confession, that original sin condemneth all who are not born again of water and of the Holy Ghost. A great majority of the Lutheran churches do not hold that original sin thus condemneth all. The Franckean declaration does not affirm that inherent sin is condemning; and it is a doctrine of theirs, that no person is punished for original sin alone. The amended form of the Franckean articles of faith was put forth in 1838, because the doctrines of the Trinity were not so expressly, distinctly and fully disclosed as we wished to have them.

Re-examined. The Augsburgh Confession contains many points of doctrine, which a great majority of the Lutheran Churches in the United States, do not profess to believe ; such as the death of the divine nature of Christ, consubstantiation, absolution, auricular confession, and that original sin is damning. Lochman's note to the 2d article of the Augsburgh Confession, corresponds with the Franckean doctrine on inherited sin. The second subdivision of the declaration of faith adopted in 1838, fully declares the doctrine of the Trinity, and subdivisions 2 and 4 taken together, fully declare the divinity of Christ, and his equality in power and glory with God the Father.

The Free Will Baptists, are considered orthodox, but as appears by a treatise on their faith, they do not declare the personality of the Son or the Holy Ghost, but it is implied.

The Rev. JOHN D. LAWYER, stated from history the origin of the Augsburgh Confession. The Lutheran churches in this country have no connection with those in Germany, and they adopted the independent form of government; and there is no judicatory, except in each individual church.

(The witness stated many things relative to the foundation, &c. of the General Synod, their Formula, the New-York Ministerium, the Hartwick Synod, and the Franckean Synod, which have been set forth heretofore.)

Witness was licensed in 1825, and ordained in 1827, by the New-York Ministerium. He was not, nor was the defendant Wieting, when ordained, required to subscribe to, or profess his belief in the Augsburgh Confession. There are some points in that Confession which many Lutheran ministers consider as relics of Roman Catholic doctrines, such as the real presence; baptismal regeneration; allowance of private confession and absolution; also the union of the Supreme Divinity with the humanity of Jesus Christ, that in his death God died.

The Hartwick Synod, by a resolution, united with the General Synod, in September, 1834. It was not done by the churches in their individual capacity.

Mr. Wieting has always professed as minister, and in private, his firm belief in the doctrine of the Trinity. Witness has known him 18 years. The Franckean declaration of faith, adopted in 1838, fully establishes that doctrine. The word Trinity is not a scriptural term. So far as witness knows, Mr. Wieting and all the ministers and members of that Synod, profess their belief in the divinity of Christ, and his equality in power and glory with God the Father. Their declaration of faith, declares and inculcates that doctrine. The Franckean Synod have never abandoned the Augsburgh Confession. They profess their belief in it as a system or summary of doctrines, but they disagree with the views contained in some of the articles. The Franckean declaration of faith was intended to exhibit a summary of essential and fundamental evangelical doctrines,

not all the doctrines taught by the scriptures. Their ministers are not required to subscribe to the declaration. It fully exhibits the cardinal doctrines of atonement, and justification by faith, and it is essentially opposed to Unitarianism.

Cross-examined. The Augsburgh Confession contains the cardinal doctrines of the Evangelical Lutheran Church. One of these cardinal doctrines is, that there is a distinction of three in the Godhead, distinguished by theologians by the name of persons, called God the Father, God the Son, and God the Holy Ghost. The 2d subdivision of the Franckean declaration of 1837, does not declare or affirm three persons in the Godhead, nor that the Son and Holy Ghost are equally powerful and eternal with the Father. By putting his own construction on the article, one who confines the glory and attributes of divinity to the Father alone, might subscribe to it. The article is defective in not fully stating the distinction in the Godhead as it regards the different divine agents, and on this account it was amended to express it more fully and explicitly. The divinity of Christ and his equality with the Father, are made out in the witnesses construction, by subdivisions 2 and 4, but it is not so explicit on account of the defect in subdivision 2 before stated. That original sin condemneth all, is not a cardinal doctrine among Lutherans; but it is considered as damning by the Augsburgh Confession.

The witness drew his own call as a preacher at Sand Lake, in which there was a reference to that Confession of Faith.

The Franckean declaration was adopted with a view to set forth essential doctrines of the bible, and to avoid stating those points which the members did not believe as stated in the Augsburgh Confession.

Re-examined. The second subdivision was amended so as to state more fully the doctrine of the Trinity in a correct and scriptural manner. Not that any of the members had any doubt on the subject at the formation of the synod, but the proceedings of the convention were then somewhat hurried, and several things were subsequently amended.

PETER BROWN, heard a conversation between one of the defendants, Mr. Sweatman and Dr. Moeller about August, 1837,

in which the latter said, "We do not adhere to, or believe in the Augsburgh Confession any farther than you do—we believe just alike."

PETER S. CROSS, conversed with Dr. Moeller on the same occasion, and Dr. M. said he did not believe the articles relative to baptism and the Lord's Supper.

The complainants witnesses were examined in September, 1840, and March and April, 1841. The defendants witnesses were examined in June, 1842.

The cause was argued by *Samuel Stevens*, for the complainants, and *Henry Hamilton* and *Marcus T. Reynolds* for the defendants.

*S. Stevens*, for the complainants.

I. The property in question was devoted to the support of the gospel ministry, according to the tenets of the Evangelical Lutheran Faith.

II. The creed, or leading doctrines of that church, are declared and set forth in the Augsburgh Confession of Faith.

I will discuss these propositions in connection.

Our witnesses prove that these were churches which had adopted the Augsburgh Confession from their earliest foundation. The most that is shown by the counter testimony, is that the applicants for admission were only required to learn Luther's Catechism, which is substantially the same. It was formally adopted under Mr. Crownse's ministry. It was the confession of the denomination of Christians known as Lutherans. The Encyclopædia of Religious Knowledge, (Appendix, page 1259,) in the article, "Lutherans in the United States," says, that the Augsburgh Confession is the acknowledged articles of faith of the Lutherans, wherever found. The same book states their judicatories, as established in America, precisely as they are alleged in the bill. Mr. Crownse testifies to the same effect.

The land in question, was granted to these churches when

they professed these doctrines ; and the same is true of the contributions for building the church edifices. They were bestowed for a Lutheran church having as its standard, the Augsburgh Confession of Faith.

III. The defendants obtained possession of the property in question, by accepting the office of trustees, to apply it to and for the uses, purposes and objects of the support of that particular faith or doctrine, and are bound so to apply it.

It is proved that the defendant Wieting was employed as one holding that faith.

IV. The doctrine or faith of the Franckean Synod established and adhered to by the defendants and others, is a departure from the essential articles of faith of the Lutheran Church as declared, promulgated and taught by the Augsburgh Confession of Faith.

1. In regard to the doctrine of the Trinity. That Confession sets it forth as consisting of *three persons,* not of three names. It is one of the mysteries of our faith, that there are three persons in one Godhead.

Now read the Franckean declaration of faith adopted in 1837. There is no Trinity declared in it, nor that there are three persons. It says God is called by three names, and he is made known by three names ; just as he was made known to the Israelites, by three names ; God, Jehovah, Jah.

The Unitarians hold the same doctrine as this in the Franckean declaration. They admit that Christ is divine, and is the son of God, but deny that he is equal with the Father. (*Encyc. of Rel. Knowledge, Art. Unitarians.*)

In 1838 the Franckeans framed a new creed, and they now say that in the one God *there is a distinction of three,* and that *he is revealed as the* Father, the Son, and the Holy Ghost. It does not hold out that there are *three persons,* and those three but one God ; and in this it differs from the ancient and cardinal doctrine of the Trinity.

2. The Augsburgh Confession declares the equality of the Son with the Father, in power and glory. (*Lochman,* 90.) The Franckean declaration, (and subd. 4 is the same in 1838 that it was in 1837,) declares that Christ is the only begotten

son of God, and is the only Redeemer, and is now exalted at God's right hand, to intercede for the human race. And this is all. Why, the Unitarians and Socinians believe this too. The whole tendency of their faith is to Unitarianism.

Taking subd. 2d, as amended in 1838, with the 4th, they profess that the Father and the Son, are inseparably connected. This is not denied by Unitarians. That they possess the same essence. The same is true of this, and Socinius agreed to it. That they are equal, and alike infinite and immutable in all natural and moral perfections. The Unitarians assent to this also. But neither sect admit that the Son is equal to the Father in power and glory.

Why, after the troubles which followed their declaration in 1837, was all this screwing, to use words appearing to bring into it the doctrine of the Trinity, but not effecting the object?

3. The effect of inherited or original sin, is plainly declared in the second article of the Augsburgh Confession. (*Lochman*, 86.) It is no answer to this to say, that the doctrine of the article would condemn an infant who died before it had any moral perceptions. It was to teach the doctrine of this article, that the property in question was given. Now turn to subd. 3d of the Franckean declaration. It in no respect conforms to the Augsburgh Confession. Indeed, it does not profess to declare what is or will be the effect of inherited sin.

4. So in regard to the Lord's Supper. The tenth article of the Confession, (*Lochman*, 105,) expresses the divine presence in the same language and sense which our Saviour used when he instituted it, and gave the bread and wine to his disciples.

The Franckean Synod treat it as merely commemorative, like the celebration of the 4th of July.

5. The disruption from the Hartwick Synod, could only be effected by unanimous consent of all the members of these churches. Their right of appeal could not thus summarily be cut off.

6. There are other new doctrines, to support which the defendants pervert these funds. They are Abolitionists, and require a temperance pledge from their ministers. What right have the defendants to interpolate these notions as a part of the creed or government of these churches?

488                    CASES IN CHANCERY.

Kniskern *v.* The Lutheran Churches of St. John's and St. Peter's, and others.

If they had remained in the Hartwick Synod, could they expel or excommunicate a member for omitting to join the fanatics against the South, or for refusing to sign the pledge ?

V. The appropriation, by the defendants, of the property which they thus held in trust, to the support of the faith, and to promulgate the doctrines of the congregations adhering to the Franckean Synod, is a violation of the trust reposed in them, and of their duty as such trustees, and a misapplication of the trust fund, which entitles the complainants to relief in equity.

The law of this case will be found in *Davis* v. *Jenkins,* (3 V. & B. 151;) *Attorney General* v. *Pearson,* (3 Mer. 353;) *Folley* v. *Wontner,* (2 J. & W. 245;) *Bowden* v. *M'Leod,* (1 Edw. Ch. R. 591-3.)

It makes no difference, that the property was contributed by various persons and in small sums. Here there is no conflict in the testimony as to what these churches were till Wieting came among them. They were Lutheran churches, holding to the Augsburgh Confession. And there is a trust in this property, for the support of that Confession, which a court of equity will enforce.

VI. The defendants should be removed as trustees and required to account for the trust property misapplied by them, and they and those, (if any,) who have succeeded them as trustees, should be restrained from diverting the trust property from the objects and purposes of the trust, as originally created.

VII. The defendants should be decreed personally to pay to the complainants the costs of this suit.

*H. Hamilton,* for the defendants.

It is a material inquiry, whether the confession of faith set up by the complainants, is repugnant to the Scriptures or not. If it be, the court will not permit the erroneous doctrines to be promulgated, even if the property were granted for their support. *The Baptist Church in Hartford* v. *Witherell,* (3 Paige, 304.)

In truth, there is no difference of doctrine or belief between these parties ; and there was no dissenting voice in these churches to the proposition to join the Franckean Synod.

8. The Franckean declaration contains all the doctrine of the Trinity, and all the words, except "person;" and that word was never used in reference to the Trinity until the 4th century with it. It declares that the Father, the Son, and the Holy Ghost, are equal and alike, infinite and immutable *in all natural and moral perfections*. Do not those perfections include *power and glory?* Then take the 4th subdivision, in connection with these! In the Theological Class Book, by William Cogswell, p. 17, the natural and moral perfections of God are defined. His natural perfections, are self-existence, eternity, immutability, omniscience, omnipotence, omnipresence, independence and unity. His moral perfections, are goodness, wisdom, holiness, justice, mercy, and truth.

As to the total abstinence and anti-slavery tenets, there is no evidence to show that they are a departure from the ancient usages. There are no English and no German churches entered. As to the doctrines preached in these churches, the preaching and administration of the ordinances have been precisely the same, from the time Mr. Moeller commenced preaching there in 1806 or 1808, till the present day. The complainants do not complain, but that Mr. Wieting preached according to their notions till 1837, and there is no proof of his preaching differently since, or ever against the Augsburgh Confession. Therefore there is no proof of any departure or perversion in the preaching. His, of the Reformation, the Reformation. The deed of the land, expresses nothing as to particular objects, or that it is to maintain any doctrines or usages. It is an absolute deed, and not one providing that the doctrines of the Lutheran church are always to be preached, or any particular form of government upheld. At that time there was no organized church in that congregation. Then they sold half of St. John's church to the Presbyterians; these old sticklers for the Augsburgh Confession! Why, Strobeck, their only witness who speaks of old people talking of it, (and he not very credible,) could not understand the Augsburgh Confession when it was read to him! The New-York Ministerium, by which all these ministers

were licensed, did not unite with the General Synod till 1838, and then refused to adopt the Formula. The oldest synod of Lutherans in the United States, that of Pennsylvania, never unite with it: The real objection to us is, not because we have departed from, or disbelieve the Augsburgh Confession, or the Lutheran doctrines; but because we would not go with the Hartwick Synod.

I. Our first point is, that the Augsburgh Confession of Faith, has never been adopted as the standard of faith of the Lutheran churches in the United States. The German Protestants were not known as a Lutheran Church, until 1537 or later. (Salmon's Geog. Grammar, 163—4.) This was after the Apology had been drawn up by Melanchthon, and after the league of Smalcald. The Augsburgh Confession, mean time, had been altered by Melanchthon.

Which of those before us is the altered, and which the unaltered? There are five English and one German edition, and they all differ. The two published under the direction of Hartwick Synod, differ from each other. According to their published notes to the Confession, we do not differ from them in our view of original sin. Dr. Schmucker's view and ours agree exactly, in this, and also in regard to baptism. (Schmuck. Popular Theology, 197; and see Lochman, 101.)

The bible is the only standard of faith in the Lutheran Church, and no other was ever adopted by it. (D'Aubigne's Hist. of the Reformation, 56; 4 Mosheim's Eccl. Hist. 274, § 2, 1st Amer. ed.) ·Schmucker's Pop. Theol. 41 to 43, says the Augsburgh Confession was *professed* by the Lutherans in Europe, and was regarded by their churches in the United States; but that no minister is bound to believe every thing in it, but only the fundamental doctrines.

The complainants do not believe in the damnation of infants, or in the real presence, or that baptism is necessary to salvation.

Lutherans generally have not believed these doctrines. *Lawyer* v. *Cipperly,* (7 Paige, 281.)

It appears by 2 Robertson's Charles V., 279, 2d Am. ed., that the Augsburgh Confession did not contain the real views of the

Reformers themselves. So Mosheim, (2 *Eccl. Hist.* 275, *note a,*) says that Melanchthon's love of peace, carried him beyond the truth, and made strange concessions to the Church of Rome, in the Apology. The Confession itself, from the same cause, contained much Roman Catholic doctrine.

The last 7 articles which set forth the Romish abuses, are not adopted by the Lutherans here. (Schmucker, 336.)

So Dr. E. L. Hazelius, an eminent Lutheran of this day, in his Discipline and Articles of Faith of the Synod of S. C., (p. 8. 20, 21. 24,) shows the temporising of the Reformers in the Confession, and that some parts of it are contrary to the bible, and are not adopted in the American churches; such as the articles as to auricular confession and the real presence. He says too, the bible is the only rule of faith and practice for the christian.

In regard to the actual appropriation of the 150 acres, and the church edifices. The mode of proof as shown in Russell's testimony, is very weak. Strobech's ignorance of the Confession, renders him incompetent to prove that others held it, or that the church adopted it.

Mr. Crownse, the most talented man in Hartwick Synod, was pressed to say it was *adopted.* He could only say it was received, or accepted, or regarded. He had it adopted in the churches, because it was not the standard before. The New-York Ministerium had never exhibited it, and it was not their standard. And Mr. Crownse disbelieves part of it. Both Schmucker, (p. 41,) and the Formula, (p. 31. 70. 73,) show that the profession, in regard to it in their churches, is limited to licentiates, and does not include members.

It was never adopted or professed in these churches till 1825, never in the Schoharie church, and was not professed by Crownse, Lape, Wieting or Lawyer, when they were licensed.

Then Mr. Lape. He *regards* the Augsburgh Confession, &c. And so do we. He says some of the 21 articles are non-essential. Have we not the same right to judge of that?

As to what occurred on the dedication. Simmons is contradicted substantially by four others, who were then Lutherans, and Simmons was not. And after 40 years, he attempts to

repeat the words used; He testifies to an utter improbability, and impeaches himself. David France knew what this Confession was; and if it had been mentioned, he would have noticed it. The Augology. "The Creed itself was ....

It was too late at the dedication, as well as in 1825, to prescribe the creed for these trusts. And there is no witness who goes back far enough to prove what it was in 1789. The persons who formed Hartwick Synod were seceders; and we have the same right to secede from that synod. There was no assent of these churches to forming Hartwick Synod, or to its union with the General Synod. Confession has the occasion. Dr. G. B. Miller's sermon, proves that the modern Lutherans do not believe the two articles of the Augsburgh Confession relative to the real presence, and the necessity of baptism. History shows that the altered Confession really contained the principles of the Reformation. Yet these complainants go for the unaltered Confession. The church edifices.

II. The ministers and members of the Lutheran Churches generally, in the United States, are not required to subscribe to or profess their belief in the Augsburgh Confession of Faith, as to all the doctrines contained in the first 21 articles. M

The Ohio and Tennessee Synods are the only exceptions. The fact in this state, prior to the Formula, is proved by all the testimony; and the subsequent acts of the synods cannot affect our rights. Ministerium had established even

Buck's Theol. Dict. Appendix, No. 5, p. 1, article Lutheranism, says their public teachers now enjoy an unbounded liberty of dissent from the decisions of those symbols or creeds, which were once deemed almost infallible rules of faith and practice. It was never alleged on the

III. The question, whether or not the defendants are orthodox, can only be determined by the proper ecclesiastical tribunal, and cannot be decided by this court. Then Mr. Lep.

By what standard is this court to judge on the conflicting evidence of what the true doctrine is? Its visitorial powers does not extend to religious incorporations. (2 Rev. Stat. 462, § 57; 3 Paige, 303; 7 ibid. 281.) It is the congregation, not the trustees, who by the law, call the minister and fix his

salary. The prayer of the bill cannot be carried out. It requires the court to take into its keeping, the consciences of that congregation. How can the court compel them to fix the salary or to pay it? Which Augsburgh Confession will it decree to have preached, and which construction of it? *The churches are required by the bill to account.* To whom, and how? They are defendants, and the complainants are not trustees. And as to directing a re-union with Hartwick Synod, the court may just as well direct a re-union with the New-York Ministerium.

There must be a plain and palpable abuse of power in the defendants, to authorize an interference. The case of *The Trustees of the Organ Meeting House* v. *Seaford,* (1 Dev. Eq. Rep. 453,) is directly in point. It was there decided, that the views of the majority should control, as long as they kept within the limits of christianity. The deed there was for the use of the congregation.

IV. The deed from Mr. Sommer and others to Johannes Schaver and others, in trust for the congregation of Cobleskill and New-Durlach, is absolute and unconditional, and founded on a valuable consideration paid, and the church or congregation have a right to use or dispose of the property thereby conveyed, for any lawful purpose.

The sale to the Presbyterians, in 1805, was therefore valid, and when it was reconveyed, there was no provision or trust for the Augsburgh Confession, or even the Lutheran faith.

V. Parol evidence is inadmissible to show that such deed was given upon any other trust or condition than what is expressed in it. *Jackson* v. *Sill,* (11 Johns. 201.)

VI. There is no proof that the consideration money mentioned in the deed, or raised to build the two church edifices, was raised or paid on condition that the gospel was to be preached or sacraments administered according to the Augsburgh Confession of Faith.

The name *Lutheran,* is merely a name of distinction. They might have professed Presbyterian doctrines under that name.

VII. Neither the formation of the General Synod; nor the

adoption of a new form of church government; nor the adoption of any declaration of faith since March 9, 1789, the day of the date of the deed; can in any manner impair or prejudice the rights of the defendants acquired under that deed.

There is no authority shown as to church government, in the churches in this country, which goes back to 1789.

VIII. The adoption, by the General Synod, of the "Formula," was an innovation upon the ancient and acknowledged usages, government, and discipline of the Lutheran churches in the United States.

IX. The act of the General Synod, in passing a vote of censure on the Franckean Synod, (which was not then a member of the General Synod,) was ex parte, without jurisdiction, and void ; and the copy of the resolution introduced to prove such vote was improperly received, and ought to have been rejected by the examiner. It was not properly authenticated. The Formula itself, (p. 84,) requires that it be signed by the president. This is signed by the secretary only.

X. The complainants are confined to the specifications or particulars in which they allege in their bill, the defendants have seceded or departed from the Augsburgh Confession, and cannot show that the defendants have abandoned it in other particulars. Those specified, are the Trinity, the divinity of Christ, and original sin.

As to the two former, the question in the Franckean declaration is limited to that of 1838. The proof is, that Mr. Wieting professes and preaches both, and there is no evidence to the contrary. As to the word *person*, it is not applicable to the doctrine. It applies to human nature only, and means an individual human being, as is shown by the dictionaries.

As to original sin. We assent to their interpretation of the Augsburgh Confession. As the article there reads, all agree it is wrong. And the bill, in this respect, is not sustained by the proof. And see Lochman, 80, 81 ; Schmucker's Notes to Article 2d of the Confession ; D'Aubigne's Hist. 270, 342, 362.

*M. T. Reynolds*, for the defendants.

Luther himself, was the last man to impose upon the churches

which assumed his name, the obligation that is sought to be imposed upon us by this bill. He came to no such results as to preclude improvements, and he had no such confidence in himself. (*Lochman*, 84.)

He was the author of this immutable creed, which is no more perfect in the doctrines than in the ceremonies. (*Lochman*, 80.) Was he perfect in and after 1530?

The evidence shows that the Lutheran Church does not hold to the Augsburgh Confession literally, and it never has been a *sine qua non* to admission. The church is not called Lutheran because they adopt Luther's doctrines. So of the Calvinists; the term is applied by their opponents as one of reproach, now that they are no longer Calvinistic.

There is at this day no difference of opinion in this state among the Lutherans. The complainants say they believe the articles of the Confession as they are, admitting of a certain interpretation. We say we believe their interpretation.

The belief of both is exactly the same. The founders and donors of these churches, had no reference to Hartwick Synod, nor was it within their anticipation.

The adoption of the Augsburgh Confession in 1825, was long after the foundation; and neither the churches or the property could be thus fettered by Mr. Crownse. The adoption was a departure, a palpable innovation. It could have been shown that the founders did not believe in its tenets; and a bill to set it aside, might have been sustained. If right in adopting it, they could certainly set it aside.

Lochman 85, note 1, shows the Franckean Synod has adopted expressions used there as common among Lutheran divines.

As to the case of *Gable* v. *Miller*, before the late assistant vice-chancellor, (the German Reformed Church case, mentioned by the court,) some of the views taken are not correct.

This country will never maintain the doctrine, that religious creeds, stereotyped 50 or 60 years ago, are to control for all time to come. If so, it is not in the power of all combined to change them.

A contrary doctrine in Europe has led to a single universal

legislative proscription, to sweep away the property and estates, whenever there was a change in their religion. Our church corporate property, which is acquired under a general deed, for the use of the corporation or church, without restrictive words or limitation to a particular faith or doctrine, may be appropriated to the use of the church, and by a majority in any form they please. It is so in this case. The deed is unrestricted. The church can change its tenets, and carry the property with it. The fund is confided to their discretion, for the use of the church or congregation. The congregation is not restricted in its use.

Here there are four dissentients, in two churches. If they succeed, the administration of the Gospel there must cease. The judgment of the church, as to its use, as well as the use of the church, is to be considered; and the discretion under the deed is unlimited. The donors expected that succeeding generations would do what they deemed right with the property. If it were given for a particular belief, there is no evidence that we do not believe as the donors did.

The utmost limitation is, that while a reasonable number of the local congregations remain of that persuasion, the property shall be used for that purpose. If this is not the law, where is the property to go, if the Lutherans all die, or all change to some other persuasion? A further limit is, that it shall be kept for general religious purposes. This is the very utmost, and it is difficult to carry it so far.

The allegation here, is a mere naked departure from a few points of the Augsburgh Confession. And the case shows that we must ultimately come to the legal principles which I have stated ; or else violence will result whenever an entire change occurs in the views of a church or sect.

*S. Stevens*, in reply.

If trusts like these were to depend on the consonance of the faith of the parties with the Scriptures, every judge would decide according to his own tenets ; and no point could ever be deemed determined.

There is no such rule that the will of a majority shall govern in such cases. The law is well stated in the late assistant

vice-chancellor's opinion in *Gable* v. *Miller*. And see the *Attorney General* v. *Pearson*, the case of Lady Hewley's Charity, and *Field* v. *Field*, (9 Wend. 394.) The consequence of such a rule would be to leave all property held by religious corporations unprotected by the law of the land.

There are two points in the case which must determine it.

I. Was the property in question devoted to the support of Evangelical Lutheran Churches according to the Augsburgh Confession of Faith ?

*First.* The deed conveyed the land in trust for the use of a Lutheran congregation. The Organ Meeting House case, cited on the other side, was not like this. The *Dutch Church* v. *Mott*, (7 Paige, 77,) shows that this deed was for a charitable and pious use, and such use must be observed.

*Second.* The doctrine of these churches at that time. Every distinctive church has a confession of faith, which shows what doctrines they believe the bible inculcates and teaches. Hence the different denominations of christians.

We show that the Augsburgh Confession was the confession of faith of the Lutherans here as well as in Europe. It is a mere equivoque of the defendants to say it must be *adopted.* No new congregation setting out as Presbyterians or as Lutherans, ever formally adopts the old standard of their sect. It is sufficient to show that the confession is received, accepted, understood. 4 Mosheim's Eccl. Hist. 89, says the Augsburgh Confession was adopted as the creed of the followers of Luther. The Encyc. of Rel. Knowl. and Schmucker say the same thing.

No more is claimed for any creed than that it be substantially professed and believed. The Confession accompanied by notes was adopted by the Lutheran churches here to show what they understood by these articles. Because portions of the church, as in the New-York Ministerium, differed on some points, it was none the less the confession of faith of the Evangelical Lutheran Church. If that Ministerium did not formally exhibit or adopt it, it does not show but that they received and regarded it. And if they had repudiated it, the fact would not

prove that it was not the confession of faith of the Lutheran Church.

But it is said the bible is the standard of that church. So it is of every denomination. Carry out the argument, and a majority may make a Lutheran Church to teach Universalist doctrines. The parol evidence proves that the Augsburgh Confession was the confession of these churches. It shows what ministers and members said of it long ago ; and it proves the dedication of one of the meeting houses conformably to it.

In 1825, on its adoption, it became their faith, if never before ; and a majority could not afterwards repudiate it. Unanimity is requisite to do that.

As to the church government—History proves it as stated in the bill. But if we are wrong in that, here by unanimous consent we became part of the Hartwick Synod, and entitled to its benefits. The proceedings of that synod as proved, in which Mr. Wieting was conspicuous, show this, and also show that the Augsburgh Confession was their principal creed. A majority cannot dissolve this synodical connection. The case of *Denn* v. *Bolton*, (7 Halsted, 206,) was an attempt to recede from a Dutch Reformed Classis, and is decisive against the attempt here.

It is like any compact among many persons. It requires all to unite in rescinding it.

II. Next have the defendants perverted this property from the trusts for which it was given ?

After denying that the Lutheran Church holds to the Augsburgh Confession, they next say, " We believe in it as much as you do." Is that so ? In a meeting of the churches, Wieting avowed that he did not believe in it. He then got up a new synod, and a new declaration of faith. They must be judged by their public declarations and their acts.

I ask the court to look through their declaration adopted in 1837. We have proved that the words of it are not technical, but used in their ordinary sense. They answer us by saying, 1. It is Trinitarian. We say there is no such thing professed in it. 2. That it was altered and made full in 1838. To this we say, it was wrong in 1837 to separate us from the Hartwick

Synod, and establish this doctrine ; and it is no answer that in 1838 they took it all back. They did not restore us to our connection with that synod. And for a year at least, they used our funds to support Unitarian doctrine. Suppose they had waited till this time to correct their creed. The false doctrines would have been maintained and disseminated.

Then as to their reformed creed of 1838—A Unitarian would say to it, "I do not consider God's natural and moral perfections to be properly expressed in W. Cogswell's pamphlet."

The doctrine is not clearly and unequivocally expressed, as it should be in a creed on a cardinal doctrine. The word *person* should have been used. It is used in all real Trinitarian creeds.

This Franckean creed does not declare that there are three persons in the Godhead. "Perfection" is not the same as "attribute." The latter relates to power. Perfection has no reference to power. The defendants had no right to change the words of the Augsburgh Confession. If they mean the same thing, they should let the old words stand. As to original sin, the Augsburgh Confession corresponds with the bible. It is a reasonable interpretation of it, that infants are saved by the atonement. The Franckean declaration in effect says that original sin alone condemns nobody.

But it suffices if we show a departure in one particular. The severance from the Hartwick Synod was enough.

THE ASSISTANT VICE-CHANCELLOR.—Before entering upon the points of difference between the parties in this unhappy controversy, I will state briefly the history of the churches in question, and advert to the principles on which courts of equity exercise their jurisdiction in such cases.

FIRST. These churches, together with that in Cobleskill, were in existence as one church as early as the year 1787, and were probably organized many years before. They doubtless had their origin in the emigration, in the early part of the eighteenth century, from the Palatinate in Germany. Dr. Schmucker, in his Retrospect of Lutheranism in the United States, (page 11, &c.) says, that one hundred and fifty families

of those driven from the Palatinate by Romish intolerance, set-
tled in Schoharie, in the year 1713. As might be expected
from their origin, these churches were of the religious denomi-
nation known as "*Lutherans*." In 1789, the society was de-
signated by the name of " *The Lutheran Congregation of
Cobleskill and New-Durlach* ;" and it is conceded that the
church was then organized as an " *Evangelical Lutheran
Church*."

On the 9th of March, 1789, one hundred and fifty acres of
land at New-Durlach were conveyed in fee by the Rev. Mr.
Sommer and others to three persons as trustees of the church
by its name before mentioned, and as expressed in the deed,
"for the common use and benefit of the said Lutheran Congre-
gation forever."

A church edifice was built at New-Rhinebeck, about the year
1798, and one at New-Durlach the next year, by private sub-
scriptions and donations of the members of the congregation
who worshipped at those places, and by other means. It appears
that the latter was dedicated about the year 1800. In 1799,
the branch of the congregation worshipping at New-Rhinebeck,
became incorporated under the statute of 1784, by the name of
" The Ministers and Trustees of the Lutheran Church in Rhine-
beck." And in 1808, the branch of the congregation which
worshipped at New-Durlach, became incorporated under the
statute of 1801, by the name of "The Trustees of the Evan-
" gelical Lutheran Church of St. John's, at Durlach, in Sharon."
The remaining part of the original Lutheran church of Cobles-
kill and New-Durlach, was incorporated as a separate church
at Cobleskill, and does not enter into this litigation.

The land which was bestowed upon the parent congregation,
in 1789, was divided in the year 1808, the Cobleskill church
taking fifty acres in severalty, and the two churches at New-
Durlach and Rhinebeck retaining the residue in common.

From that time to the present, the two latter churches, al-
though distinct corporations and societies, have held these
lands, with some other property acquired by similar donations,
as a common fund for the support of the gospel in their con-
gregations ; and have united in the employment and payment

of a minister or pastor, who officiated alternately in each church. And the church edifices erected in their respective bounds, have continued to be used for the worship of God by those congregations exclusively, from the time they were built until the present day, except for a short period nearly forty years since, during which the Presbyterians owned the half part of one of the church buildings, and occupied it for half the time. The controversy in this suit relates to the temporalities belonging to the two churches of Rhinebeck and New-Durlach.

These churches were first attached to the New-York Ministerium, an association or synod of Lutheran churches in this state and its vicinity, formed in 1796. It does not appear when the two churches first became connected with that body, but it was prior to 1820. Mr. Moeller was their pastor from about the year 1806, till 1821 or 1822. Mr. Crownse succeeded him in 1823; and the defendant, Wieting, succeeded the latter in 1828. Mr. Wieting's engagement was renewed for ten years in 1833. Both Mr. Crownse and Mr. Wieting were licensed and ordained to preach by the New-York Ministerium, and all the pastors of the two united churches were ordained and installed as Evangelical Lutheran clergymen. A General Synod of Lutheran Churches in the United States was organized in 1820, and the New-York Ministerium afterwards united with the General Synod, but I do not learn from the testimony that it was while these churches were a part of that synod. And most of the Lutheran synods in the United States, were subsequently attached to and made a part of the General Synod.

In 1830, the Hartwick Synod was formed out of the New-York Ministerium, and these churches became a part of that synod, by the general assent of the two congregations, and without any objection, so far as it appears. In 1831, the Hartwick Synod united itself with the General Synod of Lutherans in the United States ; (these churches then forming a part of that synod,) and adopted the Formula and Discipline established by the General Synod. Mr. Wieting, as pastor of these churches, participated in the organization of the Hartwick Synod, and its union with the General Synod, and continued in connection with them until 1837.

In 1837, Mr. Wieting, acting with a majority of the congregations in both churches, and also with a majority of the vestry and trustees of each church, severed their connection with the Hartwick Synod and the General Synod of the United States; and uniting with several other congregations dispersed through the central part of the state, formed a new synod, which in honor of one of the most distinguished Lutheran divines of the last century, they denominated The Franckean Evangelic Lutheran Synod, and they adopted and published a constitution in which they set forth, amongst other things, their declaration of faith, and their system of church government and ordinances. In 1838, this new synod adopted an amended constitution, containing their system and declaration of faith, in somewhat different terms from that published in 1837.

The two churches in question, under the control and direction of the defendants, continue their connection with the Franckean Synod. The complainants, who are members of these churches, and one of them a trustee, adhere to the Hartwick Synod.

SECOND. I will next speak of the principles which govern courts of equity in cases of this kind.

They proceed on the ground of *a trust;* and their aim is to ascertain its scope and objects and to enforce its proper and faithful administration. The jurisdiction is environed with greater difficulties than that over the ordinary private trusts which come under our review, by reason of the uncertainty which frequently prevails, as to the precise objects and intentions of the donor. The inquiry often arises after a great lapse of time, when no living witness can inform the conscience of the court, and when its search for truth must be made in history, and in the controversial writings of contemporaries of the donors. The course of the administration of the trust, and its alleged perversion, are also frequently shrouded in mystery and involved in the subtleties of polemics and theology. Still the court is bound to exercise its control over these charitable funds, as well as over the less difficult class of private trusts.

The law on this subject was so fully and ably investigated by

my learned predecessor in the recent case of the German Re-
formed Church in Forsyth-street in the city of New-York,
(*Gable and others* v. *Miller and others,* October 6th, 1842,)
that it is needless for me to review the authorities. On the
appeal in that case, the Chancellor fully sustained the jurisdic-
tion, and in addition to the other authorities, cited the *Clough
Church case,* (or *Dill* v. *Watson,*) in the Irish Exchequer in
1836. I have seen no report of the *Clough case;* but as stated,
it accords with the other decisions on this important point.

In the leading English authority, *The Attorney General* v.
*Pearson,* (3 Merivale, 352, 395,) Lord Eldon decided that when
it appears to have been the intention of the founder of a trust
for religious worship, that a particular doctrine should be
preached, it is not in the power of the trustees, or of the con-
gregation, to alter the designed objects of the institution. The
length and breadth of that decision may be the better estimated,
from the circumstance that the *purpose declared* in the deed,
was simply "the worship and service of God." And those
words, without more, are deemed in England to create a trust
for the established religion. Yet on its being clearly shown
by proof, that the purpose of the trust was to maintain dissent-
ing doctrines, the court decreed that purpose to be carried into
execution. And as there were no Unitarians known among
the dissenters when the trust was created, (A. D. 1701,) the
Unitarians were excluded from the trust. (7 Simon's R. 290,
S. C. upon the first decree.)

In the case of the German Reformed Church in Forsyth-
street, before mentioned, decided by the Chancellor, May 7th,
1844,(a) the complainants alleged a perversion of the tempo-
ralities of the church by the defendants, principally in two par-
ticulars ; viz., a severance of the church from its spiritual
union with the Dutch Reformed Churches, which union ex-
isted when the trust funds were bestowed; and the teaching
of Arminian or Lutheran doctrines, instead of the Calvinistic
doctrines of the German Reformed Church. On both grounds,

(a) Now reported in 10 Paige's R. 627.

504 CASES IN CHANCERY.

Kniskern v. The Lutheran Churches of St. John's and St. Peter's, and others.

the Chancellor sustained the bill, and decreed a restoration of the church property to the parties maintaining the original faith, doctrines and government of its founders.

The principles of these and the kindred authorities have been sustained in various other cases in this country, such as *Field* v. *Field*, (9 Wend: 401;) *St. Mary's Church case*, (7 S. & Rawle, 539;) *The Presbyterian Church* v. *Johnston*, (1 Watts & S. 1;) *Denn. ex dem. De Mott* v. *Bolton*, (7 Halsted's R., N. J. 205;) *Bowden* v. *M'Leod*, (1 Edw. Ch. R. 591.)

In the case of Lady Hewley's Charity, which has been reported at large since the opinion of my predecessor was pronounced in the German Reformed Church suit, (*Attorney General* v. *Shore*, 7 Simon's R. 309, note, and 11 id. 592; and in the House of Lords, reported by the name of *Shore* v. *Wilson*, in 9 Clark & Fin. 355; 5 Scott's New R. 958; 11 Simons, 615, note; and 7 London Jurist R. 781;) these questions have again been most elaborately examined, and the principles of the *Attorney General* v. *Pearson*, fully confirmed and established.

The case itself is highly instructive in reference to another branch of this investigation. Here it will suffice to say, that the relators claimed, (and so it was adjudged,) that the charity was created for the benefit of Protestant dissenters who believed in the doctrine of the Trinity ; that a majority of the trustees for several years before the information was filed, professed Unitarian opinions, although they called themselves Presbyterians ; and that they had applied a considerable portion of the rents in the education and support of Unitarian preachers, and for the benefit of other persons of that denomination. By the decree of the vice-chancellor, (Sir Lancelot Shadwell,) persons professing Unitarian opinions were excluded from participating in the benefit or administration of the charity.

The appeal from his decree was argued before Lord Brougham while chancellor, assisted by two common law judges, but he resigned the great seal before giving judgment. It was then argued before Lord Lyndhurst, chancellor, assisted by Mr. Baron Alderson and Mr. Justice Patteson. On their opinion, concurring with his own, Lord Lyndhurst affirmed the decree. The case was then appealed to the House of Lords, and the

decree there affirmed. Lord Cottenham, (before whom, while chancellor, the case had been argued on an incidental question arising under the decree,) moved its affirmance, and Lord Brougham concurred in his observations. Seven of the common law judges delivered their opinions to the House in favor of affirmance, before that body proceeded to decide the appeal.

The case therefore comes to us with all the weight of authority derived from the united judgment of the learned and venerable vice-chancellor of England, the present and the two late chancellors, and nine of the common law judges, and from the sanction of the highest judicial tribunal in that country.

In the judgment of Lord Lyndhurst, (9 Cl. & Fin. 390; 7 Simons, 310, note;) he says, " In every case of charity, whether the objects of the charity be directed to religious purposes, or to purposes purely civil, it is the duty of the court to give effect to the intent of the founder, provided this can be done without infringing any known rule of law. It is a principle that is uniformly acted upon in courts of equity." He then refers to the mode of ascertaining the intent, to which I will advert hereafter, and proceeds; " It can scarcely be necessary to cite authorities in support of these principles. They are founded in common sense and common justice. He however refers to the *Attorney General* v. *Pearson*, and a similar case in the House of Lords, *Craigdallie* v. *Aikman*, (1 Dow's P. C. 1.)

In the House of Lords, Baron Gurney said, (9 Cl. & Fin. 553; 11 Simons, 626, *note*;) " I think the investing of the trustees with the power of applying this trust for the promotion of Unitarian worship, would be the greatest possible perversion of the trust. I have always considered the intention of the founder to be the principle to be established, the rule to be abided by;" quoting Lord Eldon's language in *The Attorney General* v. *Pearson.*(a)

The Unitarian cases in Massachusetts do not necessarily conflict with these authorities. They were put upon the ground that a *majority of the congregation*, and not of *the*

(a) See *The Attorney General* v. *Munro*, (9 Lond. Jurist Rep. 461, April 22, 1845;) before Sir Knight Bruce, Vice-Chancellor.

*members or communicants* in a particular church, should govern, where the property was given to the church, or for the use of the church, without designating any particular tenet, doctrine, or sect. *Baker* v. *Fales*, (16 Mass. 488 ;) *Stebbins* v. *Jennings*, (10 Pick. 172 ;) *Page* v. *Crosby*, (24 Pick. 211.)

The only adjudged case which I have met with that expresses a contrary doctrine on the subject of these trusts, is that of the *Trustees of the Organ Meeting House* v. *Seaford*, (1 Dev. Eq. Rep. 453, North Carolina.) And it so happens, that that was a Lutheran church. There the property was conveyed to the *corporation*, and as the report says, the deed specified no particular purpose to which it was to be appropriated. The minority claiming to be trustees, filed a bill *in the name of the corporation*, charging the defendants, also claiming to be trustees, with a violation of their trust, in this that they had attached the church to a *synod*, and excluded ministers from it who were regularly ordained. It appeared that the defendants were duly elected, and were, in fact, the true representatives of the corporation ; which of itself was sufficient ground to dismiss the bill filed in the name of the corporation, although it was not urged. Judge Hall, in delivering his opinion, lays great stress upon the fact, that it did not appear that the grantor of the land was a Lutheran, and that there was no condition or purpose expressed. And the decision is put upon that ground. He also says, what no one can deny, that in a corporation, the will of the majority must govern, in the use and disposition of property held by it absolutely. And he declares his opinion to be, that it is not for the court to decide whether the parties or the church have strayed from the true faith, or introduced errors into the church government ; and that it might be more than difficult to qualify any earthly tribunal to decide it.

So far as the point adjudged in the *Organ Meeting House* v. *Seaford* is concerned, it does not bear upon the principle under discussion. The *opinion* there expressed cannot weigh much against the well considered decisions to the contrary, especially as it will be seen that the judge was speaking of a tribunal to decide which faith was the true one in reference to the

bible, and not in reference to the faith to sustain which the fund was bestowed.(a)

One of the learned counsel for the defendants, set out with the proposition, that it was a material inquiry, whether or not the Augsburgh Confession of Faith was repugnant to the Scriptures ; and that even if the property in controversy had been granted for the purpose of sustaining that faith, the court would not permit the erroneous doctrines thereby declared, to be promulgated.

The authorities which I have cited, show abundantly that this proposition is unsound. In the case of Lady Hewley's Charity, it was excluded ; and in the language of one of those learned judges, I utterly disclaim founding a judgment upon any such basis.

Were the administration of the great variety of religious charities with which our country so happily abounds, to depend upon the opinion of the judges, who from time to time succeed each other in the administration of justice, upon the question whether the doctrines intended to be upheld and inculcated by such charities, were consonant to the doctrines of the bible ; we should be entirely at sea, without helm or compass, in this land of unlimited religious toleration. I do not believe, that of the fifteen judges who now sit in our highest tribunals of law and equity in this state, a majority will be found to agree in all the doctrinal points maintained and deemed essential by any one of the denominations of Christians to which those judges belong. And while in England, where an established church and a rigid system of educational and political exclusion insures entire uniformity in this respect, the courts wholly refuse to decide upon such a principle ; it would be alike startling and absurd to establish it here.

We are only to know that the objects of the charity are not contrary to law.

(a) The case of *Keyser* v. *Stansifer*, (6 Ohio R. 363,) may perhaps be classed with the one in North Carolina. See also, *Methodist Church* v. *Price*, (4 ibid. 515, 542 ;) *The Same* v. *Wood*, (5 ibid. 205, 286 ;) *Shotwell* v. *Henderson*, in Chancery in New-Jersey, (Judge Ewing's Appendix, 40–1, 51–2, 76–7, and 84–5.)

Again, it is argued, that this very diversity of opinion amongst our judges, is a cogent reason for the courts to decline investigating these questons; that it will oftentimes happen, that the judge will be called upon to determine religious controversies, affecting the denomination to which he belongs.

It suffices to say, that no judge will probably be willing to sit in the decision of a suit in which he is interested, and the possibility of its occurrence is not a sound reason for refusing to exercise a well settled and important jurisdiction.

*Another* of the learned counsel, at the hearing, submitted that the principle could never be maintained in this country, by which certain religious creeds, stereotyped fifty or sixty years ago, were to control the disposition of charities for all time to come.  That where property was acquired by an incorporated church, for the use of that church, without restrictive words or a limitation to a particular faith or doctrine; it might be appropriated to the use of the church, by a majority of its members for the time being, in any form that they pleased, and that they might change their tenets, and carry the property with them. And he argued that the maintenance of a contrary doctrine in Europe, had led to an universal governmental proscription there, in order to sweep away the property and estates held for obnoxious *trusts,* whenever there was a change in the religion of the state.

It would be unjust to attribute to a principle of law, the acts of rapacity and persecution referred to by the counsel; acts of despotic power, or of governments trampling upon their own laws, as well as all notions of morality, justice and natural right.  Nor should we argue that such consequences can ever ensue in a country like ours, where the rights of property are so steadily maintained, and where the government by its fundamental law, is inhibited from adopting or maintaining any one creed or form of religion.  The argument itself that a majority for the time being, can mould to their own notions, the principles sustained by the gifts of the founders of the charity, and can substitute other principles or cardinal doctrines in their stead; cannot be tolerated for a moment.

It strikes at the root of all religious, charitable, and even literary gifts and bequests; which are to endure beyond the lives

of those first intrusted with their administration. It closes the avenues of benevolence, and chills the warm heart of charity; of that good will towards men which seeks to perpetuate by the means bountifully conferred on the donor, the good works which the approach of his appointed time on earth, prevents him from acomplishing or perfecting in person.

Let it once be understood to be the law of the land, that funds bestowed for the maintenance of a Protestant Church, may with the change of faith of the members, at any time, be applied to the support of the Roman Catholic forms of worship and religious doctrines; or that a devise for the support of disabled seamen, may in the wisdom of trustees for the time being, be used to educate young mariners for the better discharge of their duties; and we shall hear no more of the munificent eleemosynary donations, which so much distinguish and adorn our country. No Randall will endow another noble charity for the worn out sons of the ocean. No Warren or Rogers will bestow her property, to build churches for the ministration of the gospel to the poor and needy of our populous cities.

A more just and righteous principle animates our law. " When a gift of property is made for the service and worship of Almighty God, the thing to be regarded is, what were the religious tenets in general of the donors. Because it would not be a just application of those trust funds, if they were employed for the sustentation of religious opinions which the donors themselves would have disavowed." (Per Vice-Chancellor Shadwell in *Attorney General* v. *Pearson,* 7 Simons, 306.) And where the gift, as in the instance before me, was for the use and support of a particular description of christians, the thing to be regarded, is what were the tenets of that denomination?

If a different rule is to be established in reference to these trusts, it must be by the intervention of the sovereign power. The effort is making in England in the bill entitled " An act for the regulation of suits relating to meeting houses, and other property held for religious purposes, by persons dissenting from the united church of England and Ireland," now pending in Parliament. This effort was occasioned by the final overthrow

of the Unitarians, in the decision of the House of Lords, in the case of Lady Hewley's Charity. But even that bill, which meets with most determined opposition, and the fate of which is doubtful,(a) does not apply to cases where any particular religious doctrines, opinions, or mode of worship, are required to be taught in express terms by the deed or gift. It however makes the usage of the congregation for 25 years, to be conclusive evidence of the religious doctrines, opinions and mode of worship for which the trust was founded, in cases where the same are not so expressed.

The defendants also make it a point that the question whether or not they are orthodox, can only be determined by the proper ecclesiastical tribunal, and cannot be decided by this court.

In reference to their orthodoxy, when tried by the standards of the Evangelical Lutheran Church, the defendants, in their answer, effectually preclude such a judicatory. They set up the absolute independence of each separate church or congregation; and they have detached these churches from the Hartwick Synod, the only superior organization to which they in common with the complainants were united, and they deny its jurisdiction and control.

It would be an immense relief to me in this case, if I could repose upon the decision of a synod or classis, as was done in a great measure in the New-Jersey case of *Denn, ex dem. De Mott* v. *Bolton.*

The Chancellor however, in the *Baptist Church in Hartford* v. *Witherell,* (3 Paige's R. 304,) said that when this court is obliged to administer a trust, the chancellor cannot put his conscience into the keeping of any ecclesiastical tribunal. The facts constituting the alleged breach of trust must be stated in the bill, and if put in issue must be proved to the satisfaction of the court, as in other cases of trust.

The jurisdiction of this court being as I have shown clear,

. (a) The bill was passed, July 19, 1844. Stat. 7, 8 Vict. sess. 4, ch. 45. (8 London Jurist Misc. 339.)

undoubted and imperative; in the language of Lord Cottenham, chancellor, in a similar case, *Milligan* v. *Mitchell*, (3 Mylne & Craig, 72,) the "questions which I have to consider, are first, whether the property in question was held upon the trust alleged in the bill; secondly, whether there has been a breach of such trust; and thirdly, if there has, whether the complainants are entitled to be relieved against such breach of trust, in this suit."

THIRDLY. I now come to the points in issue between the parties.

The complainants allege that the memorable confession or declaration, presented to the Diet of Augsburgh on the 25th day of June, 1530, by the Protestant princes and cities of Germany, and which has ever since been known as the AUGSBURGH CONFESSION OF FAITH, has from that time been observed, regarded and adopted by the Lutheran Church, as containing the fundamental principles of the faith of that church, and that it is the Confession of Faith of the Lutheran Church and of all its members and adherents. That in the churches in question, prior to 1789, and from thence till 1837, the doctrines of the gospel were preached, and the sacraments administered, according to that Confession, and that the same was adopted, accepted and received, by the churches and congregations, as their Confession of Faith. That the churches were founded and the temporalities bestowed by Lutherans, for the sole purpose of having the faith and doctrines expressed in that Confession taught and inculcated, and the sacraments administered conformably thereto.

The defendants admit that the Augsburgh Confession was adopted by the Lutherans after the diet of Augsburgh, as a system or summary of their doctrines and faith, together with Melanchthon's Apology, the Articles of Smalkalden, the Larger and Shorter Catechisms of Luther, and the Formula Concordiæ; and that these are together, called the Symbolical books of the Lutheran Church. They deny that all departures from the Augsburgh Confession were ever deemed heretical or a departure from the true faith or system of doctrines of that church

either in Europe or America. They allege that many of the Lutheran churches in America, have never formally adopted it, or received it as containing their fundamental principles of faith, nor required any assent to it in all its parts and doctrines. They admit that the society or congregation from which these churches sprung, was a Lutheran church; but they are ignorant whether the doctrines or tenets there taught, were according to the Augsburgh Confession; and in substance, they traverse all the allegations of the bill, in relation to that Confession's being adopted, assented to, taught or inculcated, in all its parts and doctrines in the churches in question, at any time, or by any of the founders thereof, or of the donors of the trust funds.

The first great issue in the case is thus presented; was the property of these corporations held upon the trusts alleged by the complainants?

In the case of Lady Hewley's charity, it appeared by the deed of foundation, executed in 1704, that the object was, "to assist poor and godly preachers of Christ's Holy Gospel." Lord Lyndhurst said, the first and principal question was, what class of persons and what principles and doctrines did the foundress have in view, when she used those words? In order to decide this, he first considered the testimony, and the historical facts bearing upon the point, and ascertained that Lady Hewley was a Presbyterian; and that the great body of the Presbyterians as well as Independents, in 1704, believed in the doctrine of the Trinity, and in the doctrine of original sin. He held that it was incumbent on those who contended that she was an exception to the general belief, to establish that fact by evidence. No such fact was proved. He said farther, that all the probabilities were against her being an exception. That the principles of Unitarianism were at first received coldly, with aversion, and even with disgust, particularly among the laity. Lady Hewley was in 1704, far advanced in life, and was not likely to have adopted those opinions. And upon these data, that she was a Presbyterian, and the general doctrines of the Presbyterians at that time, Lord Lyndhurst held it established that she was a Trinitarian, and a believer in the doctrine of original sin. (9 Clark & Fin. 390-1, 393, 395; 7 Simons, 310.)

Kniskern *v.* The Lutheran Churches of St. John's and St. Peter's, and others.

The chancellor then argued forcibly, that Lady Hewley did not intend to found a charity, and bestow her property for the purpose of preaching doctrines directly at variance with her own, on points that have always been considered by every church as essential, and which she herself must have considered as essential matters of religious belief.

In the case of the *Attorney General* v. *Drummond,* cited by my learned predecessor in the German Reformed Church case, from 1 Connor and Lawson, 210, and which is more fully reported in 1 Drury and Warren's Rep. 353, where Lord Chancellor Sugden decided against the Unitarians on certain trusts for *Protestant Dissenters ;* he adopted with much forcible reasoning, the same line of evidence that was held admissible in Lady Hewley's Charity.

These authorities will aid and direct the investigation here.

In the case before me, we set out with one advantage, which the courts did not possess in the one from which I have drawn so largely. We know that the churches were founded and established as *Evangelical Lutheran Churches.*

It is thus ascertained that the property in controversy was bestowed for the support of the *doctrines and tenets* of the Evangelical Lutheran Church.

Having gained this point in the investigation, the more difficult question succeeds ; what were the essential or cardinal doctrines and tenets of the Evangelical Lutheran Church, when this property was bestowed upon those trusts, and by what standard or symbol were they declared?

Here I must observe that the defendants, in the portion of their answer which I last stated, have departed from the true issue involved in the case. It cannot affect the result, if all that they allege in regard to the non-belief in 1828 of Mr. Wieting or his congregations, or even of the complainants, in some of the articles of the Augsburgh Confession, were fully proved. The inquiry is limited to the belief and doctrines of those who in 1789, and subsequently, were the *donors of this property.* The course of the teaching in the churches at those periods, will be strong evidence of their faith and doctrine.

The unbelief of the congregations thirty or forty years afterwards, can be of but little or no weight in the scale.

The defendants concede, what is abundantly proved by ecclesiastical history, that the Augsburgh Confession of Faith was adopted by the Lutherans as a system or summary of their faith and doctrines, at a period as early as their being known as a distinct body of Christians by that designation. We know also from history that both Luther and his leading supporters in the great work of the Reformation in Germany, strongly opposed the application of the term *Lutheran* to his and their followers; and desired to be known as the *Evangelical Church.* Their opponents fastened upon them the name of *Lutheran* as a term of reproach, years before the Diet of Augsburgh; and like many names intended to be opprobrious, and for that reason bestowed on a righteous cause, it very soon became the just pride and distinction of the Reformers, who adopted his doctrines. And they have for three centuries been known in history as *Lutherans,* while they have adopted for their church the name of The Evangelical Lutheran Church.

As the defendants declare that they do not dispute but that the Augsburgh Confession is a *system or summary* of the doctrines of the Lutheran Church, and that their own published creed contains nothing contrary to that system or summary; it may be supposed that the whole controversy is limited to the latter proposition. But the answer and testimony, and the argument at the hearing, disclosed that this declaration of the defendants is not intended to admit that the whole Confession of Augsburgh, or even the whole of its essential doctrines, were ever adopted or believed by the Lutheran Church at any period, much less at the institution of these churches. And I confess that the defendants avowal of their belief in this Confession as a system or summary of doctrine, when they avowedly disbelieve its articles on original sin and the Lord's Supper; question other articles as remnants of Romish superstition and error; and are charged at least, with denying the Trinity, and the divinity of Christ; is to me quite unintelligible. At all events the effect of the answer as a whole, is to put in issue the fact that the Augsburgh Confession was the standard of Lutheran faith

and doctrine, when these churches were endowed, and I proceed to examine that question.

We find in the year 1789, a church founded and organized as *an Evangelical Lutheran Church.* What must be our inference as to the faith, doctrines and tenets of its founders? It is said by the defendants that the bible *is*, (and I will assume that they intended to say it always *was*,) the sole standard of the faith and practice of the Lutherans. As the fountain head, the ground work of their faith, this is an unquestionable proposition. And every denomination or sect of Christians, from the Arian or Unitarian to the Church of Rome, asserts, and can maintain the same proposition. In the case of Lady Hewley's Charity, every Unitarian trustee could with the same propriety have planted himself upon the bible as his great standard, and the rule of his faith and doctrine.

The question is not, whether the Lutherans in Germany in 1530, or the defendants claiming that name in Schoharie county in 1837, believed the bible. No one doubts but that they did. All profess to believe it, whether Lutheran, Calvinist or Unitarian. The question is, *how* did they understand it? What did they believe that the bible teaches and inculcates, on the great doctrines so momentous to the immortal souls of our race?

And we do not advance a single step in ascertaining what were the cardinal doctrines of the Lutherans, or of any denomination of Christians, when we learn that the bible is their doctrinal standard. This truth has been felt and acted upon for more than 1500 years. The Council of Nice, when assembled in the year 325, to refute the errors of Arius, proceeded upon that basis. The Protestants, at the diet of Augsburgh, acknowledged its imperative truth. The Roman pontiff followed in the same conviction, in the great and long protracted Council of Trent. From that day to this, every new sect of Christians has deemed it necessary and indispensable to set forth at large, and in some plain and intelligible manner, the doctrines and articles of faith, which, according to their understanding and mode of interpretation, the bible teaches and inculcates.

Therefore, in order to ascertain what were the faith, doctrines, and tenets of the founders of these churches, we turn to the Symbolical Books of the Evangelical Lutheran Church.

The defendants do not inform us that there was any change in those religious opinions or tenets of the Lutherans, which come in question in this suit, from the time of the Great Reformer until the era of the difficulties in these churches. In the absence of proof, this is not to be presumed. The burthen of proving it is imposed on the defendants, and they have produced no testimony, either of living witnesses, or in the writings of historians or theologians, to show that any such change had occurred prior to the completion of the church edifices at Rhinebeck and New-Durlach.

Independent of the testimony brought forward by the complainants, on this point, the inevitable conclusion is, that the founders of these trusts, *as Lutherans*, believed in the faith, practice, and doctrines of that sect, as declared and expressed in its Symbolical Books ; and that they contributed their funds, for the support and preaching of those doctrines and that faith and practice.

We find that the Augsburgh Confession of Faith was, from the time of the Reformation, one of those symbols, having the first place in their enumeration ; and we thus ascertain that the founders of these trusts did intend thereby to establish a church, in which the doctrines and tenets declared and established by the Augsburgh Confession of Faith, should be preached, taught, and inculcated.

This conclusion is fully confirmed by the writings of the Lutherans themselves, as also by theological writers and historians, who treat of the distinctive faith and character of the Evangelical Lutheran Church. They express but one language on this subject, to the period when these trusts were established, and so far as standard works are concerned, to the present time.

The earliest writer, in point of time, to whom I will refer, is the illustrious Lutheran historian and theologian, Louis Veit von Seckendorf. In his history of Lutheranism,(a) he says

_____

(a) Commentarius Historicus et Apologeticus de Lutheranismo, Lib. 2, Sect. 23, § 58, fol. 159, *Editio Secunda* ; in whch book the author reviews the Jesuit Maimbourgh's History of the Reformation.

that the Augsburgh Confession, having been framed by Philip Melanchthon from Luther's 17 Articles, called the Torgau Articles, was immediately transmitted by the Elector of Saxony to Luther, that he might signify whether it should be altered, and wherein ; and that Luther expressed his entire satisfaction with it, and said there was nothing in it which could or ought to be corrected or changed, and that nothing should be taken from it. Baron Seckendorf adds, that it went forth, *the foundation of the doctrine which is in very deed, Lutheran ;* and he says that Luther was not pleased with the subsequent efforts of those associated with Melanchthon to modify it, in order to conciliate the followers of the Swiss Reformers.

I should remark that Seckendorf wrote more than 160 years ago, and the edition from which I cite was published in 1694.

Mr. Milner, in his Church History, calls Seckendorf "that truly excellent and judicious Protestant ;" and other theologians speak of his fidelity and impartiality, and call his work, from which I have cited, " incomparable."

The learned Dr. Mosheim, who was himself a strenuous Lutheran, and was, in a measure, the father of ecclesiastical history, wrote his great work on that subject about a century ago. He says the Lutherans call their standard books, which contain their articles of faith, *Symbolical ;* and that all professors of divinity, and all candidates for the ministry, must subscribe to these. He adds, that they have no authority but what they derive from the scriptures of truth, whose sense and meaning they are designed to convey. He then continues :

" The chief and the most respectable of these human productions, is the *Confession of Augsburgh,* with the annexed defence to it against the objections of the Roman Catholic doctors. In the next rank may be placed the *Articles of Smalcald,* as they are commonly called, together with the Shorter and Larger *Catechisms* of Luther, designed for the instruction of youth, and the improvement of persons of riper years. To these standard books, most churches add the *Form of Concord ;* which, though it be not universally received, has not on that account occasioned any animosity or disunion." (3 *Mosheim's Ecc. History, Part 2, Chap.* 1, *Sect.* 2.) The last assertion

518          CASES IN CHANCERY.

Kniskern *v.* The Lutheran Churches of St. John's and St. Peter's, and others.

of the learned doctor must be taken with some allowance, as he was an ardent supporter of that Formula, which, although it produced no disunion, was unquestionably much contested, and the cause of grievous intolerance ; and it was never received by a large portion of the Lutheran Churches.

Walchius, (John George,) another German Professor of Theology, in his *Bibliotheca Theologica,* published at Jena in 1757, devotes nearly one hundred pages to the symbolical and doctrinal writings of the Lutherans, and their various editions and the accuracy of each. He designates the Augsburgh Confession and its Apology, and the Articles of Smalcald, as the three symbols which are called, " *oecumenica.*" (Vol. 1st, page 314.) At page 353 of the same volume, he says that the *unaltered* Augsburgh Confession is the one, " *quæ nomen et dignitatem germani verique Symboli Ecclesiæ Lutheranæ teneatur.*"

And Walchius ranks the Smalcald Articles as *next after* the Confession and Apology.

Milner's Church History, (ch. 13, page 962,) informs us that the 17 Articles which had been drawn up by Luther, and twice submitted in the conferences at Sutzbach, and once at Smalkalden, as the confession of faith to be agreed upon by the Protestants, were delivered by him at Torgau, to the Elector of Saxony, who was then on his way to the Diet of Augsburgh ; and Melanchthon was employed by the Elector and the other reformers, to make them into a more orderly and elaborate composition. The Augsburgh Confession of Faith was the result of his labors.

Mr. Haweis, in his continuation of Milner's History, (chap. 22, p. 986,) says, " The Lutheran doctrine is avowed to be comprised in the Augsburgh Confession of Faith, and in Melanchthon's Apology, and these are regarded of the first authority. The articles of Smalcald and the Larger and Shorter Catechism of Luther, are received in that church as directorial. The Form of Concord, received by the more rigid, was warmly disputed, and was rejected by the more moderate."

Mr. Adam in his *Religious World Displayed,* speaking of the *Symbolical* books of the Lutherans, says that their legitimate formulary of faith is the edition of the Augsburgh Con-

fession of 1530, which edition is called *Augustana Confessio invariata.* That the subsequent edition which was altered by Melanchthon, but not in any very material parts, was called *variata ;* but the Lutherans, as early as 1579, made the distinc-tinction, and have never admitted the Confession in this new shape, as one of the standard books of their faith and doctrine. Next to the Confession of Augsburgh, with the defence of it against the Roman Catholic doctors, better known as Melanch-thon's Apology, Mr. Adam ranks the Articles of Smalcald, to-gether with the Shorter and Larger Catechisms of Luther. And he adds, on the authority of Mosheim, that most churches, to these standard books, add the *Form of Concord,* but that it is not universally received. (Vol. 2d, pages 338 to 340, Article *Lutheranism and Lutherans.*)

In a very recent Church History published in Germany by one of the most learned Professors of Theology of the present day, the *Handbuch de Kirchengeschichte,* (by *Heinr. Ernst Fred. Guerike, Theol. D.*) after giving an account of the rise and progress of the Lutheran Church, the author states that the *Formula of Concord,* drawn up in 1576 and 1577, and published in 1580, was devised and prepared for the purpose of bringing back their doctrines to the earlier confessions of faith of the Lutheran Church and to the doctrine of Luther, and to distinguish them from Calvinism. (Guerike, Vol. 2, p. 1029. Ed. 2, Halle, 1837.) The author had previously given a full account of these earlier confessions, placing in the front rank that of Augsburgh.

Without citing more of the numerous German and English writers on this prolific subject, I will advert to some of our American theologians.

In 1818, George Lochman, a Lutheran clergyman at Harris-burgh, Pennsylvania, and afterwards a doctor of divinity, pub-lished "The History, Doctrine and Discipline of the Evan-gelical Lutheran Church," which appears to have been a book of authority at that period, on the subject on which it treats. He says, (p. 84,) that the symbolical books of the Lutherans are The Augsburgh Confession, The Apology of the Confession, The Short and Larger Catechism, and the Smalkalden Articles. He

520 CASES IN CHANCERY.

Kniskern v. The Lutheran Churches of St. John's and St. Peter's, and others.

then inserts at large the twenty-one articles or chapters of the Augsburgh Confession which are esteemed essential, omitting the seven last of the 28 Articles of which it consisted, and which seven are devoted to pointing out the errors and abuses that occasioned the separation from the Romish Church. With the 21 articles, Lochman intersperses extracts from the other symbolical books.

Dr. Schmucker, another distinguished Lutheran divine, and for many years the Professor of Theology in the Theological Seminary of the Lutheran General Synod at Gettysburg, Pa., published his *Elements of Popular Theology*, in 1834, which work was written at the request of the General Synod.

He says, (p. 40, 41,) that the " Augsburgh Confession, which is justly styled the mother symbol of the reformation, has been adopted by the major part of all Protestant Europe, and has for about three centuries past, been the standing symbol of Lutheranism in the following kingdoms ; Germany including Prussia, part of Hungary, and a small part of France, Denmark in which the king must profess the Augsburgh Confession, Norway, including Iceland, and Sweden." He says the Moravians, or United Brethren, though peculiar in their church government, have always retained the Augsburgh Confession as their symbol. He also says, " The Lutheran Church in the United States has always regarded it as the authorized summary of her doctrines, but has not required any oath of obligation to all its contents. The General Synod has adopted only the 21 doctrinal articles. No minister, however, considers himself bound to believe every sentiment contained in these 21 articles ; but only the fundamental doctrines."

Dr. Schmucker furnished the principal part of the article, " Evangelical Lutheran Church," in *Rupp's History of all the Religious Denominations in the United States*, published at Philadelphia, during the present year, and the same statement is there made in regard to the symbols of that church.

The *Encyclopædia of Religious Knowledge*, an industrious compilation, but whether a book of authority I have not learned, says, " the Augsburgh Confession, consisting of 21 articles, is the acknowledged standard of faith for the Lutherans wherever

NEW-YORK—JULY, 1844. 521

Kniskern v. The Lutheran Churches of St. John's and St. Peter's, and others.

they are found." (*Appendix*, p. 1259. *Article, Lutheran Evangelical Church.*) The same thing substantially, is said of the German Protestants, in the *Encyclopædia Americana*, vol. 10*th*, p. 540, *Article, Reformation.*(*a*)

The Evangelical Lutheran General Synod of the United States, of which the Hartwick Synod forms a part, requires all candidates for licensure to the ministry, expressly to profess their belief, 1. in the Scriptures as the word of God, and the only infallible rule of faith and practice. 2. A belief "that the fundamental doctrines of the word of God, are taught in a manner substantially correct in the doctrinal articles of the Augsburgh Confession." (See their *Doctrine and Formula* for the Government and Discipline of the Evangelical Lutheran Church, Troy Edition, 1832, ch. 18. sect. 5.)

And no other symbolical book is referred to in the ceremony of licensure. Dr. Schmucker in his Popular Theology, says that this pledge is required by the Lutherans generally on licensure.

The New-York Ministerium has not adopted the Formula of the General Synod ; but it appears from their published reasons, to which the defendants referred, and which are quoted in Mr. Lawyer's Address to the Franckean Synod in October, 1837 ;

---

(*a*) Since this decision was made, I have met with some further historical evidence. The great and revered Lutheran Missionary, Dr. Muhlenberg, in his reports to the Orphan House at Halle, (1 Hallische Nachrichten, 363 to 367,) writing in 1750, says of the Lutheran Church in the city of New-York, (Trinity Church, the Low Dutch Lutheran foundation, now the United German Lutheran Church,) "that the church had been built and dedicated with their own mites and friendly aid from Europe, for an Evangelic Lutheran congregation, according to the unaltered Augsburgh Confession."

Dr. Kunze in the same work, (vol. 2, p. 1508 et seq.) giving an account of the Lutheran Church in this state, speaks of Mr. Schwerdtfeger, above Albany, Mr. Moeller in Albany, Mr. Kiess in Stone Arabia, and Mr. Gray in Eastcamp ; and adds, "further up an old gentleman of the name of *Sommer,* who cannot see any more."

These he names as the regular evangelical preachers at that time stationed in this state. He was writing in May, 1785. He says, "Entirely vacant, are several fine congregations, such as Rhinebeck, Wurtemberg, and many others in Tryon county, which is entirely settled by Germans."

522 CASES IN CHANCERY.

Kniskern v. The Lutheran Churches of St. John's and St. Peter's, and others.

that their declining to adopt it was on account of the rights of judicatory to which they would thereby become subject, and not because of the adoption of the Augsburgh Confession. The East Pennsylvania Synod, the oldest as well as largest in the United States, did not adopt the Formula, and receded from the General Synod. Their reasons were not made known to me.

It did not appear that any Lutheran Synod or church in the United States, (except the Franckean Synod,) had adopted any Formula or Declaration of Faith, in lieu of the Augsburgh Confession, or in effect a substitute for it, or in any manner variant from it; or had repudiated or publicly denied the authority of any of the Doctrinal Articles of that Confession.

The Lutheran Synod of Tennessee, which in 1834 was not in connection with the General Synod, and I believe has never united with it, expressly adopted the Augsburgh Confession of Faith entire, containing the whole 28 Articles.

The synods of Ohio, which next to that of East Pennsylvania, are the largest body of Lutherans in this country, adopted the whole Confession in the same manner.

Thus it appears from the origin and history of the Lutherans, and the concurrent and overwhelming testimony of theological writers and ecclesiastical historians, that the Augsburgh Confession of Faith was one of their principal symbols, and declared their doctrines, articles of faith and rules of discipline, from the year 1530, until long after the endowment of the churches in question.

I will now speak of the evidence in the cause, bearing upon its actual adoption in those churches.

Without repeating it in detail, the testimony proves that the old members of these churches, those who were contemporary with the grant of the land, as well as the erection of the edifices, adhered to the Augsburgh Confession and regarded it as the ground work of the Lutheran doctrine; that the Rev. Mr. Sommer, in the Schoharie church, explained the confession to those who joined the church; and that Dr. Wacherhagen, when ministering in the Lutheran church in Schoharie in 1808, treated the Confession as the articles of faith of that church;

and ten years, before the Augsburgh Confession was read in the same church by the minister, on admitting persons as members of the church.    One of the witnesses had been a member of the Rhinebeck church for 47 years, and was a trustee when their house of worship was erected.    It was objected to his testimony, that he had never read the Confession, and could not tell what was meant by it.    I think that this does not overcome the force of what he states.    He may have heard so much about the Augsburgh Confession, that the name and circumstances became indelibly impressed on his memory, without his ever knowing what was its import.    He might well remember that a certain church went by the name of Lutheran, without having ever known the origin of the name or its meaning.

*Martin Simmons,* a witness, 70 years of age, belonging to the Dutch Reformed Church, states that he was present at the dedication of the New Durlach church ; and that at the close of the dedication sermon, the minister who preached it, the Rev. Mr. Krotz, said, " This house is dedicated unto the Lord, an Evangelical Lutheran House of Prayer, in which the gospel is to be preached, and the sacraments of Baptism and the Lord's Supper to be dispensed, according to the Augsburgh Confession."    When this was stated in English by the witness, his language was slightly varied, but in no essential particular. The sermon was preached in the German language.

To prove that Simmons was mistaken, or not to be believed, the defendants called four witnesses who were present at the dedication, and heard nothing said about the Augsburgh Confession.    They were all Lutherans at that time, although three of them have since withdrawn from that communion.    Of these witnesses, Mr. Shafer does not recollect that the sermon was in German, but does recollect all the dedicatory words stated by Simmons, except those relative to the Augsburgh Confession. Henry France remembers that the sermon was in German, but does not remember any dedicatory words, nor any particular words of the sermon.    Mr. Loucks does not recollect which of the three clergymen present on that occasion preached the dedication sermon, nor that there was any dedication distinct from the sermon.

David France remembers that Mr. Krotz preached the dedication sermon in German ; and it appears to him that Mr. Krotz said, " this house is dedicated to the Lord, and that it should be a house of prayer." But this witness is mistaken ten years in the time of the dedication. Upon the whole, I cannot discredit the testimony of Simmons. On the same ground, the testimony of one or more of the defendants four witnesses would be discredited, for they differ in their recollection, more or less. Two of them confirm Simmons in the fact that there was a form of dedication used, both concurring with him in the words as far as they go, and one remembering much more of it than the other. And it is certainly more probable that Simmons, who was not a Lutheran, and not familiar with their standards, would remember the use of the words " Augsburgh Confession" in the dedication, than those to whom they were, in a measure, household words, and to whom their use in the dedication of a Lutheran Church, may have appeared so much a matter of course as not to attract attention.

The positive testimony of a witness to a fact which he was in a situation to know, is not contradicted by the testimony of others present who do not recollect the occurrence. The general accuracy of Simmons's recollection is confirmed by all of the witnesses ; and upon the best consideration which I can give to it, I am bound to believe his testimony.

The *Rev. 'Adam Crownse,* when a boy, resided in these congregations, and was taken into the church by the Rev. Mr. Moeller, the first settled preacher there. He says that on that occasion, Mr. Moeller, in his lectures preparatory to confirmation, referred to the Augsburgh Confession, as exhibiting the doctrines of the church. Mr. Crownse succeeded Mr. Moeller, and was the pastor of these churches from 1823 to 1828 ; and he says, that during that period, it was regarded as containing their fundamental rules and doctrines ; and in 1825 or 1826, it was formally adopted at a convention of the two churches, as published in Dr. Lochman's work.

This evidence, of course, does not of itself show what were the standards of the founders of these two churches. But it reflects back with a strong light to the period of the foundation.

If the Augsburgh Confession had been an innovation, a new thing, unknown to the fathers of the two churches and to those who were contemporary with the Rev. Mr. Sommer, and the donors of the property in question ; the proposal to adopt it in 1825 would have made a commotion, at least equal to that occasioned by the secession from the Hartwick to the Franckean Synod.

Further evidence of the same character is furnished by the defendants themselves. The Hartwick Synod was formed in 1830, and these churches constituted a part of it. In 1831, and again in 1834, Mr. Wieting, then the pastor of these churches, was present, and an active participator in the proceedings of that synod, and of the Ministerium. At the session in 1831, the Hartwick Synod unanimously adopted the Formula, &c. of the General Synod of the United States, containing the Augsburgh Confession ; and on Mr. Wieting's motion, directed a thousand copies of it to be printed, under the direction of the secretary, and it was published accordingly. Mr. Lawyer was at that time the secretary of the synod. In 1834, as chairman of one of the committees of the Hartwick Synod, Mr. Wieting made a report, in which he eulogizes, in strong terms, Schmucker's Popular Theology, then a recent work, and says, "It ought to be the next in rank to the bible in the "library of every Lutheran."

Yet this book declares that the Augsburgh Confession has always been regarded by the Lutheran church in this country as a summary of her doctrines, and her ministers are required to profess their belief in its doctrinal articles. In another report made at the same session, in conjunction with Mr. Crownse, on the Hartwick Seminary, he speaks in high terms of that institution, and commends it to parents, &c. It appears by the theological course of study at that time pursued there, that during two terms of the third or licentiate's year, the *Symbolical Books* were regularly studied, in course.

At the sessions of the Hartwick Synod, both in 1831 and 1834, the Ministerium proceeded to the licensure and ordination of ministers, in the manner prescribed by the Formula of the General Synod, and the ministers ordained on each occasion,

were made to give upon the bible, with the solemnity of an oath, the pledges required by the Formula.

We thus have the strongest recognition by the Rev. Mr. Wieting, evidently the leader and the master spirit amongst the defendants, that the Augsburgh Confession was one of the standards of the faith and doctrines of the Evangelical Lutheran Church, as constituted within the bounds of the Hartwick Synod, and in the churches in question, as late as the year 1834.

Again, when Mr. Wieting gave his reasons to the assembled members of these churches in 1837, for separating from the Hartwick Synod; his objection to that synod was, that they believed in the Augsburgh Confession, and no one could be admitted to that body without subscribing it.

The four witnesses for the defendants before mentioned, testify that on their admission to the Lutheran church, they did not hear any reference to the Augsburgh Confession. They were all previously instructed in Luther's Catechism. Only one of them was admitted in these churches. Two state that they have frequently been present when Mr. Moeller confirmed persons, and that he said nothing about the Augsburgh Confession. And one of them who is still a Lutheran, says that he never knew it to be the standard of faith in these churches. He supposed that the bible was their standard.

The circumstance that the Augsburgh Confession was only occasionally, or even rarely mentioned, in the usual public services of the churches, does not go far to show that it was not one of their standards or symbols. Its doctrines were more familiarly expressed, and better adapted to the minds of plain and unlettered men, in the Catechisms of Luther; and there would be but little occasion to speak of the Confession, the Apology, or the Smalcald Articles in the ordinary course of the church. In a Presbyterian church, the Westminster Confession may not be mentioned publicly for a year together; and the same silence occur as to the Thirty-nine Articles in a Protestant Episcopal Church; and neither event excite surprise or even observation ; and yet no one would the less believe and understand that these were

the standards of the two churches respectively. Nor is this question influenced by the sale of a part of one of the church edifices to the Presbyterians, and its re-purchase. The answer does not mention this fact; and if it did, there is no evidence that the part sold was ever conveyed or paid for, or that it reverted, for any different trust or purpose than that for which it was previously held.

The evidence of the several clergymen who were examined on either side, so far as it affects the general question relative to the Lutheran standards, is chiefly historical, and it was held by several of the judges, in the case of *Lady Hewley's Charity*, that such testimony was inadmissible. It being derived from books, the books themselves are the better evidence.

Again. It is a marked feature of the case, that those who deny the adoption of the Augsburgh Confession in these churches, or by their founders, do not bring forward any symbolical book or declaration of faith as having superseded it, or been received by the Lutherans of the last century in its stead. The other known Lutheran Symbols, as I will presently show, do not relieve them from this difficulty; nor are they urged as having had any different or greater force than the Confession, among the Lutherans in this country. The allegation of the defendants is, that the bible is the only Lutheran standard, as it was of Luther himself. But this, as I have already said, is an evasion of the point. Martin Luther set forth in the Augsburgh Confession, the great doctrines which the bible, in his understanding of it, taught and inculcated. The Council of Trent did the same, in its Doctrinal Decrees. So did the Synod convened at Dordrecht, in the canons there declared. So did the Westminster Assembly. And so have the defendants themselves done in their *Declaration of Faith*, in the constitution and standing ordinances of the Franckean Evangelic Lutheran Synod, now in evidence before me. These standards distinguish one christian sect or denomination from another, and we look to them to see whether a church be Lutheran, Calvinistic, or Roman Catholic, or of some other belief.

Nor do we obtain any aid from the argument, (or the evidence tending to support it,) that the Augsburgh Confession

528          CASES IN CHANCERY.

Kniskern v. The Lutheran Churches of St. John's and St. Peter's, and others.

has never been *adopted* as the standard of faith of the Lutheran Churches in the United States, or of these particular churches. If the argument is to be taken *literally*, it is probably true in most instances; and it then amounts to nothing. I have no doubt it may safely be asserted, of two thirds of the churches in the United States, that: they singly, have never *formally adopted* any standard of faith or creed. Yet no one imagines that they are therefore without one. When a church is established as a Dutch Reformed Church, they have their standards in the canons of Dort and the Heidelburgh Catechism. So of the various other sects. From their designation and their distinctive character, we learn what are their peculiar faith and tenets. The belief in which the founders grew up, and which they professed, becomes the belief of the church of their institution. It is co-existent with the church itself. The name of their sect announces to the world what is that belief; and it is as much the faith of the church so founded, as if it were formally adopted in a public meeting, and then engraved on its walls. So when new sects spring up, professing, as they invariably do, to look to the bible alone as their standard of faith and doctrine; the moment that they attempt to show wherein other sects depart from that standard, they are driven to set forth their own peculiar interpretation of the bible, their doctrines and belief. These, whether so called or not, constitute their *creed*, which the world is to understand that they maintain.

In support of the position that the Augsburgh Confession had never been adopted by the Lutheran churches in this country, two clergymen of the Franckean Synod were called as witnesses, and they state sundry points of doctrine contained in it, which many Lutheran ministers either do not approve, or positively condemn. And I am referred to an extract from Professor Miller's sermon, as evidence that he did not believe in the Articles of the Augsburgh Confession relative to baptism and the Lord's Supper; nor indeed in the propriety or advantage of Creeds in general. It is unnecessary to say whether this is proper evidence; Mr. Miller being a competent witness to prove his own opinions. There are two considerations which it appears to me, render this species of testimony unimportant.

1. It does not go to the period of the foundation of these trusts. And, 2. It at most proves instances of partial dissent, which are of frequent occurrence in all churches and denominations, and which have occurred from an only period of the Christian era. They have been more frequent since the Reformation restored freedom of conscience; and sometimes they ripen into secession. But they prove nothing against the general faith and doctrines of the sect in which they happen. If I may allude to another church controversy of general interest at this day, the 39 Articles are the standard of the Church of England, although Archbishop Whateley on the one extreme, and Dr. Pusey and Mr. Newman on the other, are as far separated in their views of those articles, as are the litigant parties in this case relative to the true standards and doctrines of the Lutheran Church.

The omission in the copies and translations in common use, of the seven last articles of the Augsburgh Confession, was also urged against its authenticity as a standard of the Lutheran Church in this country. An examination of the whole 28 Articles shows, what all the writers on the subject state, that the seven last articles of that memorable document, were drawn up for the purpose exclusively of showing to the Diet the abuses and corruptions of the Romish Church, of which the Protestant Reformers more especially complained. Those articles contain no declaration of faith or doctrine; and after the separation between the Romanists and Protestants had become permanent, and the immediate interest of that event had ceased, the seven articles came to be omitted in the publications of the Confession. They were valuable as matters of history, but were not of any practical application in the Lutheran churches.

The other Symbolical Books of the Lutherans do not differ, at least in favor of the defendants tenets, from the Augsburgh Confession. Most of them are subsidiary to that instrument, and both their form and substance show that they were not designed to supply the place of the Confession.

Thus, the Defence of the Confession, (the Apology,) drawn up by the pious and eloquent Melanchthon, and delivered to the Emperor Charles the Fifth, on the 22d September, 1530, was

.occasioned by the first impulse of anxiety and alarm among the Protestant potentates, on the rejection of the Confession by the Diet of Augsburgh, and the severe decree first made thereupon against the Protestants and their faith. It was, of course, offered for the purpose of appeasing the Emperor, and obtaining some modification of the decree, or some ground of compromise, by which sanguinary persecution and civil war might be averted.

And I am sure that Melanchthon's exordium, or introduction to the Apology, would be deemed by the defendants as far more anti-scriptural, than any thing which they find in the Augsburgh Confession; especially on the subjects of the efficacy of baptism and the real presence in the Lord's Supper. (See Melanchthon Operum Omnium, pars 1, fol. 58, editio 1580, and Seckendorf's Commentarius, lib. 2, sect. 35, § 79, additio.)

And we learn from the valuable Church History of Guerike, (vol. 2d, page 863,) that Luther, when writing to Melanchthon respecting the Apology, says, that " it has conceded all too much. If they will not take that, I do not know what I could give more." And Luther held similar language at the same time, in a letter to the Land-grave of Hesse.

So of the Smalkaldic Articles drawn up by Luther, with the aid of other theologians, under the auspices of the third convention of the Smalkaldic League, and signed in 1537. These Articles were chiefly an enlargement of the last seven articles of the Confession, displaying the abuses and errors of the Church of Rome, and contained moreover, for the first time in terms, an express denial of the authority of the Pope. They also set forth anew, the leading doctrines of the Protestants who agreed with Luther, and in that respect fully confirmed the Augsburgh Confession, adopted at Smalkalden. And, indeed, the Articles declare, in so many words, that the convention republished and declared their assent to the Confession and the Apology, and directed them to be taught in, and believed by their churches.

Here again the defendants find no encouragement for their peculiar views, by rejecting the Confession, and setting up the Smalkaldic Articles as the more authoritative symbol of the Lutheran faith. The obnoxious doctrines are in some instances

more strongly expressed in those Articles than in the Confession. Thus, of the Holy Supper, the Articles say, " *Sentimus* " *panem et vinum in coena esse verum corpus et sanguinem* " *Christi ;*" without the qualification of the words, *external signs.* (Seckendorf, lib. 3, § 55, 56.)

The Formula Concordiæ which was generally adopted, stands on the same footing in respect to this controversy. We have seen Dr. Guerike's account of the object of the Formula. And Dr. Mosheim says it was especially employed to preserve the Lutheran Church against the opinions of the Reformed Church relative to the Eucharist. (Part 2, ch. 1, § 39, vol. 3, p. 254.)

The Catechisms of Luther will scarcely be referred to as teaching any different essential doctrines from those contained in the Confession ; much less as a superior or more authentic exposition of the belief of the Evangelical Lutherans. They teach the doctrines in more simple language, and perhaps better adapted to the purpose for which they were designed. But it is not claimed, and certainly there appears to be no historical ground for claiming it, that Luther himself ever changed his views in regard to the three articles of the Confession, which become important in this suit.

I have been thus minute in reference to the Symbolical Books, in order to show that the Augsburgh Confession of Faith, while it is always the first mentioned in enumerating them, is also the chief and principal standard. And that in its bearing upon the defendants position, it is no less favorable than if it were shown to have been secondary or subsidiary to the others.

One fact is also decisive of its being deemed the great Symbol of the Lutherans, which is that it is found published at large in a great variety of forms ; and one of the witnesses speaks of it as being contained in the old German bibles ; while on the other hand, the Apology, the Smalkaldic Articles and the Formula, are very rarely to be found, *in extenso,* even in our large public libraries.

*Buck's Theological Dictionary, Article, Lutheranism,* was referred to in connection with the defendants argument, that the Lutherans have long ceased to believe in several of the

doctrines and practices inculcated by the Augsburgh Confession. This book, although widely disseminated, is not a work of authority as I am informed by those best acquainted with this department of knowledge.

On the other hand, Mr. Adam's book, before referred to, which was published within the last thirty years, says in reference to the Lutheran Church; "From the time of Luther to the present day, no change has been introduced into the system of doctrine and discipline that is received in this church; so that the ancient confessions and rules that were drawn up to point out the tenets that were to be believed, and the rites and ceremonies that were to be performed, still remain in their full authority, and are considered as the sacred guardians of the Lutheran faith and worship." (*Religious World Displayed*, vol. 2d, page 335.)

Mr. Adam proceeds to say that the method of illustrating the doctrines of christianity has undergone several changes in the Lutheran Church, although the confessions continue the same. The particular doctrines which he specifies as being the subject of this change, are the Calvinistic tenets of *absolute predestination, human impotence* and *irresistible grace*, of which, he says, Luther was an advocate, but that he has in this respect, very few followers among those that bear his name. As the Lutheran symbols declare no such doctrines, the unbounded liberty of dissent mentioned by Mr. Buck could not have referred to the doctrines which Mr. Adam details as the chief points in which their method of teaching has changed since the time of Luther.

The recent *Union* of the Evangelical Church in the Prussian dominions, effected by governmental authority, corroborates the view of Mr. Adam. For in that Union, embracing the Reformed as well as Lutheran churches, the articles of faith are chiefly from the symbols of the latter; the former yielding in a great degree the high toned doctrines of the Five Points, and the Lutherans in the Union, assenting to the spiritual presence only in the sacrament of the Lord's Supper. But in this Union, the churches expressly relinquish their name and character as *Lutheran Churches;* and it therefore

gives no support to Mr. Buck's statement. And I might add, that it has produced the bitter fruits which might be expected from forcing the consciences of men; great dissatisfaction, heart burnings, irreligion, and that tendency to infidelity, which is the reproach of a great mass of the German Protestants of this day. Another consequence, of which we cannot complain, is the extensive emigration of Prussian subjects to the United States.

It is, doubtless, true of the Lutherans as of every other sect, that various learned men amongst them have held different views in regard to some of the articles of their faith and doctrine, and have published their variant constructions of such articles. And this is peculiarly the case in reference to the Lord's Supper, holding, as they did, a sort of debateable ground between the simple commemoration of the great Swiss Reformer, Zuingli, and the transubstantiation of the Romish Church; and still variant from the spiritual presence held by Calvin and his immediate followers. But in respect of the three essential points which form the issue in this suit, I do not find that any Lutheran of note, much less any considerable or even respectable portion of the Lutheran Church, ever, either by profession or construction, held any different doctrine from that contained in their leading Symbols, from the days of Martin Luther to the era of this controversy.

Occasional differences and dissents among the Lutherans, on their doctrinal articles, do not, as I have already said, impugn the position that their standards as a church remained the same. And such dissent, if it had been shown to have existed upon these three points, must be traced to the founders of the churches in question, in order to establish the defendant's ground in regard to the force of the Confession.

To conclude this most interesting and importaat branch of the case. I find that these churches were founded as Evangelical Lutheran Churches, by the descendants of Lutherans who fled from Germany to avoid religious persecution; that for more than two centuries prior to their foundation, the Augsburgh Confession of Faith had been one of the principal, and the first in rank of the symbolical books and standards of the

doctrines of that denomination of Christians; and that no other or different symbolical books are shown to have been recognized or known among the Lutherans who endowed these churches, or in any of the Lutheran congregations which then existed in this country or in Europe. All of this is established by the concurring testimony of every historian, and of every theologian, who has written on the subject prior to the year 1830; so far as my own researches, aided by the great learning and untiring diligence of the counsel in the case, have enabled me to discover.

In addition to this, I find that the Augsburgh Confession was treated as their doctrinal standard by several of the contemporary members of these churches, and was recognized from time to time by their pastors, for twenty years after they had procured stated preaching in the churches. That one of the church buildings was dedicated to be used according to that Confession, for preaching the gospel and administering the sacraments; that at a much later period, the churches formally adopted the Augsburgh Confession, and subsequently attached themselves to a synod which adheres to it; and finally that until the year 1837, no other confession or declaration of faith or doctrines was known in those churches, save the Smybolical Books before mentioned, of which this was the principal, and next to the Catechisms, the best known and understood.

It is therefore established that the Augsburgh Confession of Faith was accepted and receive₁ ᵫy the churches in question at the time of their endowment, ₐ ˡ by the members thereof, as their confession of faith; and t' churches were founded for the purpose of having the faith ᵫ²l doctrine expressed in that . Confession, taught and inculcate' ᵫerein. And that in respect of the doctrines in question in suit, there never had been any established or even known ent from the Augsburgh Confession in this, or any of th₁ ᵫeran churches.

FOURTHLY. The next great iₛ ᵫetween the parties, which it becomes my duty to examine, e alleged perversion of the trusts in question by the defendₐ . The bill in substance charges the defendants with havⁱⱼ ₋ abandoned and repudiated

the Augsburgh Confession of Faith in these churches; that they have seceded from the Hartwick Synod without the sanction of the latter; and organized with other churches, a new and independent synod, and adopted a new declaration of faith, and a peculiar government at variance with the faith and government of the Evangelical Lutheran Church. That this new declaration of faith, differs from the Augsburgh Confession in three essential particulars, viz.:

1. It does not maintain and declare the doctrine of the Trinity, or that the three persons constituting the Godhead, are equal in power and glory; or even that there are three persons constituting the Deity. 2. It does not declare or admit the divinity of Jesus Christ, or his equality with God the Father. 3. It does not teach or declare that man will be condemned to punishment in a future state, because of original or inherited sin, unless it be repented of; or that it condemneth all who are not born again of water or of the Holy Ghost.

I will omit the subject of the government and judicatories of the church for the present, while I examine the other issues made.

I. The defendants by their answer deny that the Franckean declaration of faith is essentially variant from the Augsburgh Confession, in respect of the doctrine of the Trinity, or that it is in any wise Unitarian. And they aver that it declares essentially the doctrine of the Trinity, as professed and believed by the whole denomination of Lutherans. And they further aver that they believe that doctrine in its fullest extent, as taught by the Augsburgh Confession.

The defendants examined as witnesses, two clergymen of the Franckean Synod, one of whom, (Mr. Lawyer,) by his ability and intelligence appears to have merited the place of leader and prime actor in its organization. They both assert that the members of that synod believe in the Augsburgh Confession as a system or summary of doctrines, but they do not believe, nor do Lutherans generally profess to believe, in certain doctrines therein declared. Both mention the second article, (on inherited sin,) as one of these, and also private confession and absolution. Mr. Lawyer says that several points in the Confession,

are considered by many Lutheran ministers as relics of Roman Catholic doctrines; such as the real presence in the Lord's Supper, baptismal regeneration, and the idea that God, the divinity, died at the passion of Jesus Christ.

Undoubtedly, the most authentic as well as conclusive evidence of what the defendants and the Franckean Synod believe and teach ; is to be found in their Declaration of Faith. Mr. Wieting, representing the defendants as their pastor, and one or more of the defendants also representing the others and professing to answer for the church as lay delegates ; participated in framing and promulgating this declaration, both in 1837 and 1838. And the published proceedings declare that the constitution containing the same, was unanimously adopted on both occasions. The defendants in their answer state the one adopted in 1838, to be "a summary exhibit of the system of doctrines" held to and inculcated by Lutheran churches.

It was therefore put forth to the world as the standard of the doctrines of the adherents of the new synod. It declared to all mankind, how they understood the bible, and wherein they differed from other christian denominations in their doctrinal belief.

It is also evident, that they no longer recognised the Augsburgh Confession as their symbol or doctrinal standard. Their constitution makes no allusion to it. They adopted a similar declaration, as the 12th Article of their constitution, which as the president of their synod stated in his address in October, 1837, "contains the doctrines which (they) believe, and not those points which (they) do not believe." This, in effect, superseded every different standard. Indeed, the president cites the entire silence of their constitution in regard to the Confession, as proof that they have not *renounced it*. This is however a mere play upon words. He declares in the address that they do not believe in *all the doctrinal articles* of the Augsburgh Confession. Some of them, he says, are manifestly unscriptural; and "we do not receive and adhere to it complete, entire, and in all points of doctrine." In the report of a committee at the same meeting in October, 1837, in reference to the Hartwick Synod proceedings, they speak of that Synod's

regarding and adopting the Augsburgh Confession as the *standard* of the Evangelical Lutheran Church, as being "a fact of which they were never before apprised, and which is worthy to be fully understood by the churches." As if its *being so understood,* would turn aside other Lutheran Churches into the Franckean Synod, which adopted a more scriptural standard. This report is signed by Mr. Wieting, and one other of the defendants.

Further, it is proved by Dr. Moeller, that Mr. Wieting, in the fore part of May, 1837, when he gave from the pulpit of one of these churches his reasons for separating from the Hartwick Synod, stated that he did not believe the Augsburgh Confession. That it was an antiquated thing, unfit for the present age. Nicholas Russell testified that one of the defendants, a deacon in the New Rhinebeck Church, told him that they, the Franckeans, had put the Augsburgh Confession entirely aside, and held to the bible, and nothing but the bible.

By Section 2 of Article 6th of their Constitution, they require, every church which seeks to become connected with their synod, *to adopt the constitution ;* and the 4th section reserves to the synod the power of cutting off any church that shall be proved to have become fundamentally corrupt in doctrine. And in their form for the "Ordination of Ministers," published by order of the synod, in the church discipline, the candidates are required to promise faithfully to observe the constitution.

I cannot doubt, therefore, but that the defendants have abandoned the Augsburgh Confession of Faith in these churches, and that in some essential articles, they have repudiated it.

But the complainants are restricted to the points stated in their bill ; and I recur to them, to see whether the Franckeans have repudiated the Confession in those points, or adopted a declaration or creed at variance with it.

The first article of the Augsburgh Confession of Faith is in these words : " Of God. In the first place, we unanimously teach and hold, agreeably to the decree of the Council of Nice, that there is one only Divine Being, who is called, and truly is God ; but there are three persons in this only Divine Being

equally powerful, equally eternal; God the Father, God the Son, and God the Holy Ghost; all three one Divine Being, eternal, without parts, without end; of unmeasurable power, wisdom, and goodness; the creator and preserver of all things, visible and invisible."

In addition to this, the third article, (" Of the Son of God,") declares that God the Son " eternally rules over all his creatures, and governs; that he sanctifies, strengthens, and comforts, through his Holy Spirit, all who believe in him, and gives unto them life and various gifts and blessings, and that he defends and protects them against the devil and against sin."

The first declaration of faith adopted by the Franckean Synod in May, 1837, contains this substitute for the first article of the Augsburgh Confession.

" Of God and Creation." (We believe,) " 2. That there is only one true and living God, called and made known by revelation under the name of the Father, Son, and Holy Ghost; infinite and immutable in all natural and moral perfections; the Almighty maker of heaven and earth, and of all things, visible and invisible."

The 4th clause, relative to Jesus Christ, does not attribute to him any of the powers of God.

The difference between the Augsburgh Confession and the Franckean Declaration of 1837, in respect of the Trinity, is too obvious to require extended comment.

Mr. Lawyer frankly testifies that the latter does not affirm three persons in the Godhead, nor aver that God the Son and God the Holy Ghost are equally powerful and eternal with God the Father; and that a believer who confines the glory and divine attributes to the Father, and to him only, might by construing the article, subscribe to it.

On the other hand, Mr. Ottman testifies that he thinks this article in the Franckean declaration *does* imply three persons in the Trinity, and that it distinctly avows that God the Son and God the Holy Ghost, are equally powerful and eternal with God the Father.

I can only say as to this, that it requires much more acute-

ness than I am accustomed to see brought in aid of construction, to make any such thing out of the article in question.

So far as I can judge of language when applied to this subject, the Franckean declaration, in 1837, as to God, was nearly or quite, *Sabellian.* The Sabellians held that there was but one person in the Godhead, and reduced the three *persons* in the Trinity, to three *characters* or *relations.* Sabellius himself made use of this comparison to illustrate his doctrine; "as man, though composed of body and soul, is but one person, so God, though he is Father, Son and Holy Ghost, is but one person." And he taught that the *Word* and the *Holy Spirit*, are only *virtues, emanations* or *functions* of the Deity; that the Father, Son and Holy Ghost, were one subsistence and one person, with *three names.*

The fourth section of the Franckean Declaration of 1837, is also in connection with the second, substantially conformable to the view of Sabellius; for he held that a certain *portion* of the divine nature, was united to the son of God, the man Jesus, in the same manner that he considered the Holy Ghost as a *portion* of the everlasting Father.

At the second annual session of the Franckean Synod, held in June, 1838, their declaration of Faith was revised and published anew. The reason for this revision, as Mr. Ottman, one of their licentiates, testifies, was that the doctrines of the Trinity were not so expressly, distinctly and fully declared, as they wished to have them.

The fact of altering the declaration in this respect, with the reason assigned, confirms all that I have said of its intrinsic character.

The new Declaration of Faith, published in 1839, is contained in Article 12th of the Constitution. The second section is in these words:

"Of God and Creation. 2. (We believe,) "That there is only one true and living God, and that in this one God there is a distinction of three, revealed in the Scriptures, as the Father, the Son, and the Holy Ghost; inseparably connected with one another, possessing the same essence, and equal and alike, infinite and immutable, in all natural and moral perfections; the

Almighty maker of heaven and earth, and of all things visible and invisible."

This, the defendants insist, exhibits the doctrine of the Trinity as held by the Lutherans and by all Trinitarians, in its fullest extent.

The first remark that occurs is, that if such were the design, why did they not adopt the first article of the Augsburgh Confession; the language of which is at once plain, intelligible and explicit, and which requires no resort to theological dictionaries or class books, to be understood by the most unlettered Christian? I say *understood*, so far as this holy and sublime mystery may be understood by men in the present life.

And I confess that I approach the examination of all these questions, and especially of the one under immediate consideration, not only with great diffidence and profound reluctance, but with an oppressive sense of the inherent difficulties which ever have attended, and to the end of time must attend, their explication. But it is a duty from which I may not shrink; and it is a satisfaction to know that if I err in its performance, the parties can readily review and redress my judgment.

To arrive at a conclusion satisfactory to myself, I have resorted to the creeds, doctrinal standards and authoritative publications of the various denominations of Christians, to see in what language they express their belief in relation to the Supreme Being.

*First.* In those denominations which not only avow a full belief in the Trinity, but are conceded by all the world to hold that doctrine.

In the Church of Rome, the doctrinal decrees of the Council of Trent contain their standard of faith. The first decree is " The Creed of Faith," and commences thus :

"In the name of the holy and undivided Trinity, Father, Son and Holy Ghost." It then proceeds with the confession of faith in the words of the Nicene Creed ; which, I need scarcely say, affirms three distinct existences or persons in one God, who are equally adored and glorified ; that the Son is God of God, born of the Father before all ages, is to judge the living and the dead, and of whose kingdom there shall be no end ;

that the Holy Ghost is the Lord and Giver of Life, who pro-
ceedeth from the Father and the Son, who spoke by the
prophets.

In *Rupp's History of all the Religious Denominations in
the United States*, a work compiled with great care, and by
theologians esteemed a book of high authority, (the articles on
each sect having been prepared by an eminent writer of that
sect ;) Professor Walters, in the article on the Roman Catholic
Church, says, " The Catholic Church holds, as the foundation
of all religion, that there is but one supreme, self-existent, eter-
nal Deity, infinite in wisdom, in goodness, in every perfection ;
by whom all things were made," &c, " It teaches that in this
one God, there are three divine persons, perfectly distinct in
personality, perfectly one in nature." " The Catholics believe
that the Holy Ghost, the third person of the blessed Trinity,
proceeds from the Father and the Son, and is equally God with
them."

The first article of the Augsburgh Confession professes ex-
pressly to be a declaration of the Nicene Creed, in relation to
God, and it never was understood to contain any point or doc-
trine, variant from the established belief of the Church of Rome
on that subject.

The Protestant Episcopal Church in Great Britain and the
United States, adopts the Nicene Creed in Article Eighth, and
in its order for Daily Morning Prayer ; and the first of the
Thirty-Nine Articles declares its " *Faith in the Holy Trinity*,"
in these words :

" There is but one living and true God, everlasting, without
body, parts, or passions, of infinite power, wisdom, and good-
ness ; the Maker and Preserver of all things, both visible and
invisible. And in unity of this Godhead, there be three per-
sons, of one substance, power, and eternity ; the Father, the
Son, and the Holy Ghost."

And Article 5th, *Of the Holy Ghost*, is thus ; " The Holy
Ghost, proceeding from the Father and the Son, is of one Sub-
stance, Majesty and Glory with the Father and the Son, very
and eternal God."

The Dutch Reformed Church receives as its Creed, the Con-

fession of Faith as revised in the National Synod of the Council of Dort, in 1618 and 1619, with the Heidelberg Catechism, and the Canons of Dort on the famous five points.

Article 1st of the Confession revised at Dordrecht, asserts, "that there is only one simple and spiritual being, which we call God; and that he is eternal, incomprehensible, invisible, immutable, infinite, almighty, perfectly wise, just, good, and the overflowing fountain of all good."

Article 8th is entitled, "That God is one in essence, yet nevertheless distinguished in three persons;" and it asserts that God is one single essence in which are three persons, really, truly and eternally distinct, according to their incommunicable properties, namely the Father, the Son, and the Holy Ghost.

After asseverating and illustrating their distinctness in emphatic terms, it concludes, "For they are all three co-eternal and co-essential. There is neither first nor last, for they are all three one in truth, in power, in goodness and in mercy."

Article 9 contains the proofs of the 8th article. Article 10 declares the glory and divinity of Jesus Christ, and his equality with the Father in all things; and article 12 treats of the Holy Ghost, and declares that the Holy Ghost is true and eternal God, and of one and the same essence, majesty and glory with the Father and the Son.

The doctrinal system of the German Reformed Church is contained in the Heidelberg Catechism.

In its explication of the Apostles Creed, (which this, and I believe all Trinitarian churches adopt,) the Catechism teaches that God has revealed himself in his word as but one divine essence, and that the three distinct persons, Father, Son and Holy Ghost are the one only true and eternal God. It then sets forth the distinct offices of each, and re-asserts their unity, co-eternity and glory.

The Presbyterian family of Christians, in its various branches of the Presbyterian Church of the old and new schools, Associate Presbyterians, Associate Reformed Church, Church of Scotland, and many others, together with the Congregationalists, adopt the Westminster Confession of Faith.

The 2d Chapter of the Westminster Confession treats "Of

God and the Holy Trinity," and it first sets forth that there is but one only living and true God, and states his attributes and perfections at large. Section 3, is in these words: "In unity of the Godhead there be three persons of one substance, power and eternity; God the Father, God the Son, and God the Holy Ghost. The Father is of none, neither begotten nor proceeding; the Son is eternally begotten of the Father; the Holy Ghost eternally proceeding from the Father and the Son." Chapter 4th, Of creation, declares that God, the Father, Son and Holy Ghost, created the world. Chapter 8th, is Of Christ the Mediator, and section 2d declares that he is very and eternal God, of one substance and equal with the Father.

And in the Larger Catechism of Westminster, which is also a standard with the Presbyterians, the answer to Question 9th is thus: "There be three persons in the Godhead, the Father, the Son and the Holy Ghost; and these three are one true eternal God, the same in substance, equal in power and glory, although distinguished by their personal properties."

The Cumberland Presbyterians adopted a Confession of Faith and Catechism, founded on those of Westminster, which assert the doctrine that God is an infinite, eternal and unchangeable spirit, existing mysteriously in three persons, the three being equal in power and glory, &c., and that Jesus Christ is both God and man in one person. (*Rupp's History*, 218.)

The Articles of Faith of that large body of Christians in this country, the Methodists, contain the following:

"Article I. Of Faith in the Holy Trinity. There is but one living and true God, everlasting, without body or parts, of infinite power, wisdom and goodness, the maker and preserver of all things visible and invisible. And in unity of this Godhead there are three persons, of one substance, power and eternity: the Father, the Son, and the Holy Ghost." The second and third articles relate to our Saviour. The fourth is thus expressed. "IV. Of the Holy Ghost. The Holy Ghost, proceeding from the Father and the Son, is of one substance, majesty and glory with the Father and the Son, very and eternal God."

The "True Wesleyan Methodist Church" hold substantially the same doctrine, and in respect of the Holy Trinity, in the same language.

The Greek, Russian Greek, and Armenian churches, believe in the doctrine of the Trinity, as held by the Protestant and Romish churches, save that they maintain that the Holy Ghost proceeds from the Father only, and not from the Father and the Son.

It was said at the hearing, by the learned counsel who opened for the defendants, that the term "person," in reference to the Trinity, was never known or used before the fourth century. That counsel was so full and accurate in his historical as well as theological knowledge, that I did not venture to question this position until after a careful inquiry. I am satisfied, however, that it is erroneous, and that the term was used, and the expression Trinity also (or words which can only be thus interpreted,) as early as the second century.

Polycarp, Bishop of Smyrna, the disciple of St. John, died about A. D. 168. (*Guerike Kirchen Geschite*, 73.) His doxology was addressed to the whole Trinity.(*a*)

And Justin Martyr, in the middle of the same century, (Dr. Priestley says Justin wrote about A. D. 140,) declared that the worship of the Christians was of the whole Trinity. (Justin Martyr, 1st Apol. 56, 60 ; Dial. de Tryph. pp. 358 and 265, 232–3. Also, Lactantius, Instit. Divinorum, lib. 4, De vera sap. ch. 4, also ch. 29.) Indeed, the great Unitarian, Dr. Priestley, concedes that the writers who have come down to us, if we omit the author of the Clementines, were all, without exception, from Justin Martyr to Athanasius, what he calls "Platonizing" Trinitarians.(*b*)

One of the defendants witnesses mentioned the Free Will Baptists as an instance of an *orthodox* denomination, (to use his language,) which did not express their belief of three persons in the Godhead. I think that the witness erred. In the

---

(*a*) Berriman's Historical account of the Controversies concerning the Trinity, 70.

(*b*) History of Early Opinions concerning Jesus Christ, vol. 4, Appendix, p. 391. The author of the Clementines, he says, was an Unitarian.

In the same work, Dr. Priestley says that Justin Martyr was the first writer that can be proved to have advanced the doctrine of the permanent personification of the *logos*. (Vol. 1, p. 269.) And that Justin was the first writer who publicly maintained the pre-existence and divinity of Christ. (Vol. 3, p. 277, 8.)

Kniskern *v.* The Lutheran Churches of St. John's and St. Peter's, and others.

article on that sect in Rupp's History 65, written by the Rev. Mr. Burbank, a Free Will Baptist, the articles of their faith are set forth, and they expressly state the existence of three persons in the Deity.

*Second.* I will now consult the standards of denominations who do not believe in the doctrine of the Trinity.

The Unitarians, or Unitarian Congregationalists, believe that Jesus Christ is a distinct being from God, derived from him and sent for the purpose of the redemption of fallen man ; not before existing, subordinate to God. That the Father alone is entitled to be called God, and alone possesses the attribute of infinity. They hold the supremacy of the Father, and the inferior nature of the Son. That the idea that Jesus was the infinite and supreme God, is irreconcileable with the language of the new testament. Some Unitarians, however, hold that Christ pre-existed his coming upon earth. The Unitarians object to the doctrine of three persons in one God, on account of its intrinsic incredibility, and because according to their conception of it, it teaches that there are three beings, three minds, three conscious agents, and thus it makes three Gods, and to assert that these three are one, is a contradiction. And they generally do not think it lawful, directly to address Christ in prayer.

They profess to believe in the *divinity* of Christ, and they regard him as one with God in affection, will and purpose.

By the Holy Spirit, Unitarians suppose is meant, not a person, but an influence. See the Article on Unitarians, in *Rupp's History,* 704 to 710 ; written by the Rev. Mr. Lamson, an old and well known minister of that church.

Mr. Adam in his View, &c., vol. 2, p. 159, says, that the Unitarians in England, have totally divested Christ of his Divinity, and maintain that he had no existence before he was conceived by the Virgin Mary ; and that the Holy Ghost is merely a figurative expression, to denote the power or energy of God.

The Universalists entertain views similar to the English Unitarians, in relation to God, Christ and the Holy Ghost.

*Rupp's History*, 727. 730. 732. The second article of their *Profession of Faith*, adopted at the General Convention of the New-England States in 1803, is as follows ; " We believe there is one God whose nature is love ; revealed in one Lord Jesus Christ, by one Holy Spirit of Grace, who will finally restore the whole family of mankind to holiness and happiness."

The " Christians," or Christian Connection, are Unitarian in their belief; holding however that Jesus Christ is divine, and generally, that he existed with the father, before all worlds. (*Rupp's History*, 169 ; *Millard's True Messiah.*)

The Friends, (Hicksite Quakers,) avow that they reject the common doctrines of the Trinity, as contrary to reason and revelation. Yet they believe in the divinity of Christ.

The heresy of Arius, so destructive to the church of Christ in the fourth century, the cause of the first bloody persecution by Christians of their own brethren, and the subject of most bitter controversy until the present day, consisted in the doctrine that Christ, although he was God, was of a different essence, and inferior to the Father even as to his Deity ; and that the Holy Ghost was not God. That Christ was created prior to all other beings, but denying that he was eternal.

Another distinguished tenet on this subject, was that of Lælius and Faustus Socinius, who argued that Christ was a mere human being, but upon his death was advanced by God to the government of the created universe, and became the proper object of religious worship.

Many of those who deny the doctrine of the Trinity at this day, follow in part the views of Socinius and in part those of Arius; and among the Unitarians, some are Socinians and others nearly allied to the High Arians in belief.

I will not pursue the labyrinth of the doctrines, and shades of belief, on this holy mystery, which have filled innumerable books and treatises for centuries past ; but will now attempt to compare the Franckean creed with the tenets professed by ninety-nine hundredths of the Christian world.

It is a circumstance which weighs against the Franckean declaration, that in respect of the Holy Trinity, they should have departed from the plain terms of the great Lutheran

standard, if as they allege, they believe the doctrine of the Trinity as set forth in that standard.   If the Augsburgh Confession on the subjects of original sin, baptism and the Lord's Supper, was different from their interpretation of scripture; what need was there, in order to express their dissent on those points, that they should write a new creed on the subject of the Trinity, discarding an article to which they now declare their substantial assent?

Connecting this needless deviation from the time-honored symbol of their church, (that memorial of the Reformation which every true Protestant reverences, although he may not subscribe to all its doctrines,) with the palpable Unitarianism of the Franckean declaration of faith adopted in 1837; the new declaration in 1838 merits close scrutiny; and if it turns out to be in any degree evasive or silent upon any pointed feature of the doctrine of the Trinity, it must receive our condemnation as an intentional deviation from the Augsburgh Confession in that behalf.

In every creed, or exposition of belief, of the large bodies of known Trinitarians, we find one point which is most fully expressed and declared, viz., that in the one living and true God, *there are three distinct persons.*   The word *person*, is used to express, that individuality, and distinction of one from the other, which constitutes the sublime and confessedly incomprehensible mystery, which Trinitarians believe.   They assign to each distinct personality, agency and divine offices; while they attribute to each and to all equally and alike, in one essence, the great functions, powers and perfections of the Triune God.

The Canons of the Synod of Dort illustrate the distinction of persons as well as their unity, by saying that " the Father is not the Son, nor the Son the Father, and likewise the Holy Ghost is neither the Father nor the Son.   Nevertheless these persons thus distinguished are not divided nor intermixed : For the Father hath not assumed the flesh, nor hath the Holy Ghost, but the Son only.   The Father hath never been without the Son, or without his Holy Ghost." (Article 8th.) Here is a definite proposition in regard to this great subject, which is capable of being expressed in the plainest and most simple terms, and which

as we have seen, is most emphatically and distinctly expressed in the first article of the Augsburgh Confession of Faith.

After a most careful and anxious consideration of the Franckean Declaration of 1838, I am compelled to say that it does not to my understanding *declare* or *express*, that there are three distinct persons in the Godhead. It indeed asserts in section 2d, that "in this one God, *there is a distinction of three*, revealed in the Scriptures as the Father, the Son and the Holy Ghost;" but the inquiry at once occurs, a distinction of three what? Does it mean a distinction of *three names*? That was the obnoxious feature in the declaration of 1837. Does it mean *three persons*, three individualities? If so, why were not those words inserted? The identical words in which this solemn truth had been expressed in the Augsburgh Confession, then lying open before them, and in which it had been maintained in their Church for three centuries? Does it mean three distinct *characters, relations* or *revelations*, of the only one true God? It is perfectly consistent with that meaning, so far as the express terms reach. Let us assume that the latent meaning really was, that God is only one being, revealed in the Scriptures in three distinct characters or relations. The residue of the section asserts, that these three relations are "inseparably connected with one another, possessing the same essence, and equal and alike immutable in all natural and moral perfections." All this follows of course, if they are three relations or characters of one divine being. It may be said to be a very unnecessary outlay of words to express it. But all these words do not necessarily express any greater meaning. Then take the 4th section of the Franckean declaration, which relates to Jesus Christ and Redemption, and read it with the hypothesis that he is but a relation or character of the one living God as revealed in the Scriptures, and it is consistent with that hypothesis. And so of section 7, "Of the Holy Ghost." As virtues or emanations of the Deity, Jesus Christ could, on this assumption, be manifested in the flesh, ascend into heaven, and be exalted at God's right hand, to intercede for our race; and the Holy Ghost more especially, might be "given to quicken and renew the hearts of men."

Undoubtedly, these clauses are all perfectly consistent with the Trinitarian construction of the Article. And if the word "*persons*" had been inserted, they would, in so much at least, have harmonized with the Augsburgh Confession. In short, it may be conceded that the Franckean Article is *capable* of a Trinitarian construction, and still the case will not be relieved. It then becomes merely equivocal, accommodating itself to the consciences of both Trinitarians and Unitarians. In order to avoid the conviction that it is a departure from the faith of the Lutheran founders, it should have propounded the doctrine of the Trinity in plain and explicit language, which construction could not pervert or circumvent. And I cannot forbear connecting the omission of such language with the obviously defective declaration of 1837, and am thus directly led to the conclusion that the Articles of 1838 were not intended to declare or express that there are three individuals or persons in the Godhead.

It would seem that like the "*Disciples of Christ*," better known as *Campbellites*, the Franckean Lutherans were unwilling "to use those scholastic terms and phrases which the wisdom of men" has provided; and perhaps will say with that sect, that "although they use not the words Trinity, Triune, &c., they receive every thing which the Scripture affirms of the Father, the Son, and the Holy Spirit, giving to every expression its full and obvious meaning." This is all well in establishing a new or better sect. But when a church or synod of Lutherans or Presbyterians, brought up amongst ancient standards which express in the strongest terms the doctrine of the Trinity, announce that they have adopted such a declaration of their faith, carefully eschewing these terms of mere human learning, and such declaration is vague, reserved and inexplicit on this point, what can we infer, except that such church or synod no longer believe or mean to profess the doctrine as contained in the old standards?

And when, as we are informed by the Franckean ministers, this article of faith was amended in 1838, and published in its present form, for the express purpose of stating the doctrine of the Trinity more fully and explicitly than it was stated in

1837, is it possible to believe that the framers of the amended article, intended to profess or declare that doctrine in the full and unequivocal manner in which it is set forth in the Augsburgh Confession? Is not the difference the more marked and emphatic, when we consider the two successive efforts of the Franckean Synod to make their belief plain and explicit?

The Franckeans appear to have patterned, in some respects, after a new sect denominating itself " *The Church of God*," which sprung out of the German Reformed Church in Pennsylvania, and first assumed a distinct organization in 1830. This sect set out to establish " spiritual, free and independent churches, consisting of believers or Christians only, without any human name, or creed, or ordinances or laws." I quote from their founder and principal minister, the Rev. John Winebrenner, who, notwithstanding they were to have no creed or laws, furnishes for publication " *The Faith and Practice of the Church of God*," in no less than 27 articles or heads, which he says is an *outline* of their avowed principles and practice. The 18th and 19th of these articles are against the manufacture, traffic and use of ardent spirits as a beverage, and against slavery as impolitic and unchristian ; therein stopping far short of the Franckean declaration. They renounce the doctrine of unconditional election and reprobation, and thus depart from their German Reformed standards. Their article as to God is in these words : " She" (the Church of God) " believes in one Supreme God, consisting of Father, Son, and Holy Spirit, and that these three are co-equal and co-eternal." And there is nothing in the separate articles relative to Jesus Christ or the Holy Ghost, which award to them either Divinity, power or glory.

This creed, coming from one who once professed the Canons of Dort or the Heidelbergh Catechism, appears exceedingly barren and unsatisfactory in reference to the doctrine of the Trinity in Unity, if we are to understand from it that the writer believes that doctrine.

The words " consisting of," and " these three," go farther in this respect than the Franckean Declaration. *Consisting of* is used by many theologians as synonymous with " composed of,"

or " having being concurrently ;" and in that sense would, in connection with *" these three,"* go much farther to express a distinct personality of three in the Godhead.

The similarity to which I have alluded, and the apparent reserve in expression in the two creeds, is certainly a coincidence which deserves attention.

There is another defect, which it is alleged, distinguishes the Franckean declaration in respect of Jesus Christ and the Holy Ghost. The Augsburgh Confession declares that the three persons in the Divine Being called God, are *equally powerful,* equally eternal; and that all three are one Divine Being of unmeasurable power, wisdom and goodness.

The doctrinal standards of the other Trinitarian Christians which I have cited, affirm the same truth in distinct, and some of them in very emphatic terms.

Let us assume, for this part of the argument, that the Franckean declaration does assert the existence of three persons in the one true God. Does it assert that the Son and Holy Ghost are *equally powerful,* and equally eternal with the Father ?

It will not suffice to answer this by saying that as they are one with the Father, they must necessarily be equally powerful. Luther, Melanchthon and the German Protestants in 1530, deemed it essential to declare this equality in express terms. The principal christian denominations, adopting the Trinity, have all deemed it necessary. Accordingly the defendants insist that the Article in question, does avow and express this doctrine. They find it in the words, "equal and alike infinite and immutable in all natural and moral perfections." The first words, "equal and alike infinite," are limited to those which succeed, and qualified by them. The whole point therefore turns upon the meaning of " natural and moral perfections."

The Campbellites would have rejected these words at once, as savoring too much of *human wisdom.*

To illustrate and enforce their meaning, the defendants read from the *Theological Class Book,* by *W. Cogswell,* a small publication issued at Boston in 1840, in the form of question and answer. This book divides God's perfections into Natural

and Moral; and says that the natural perfections of God are "eternity, immutability, omniscience, *omnipotence*, omnipresence, independence, unity," and the moral perfections of God are, "goodness, wisdom, holiness, justice, mercy and truth."

It cannot be denied, that if the Franckean declaration is to be construed by this book, it does declare the equality in power of the Son and Spirit with the Father, and that they are equally eternal. As I could not find these words defined thus, in any other book, I have taken much pains to learn the standing of the Class Book. On inquiring of some of the professors in our theological seminaries, and several doctors of divinity, I did not meet with one who had ever heard of the work. This fact, and its standing alone, so far as my researches have extended, induce me to allow to it no further influence than I would to any biblical critic, or professed lexicographer, whose reputation and accuracy has not received the sanction of the literary and scientific world. And it imposes upon me the unpleasant duty of criticising the words in question.

The division of God's perfections into *natural* and *moral*, is manifestly for the purpose of illustrating the subject by our human nature. Because, strictly speaking, God's *moral* perfections, as defined by the defendants, are as much *his* nature, and as natural to him, as any of those which they call natural. All his perfections and his attributes are his natural attributes and perfections.

We are therefore to ascertain God's moral and natural perfections, by comparison or contrast with those of mankind, and we cannot understand by the term *natural perfection*, when applied to the Deity, any thing which would not be esteemed a natural perfection, when applied to a man. And the point is then distinctly presented, is *power* a natural perfection of man?

It at once occurs to every mind, that men possess different kinds of power; they have physical power, mental or intellectual power, and moral power; which last embraces of itself a great field of influence. Some have one of these, and not the others. Some possess one or more, or the whole, in an infinite diversity of extent and combination. The physical power may be termed *natural*; the moral power never can be so termed;

and the intellectual is more an acquired, than a natural perfection. It is evident, that to say of *power*, that it is a *natural perfection*, when applied to a human being, is a confusion of ideas. It conveys no clear or definite object to the mind.

Is the idea any more clear or definite when applied to the Supreme Being ? We all agree that power is an attribute of God. He is omnipotent. But when the defendants assert that God has all *natural perfections*, without further illustration, would any person who had not studied W. Cogswell's Class Book, understand by it, that they intended to declare that he was omnipotent?

If the word "*perfections*" had stood alone, the meaning would have been more intelligible, at least in respect of the equality of the three persons constituting the Godhead, as it is a word sometimes used to express an attribute of God. But this equality is limited to *natural* and *moral* perfections, and we are assured that omnipotence is one of the former. So if the expression were, " *all divine perfections*," to my mind the language would have conveyed much more than the article now does. The distinction taken in the article refers us to our ideas of human nature for an explication of the meaning of the words. On recurring to those ideas, we find a third class of perfections, the intellectual ; and we also find that power is deducible from each class, and all the classes combined.

I must presume that the Franckean Lutherans, when putting forth a declaration of faith for the information of their own people and the world, the unlettered as well as the learned, intended to use language in no technical or professional sense, but in its ordinary and every day meaning.

Receiving it in that sense, although I speak with great diffidence on this point, I cannot understand by the Article in question, that the defendants believe the Son and the Holy Ghost to be equally powerful with God the Father. And when I contrast the language of this Article, with the positive and explicit language used by other Christian denominations, and the pointed words of the Augsburgh Confession ; I cannot help expressing my surprise that the Franckean Lutherans

should have failed to use similar language, if they really believed in the doctrine indicated thereby.

The doubt whether they do so believe, is strengthened by a consideration of the subsequent articles relative to Jesus Christ and the Holy Ghost. The one affirms no attribute of *power* in the Son of God, nor the other in the Holy Ghost. And these articles too, stand out in strong relief, when compared with the similar articles of faith in the standards of other churches.

I have examined this point at great length, because I desired to avoid expressing any opinion upon the fact that the defendants claiming to be Evangelical Lutherans, have established a new declaration of faith, which is alleged to be a departure or secession from their church. Conceding that the mere reforming of the language of the old standards, or wholly remodelling them, is unobjectionable; there can be no doubt of the secession when the change extends to essential doctrines.

The testimony of *other* Franckeans, that they believe in the Trinity, and so understand the declaration of their faith, is unavailing to the defendants. They must stand or fall by the declaration itself, the solemn act by which they presented themselves to the christian world as a new synod, more evangelical and scriptural than their brethren who remained behind. In that declaration they have set forth what they deemed to be "esssential doctrines of the bible, while they avoided stating those points which they did not believe as set forth in the Augsburgh Confession." (*Mr. Lawyer's testimony.*) They do not now repudiate it, but claim a construction of it which I am unable to derive from its language.

Next. In regard to the divinity of Jesus Christ, and the alleged omission in that behalf in the defendants declaration.

Article 3d of the Augsburgh Confession is in these words, as translated by Dr. Lochman.

"Of the Son of God." "We also teach that God the Son, became man, born of the virgin Mary; and that the two natures, divine and human, inseparably united together in one person, are one Christ, who is true God and man, who was truly born, who was crucified, dead and buried; that he was a sacrifice, not

only for original sin, but also for all other sins, and reconciled the wrath of God. Also that the same Christ descended into hell, truly arose from the dead on the third day; that he ascended into heaven, and sitteth at the right hand of God; that he eternally rules over all his creatures and governs; that he sanctifies, strengthens and comforts, through his Holy Spirit, all who believe in him, and gives unto them life and various gifts and blessings, and that he defends and protects them against the devil and against sin. Also that the same Lord Christ will publicly come to judge the living and the dead."

The fourth section of the Declaration of Faith of the Franckean Synod, is as follows : " Jesus Christ and Redemption." 4. (We believe,) "That Jesus Christ, the only begotten Son of God, in the fulness of time, was manifested in the flesh, and is the only Redeemer—that he was crucified, dead and buried— that he arose from the dead, ascended into heaven, and is now exalted at God's right hand, to make intercession for the whole human race."

And section 11th, " Final Judgment and Future State." 11. (We believe,) "That Jesus Christ will come the second time, when he will judge the world in righteousness; that there will be a resurrection of the dead, both of the just and unjust, and that he will receive the righteous into life eternal, but the wicked will be sent into endless punishment."

It is not claimed by the defendants that the sections just quoted, affirm the equality of Christ with God the Father, although the fourth declares his divinity. They however contend that his equality is fully expressed and declared in the second section, " Of God and Creation ;" and in their answer they allege that Mr. Wieting has always taught and preached the doctrine of the equality of Jesus Christ with the Father in its fullest extent, and his preaching has been so received, and approved of by the members of the two churches in question.

I have gone so fully into this subject in speaking of the Trinity, that it is unnecessary to enlarge upon it. It is involved in the doctrine of the Trinity. The belief in the *divinity* of the Saviour is not any mark of a belief in his equality with God the Father. All Socinians, and most of the Unitarians believe in

Christ's divinity, and could subscribe to his attributes as set forth in both the 4th and 11th sections of the Franckean Declaration. Therefore, unless the second section proclaims the equality of Jesus Christ with the Father, it is not to be found alleged in their creed.

My conclusion upon this has been already stated. The section fails, in my humble judgment, to convey the idea distinctly that there are three persons in God, all three one Divine Being; and even if that difficulty were obviated, it does not declare clearly or explicitly, that the Son and the Holy Ghost, are equally powerful with God the Father.

The first article of the Augsburgh Confession is positive in this respect; and the various creeds of Trinitarians from which I have quoted, are equally direct and explicit.

III. The remaining ground upon which the complainants insist that they have shown an essential difference between the Augsburgh Confession, and the declaration of the Franckean Synod, is in reference to *original or inherited sin.*

The second article of the Augsburgh Confession is as follows:

"Of Original or Inherited Sin." "We teach that after the fall of Adam, all men, who are naturally born, are conceived and born in sin; that is, that they are all, from their infancy, full of bad desires and dispositions, and can have no true fear of God, nor faith in God, by nature; and that this innate disease and inherited sin, is really to be accounted sin and condemneth all who are not born again of water and the Holy Ghost."

The third section of the Franckean Declaration of Faith, is in these words, viz. "Primitive State of Man and his Apostacy."—3. (We believe,) "That man was created in the image of God, free from sin and every moral imperfection; that he fell by disobedience from this state, and became morally depraved in his nature, and that in consequence of this sin, he transmitted his moral pollution and sinful propensities to all his posterity."

Section 5.—" *Of the way of Salvation and the Atonement,*" it is true, declares " that those only who repent and believe in the Lord Jesus Christ will be saved."

Kniskern *v.* The Lutheran Churches of St. John's and St. Peter's, and others.

The difference between the two creeds on this point is never-
theless, too manifest to require extended remark. The Augs-
burgh Confession declares that the sin inherited from our first
parents, *is really to be accounted sin,* and condemneth all.
The Franckean declaration declares nothing of the kind. The
answer does not admit or deny the difference, but the defend-
ants counsel did not dispute it at the hearing. One of their
two clerical witnesses, testified that it was a doctrine of the
Franckeans that no person is punished for original sin alone.
The other said, that in every sense of the phrase, *original sin,*
it is not a cardinal doctrine among Lutherans, that original sin
condemneth all who are not born of water and the holy ghost.
Both say that as expressed in the second article of the Augs-
burgh Confession, the doctrine is not held by a great majority
of the Lutherans in the United States.

The grounds of defence, therefore, on this point are, that the
doctrine itself is not essential or cardinal ; and that it has been
abandoned by the Lutherans generally.

1. As to its being an essential and vital article in the Con-
fession of Faith presented at Augsburgh, I can entertain no
doubt. It stands next in order to the declaration of the Prot-
estants as to God, the Creator of all. It is the foundation of
the great atonement, of its necessity ; in short, of the Christian
religion itself ; and in every creed and declaration of Christian
doctrines, the dogma of human depravity, by the fall of our
first parents, in some form, occupies a prominent position, and
is made the basis of the belief in Christ's coming upon earth,
and man's redemption. From the decrees of the Council of
Trent, to the declared belief of the Universalist, this doctrine
is made essential and cardinal. The *total depravity* of man-
kind in consequence of the fall, was one of the *Five Points*
established by the Synod of Dort, on account of the disbelief of
which the Arminians were persecuted ; and which points, to
this day are of commanding influence in the creeds of Calvin-
ism. And in reference to the tenets of other denominations,
the Lutheran creed in the Augsburgh Confession, that inherited
sin is really to be accounted sin, and of itself condemneth all
mankind, is an essential doctrine, and not a difference of opinion

on a minor particular, or a *minutia*, within the acknowledged leniency of the Lutheran Church in respect to human creeds.

2. In order to derive any benefit from the alleged abandonment by the Lutherans of the doctrine of Inherited Sin as contained in the second article of the Augsburgh Confession, the defendants must establish the changed belief to have existed in these churches when they were endowed with the temporalities in controversy. The history of the Augsburgh Confession with which I set out, shows that no such abandonment had taken place at that period. The testimony respecting it adduced by the defendants, and the publications on the subject, are far from establishing that the Lutherans generally in this country, at the present day, do not believe that article ; although they undoubtedly show a wide latitude of construction among their theologians, in regard to human depravity by nature and its consequences. But I have no evidence before me that any of the donors of the property in question dissented expressly or by construction, from the second article of the Confession, or that they intended their gifts for the support or teaching of a modified or different doctrine.

The complainants have, therefore, in my opinion, established that the defendants have adopted a rule or standard of faith which is different from the Augsburgh Confession of Faith, and the other standards of faith and doctrine of the Evangelical Lutheran Church, as held and maintained by the founders of the two churches in controversy; and that they have diverted the churches and church property from the purposes and objects for which they were erected and bestowed, and perverted them to the preaching, teaching, and support of an essentially different faith and doctrine, in violation of their duty as trustees of that property and those edifices.

IV. There is another ground which forms an important portion of the complainant's bill, and which relates solely to the government and discipline of these churches, and the severance of their connection with the Hartwick Synod.

The government of the Lutheran Church in Europe, differs

in different countries. In Germany, the sovereign or rulers of the state appoint the consistories, or highest councils of the church. Ordinations are made by the superintendent, appointed by the civil authority, and he usually presides in the consistory ; or by any clergyman commissioned for that purpose by the civil government. In Sweden and Norway, Episcopacy still prevails, and also, in a modified form, in Denmark.

In this country, the Lutherans, relieved from the shackles of state control, adopted a parity of ministers, and the free voluntary convention of synods. How far the consistories in Europe, and the synods in the United States prior to the present generation, were *judicatories*, in the sense claimed by the complainants, I have not been enabled to satisfy myself from the testimony of the witnesses or from books.

It is, however, undeniable, that the early Lutherans in this country regarded an ordained ministry as an essential part of their church, and that no different opinion on this point has ever been promulged. They looked to Germany for pastoral aid, and from the arrival of the zealous and intellectual Muhlenberg, the pupil of Francke, until this time, they have recognized none but regularly ordained or licensed ministers. This, of itself, without reference to judicatories, or appellate jurisdiction, exhibits the absolute necessity of a government by synod, consistory, or ministerium ; a union of ministers of their church, for the purpose at least of regulating the admission and licensure of preachers of the gospel. The Franckean constitution itself contains full provisions for continuing an ordained ministry in this mode. Therefore, although these churches in Sharon were, in 1789, attached to no synod or ministerium, there can be no doubt that the pious donors of the land in question, fully expected and intended that the churches should unite with and form a part of such an ecclesiastical body, whenever their convenience and the growth of the country would permit it to be accomplished. And we are bound to infer, that a synod connection was as much within the intention of the donors, as the preaching of the Word by an ordained minister.(*a*)

---

(*a*) See the note, ante page 521, from the *Hallische Nachrichten.*

The subsequent connection formed with the New-York Ministerium, was thus the performance of a legitimate duty by those who were then clothed with the administration of these churches. The union of the same churches with others, in forming the Hartwick Synod, was, so far as it appears, an unexceptionable act, further carrying out the intention of the donors, with greater convenience and advantage to the churches.

Whether the connection of this synod with the General Synod of the United States, with appellate powers of discipline, was also proper, I am not prepared to say. Without those powers, I perceive no objection to it. Without reference to that question, the Hartwick Synod including these churches, adopted the *Doctrine and Formula* of the General Synod, and thus made its discipline and government, as adapted to local synods, a part of the system of the Hartwick Synod, to the benefits of which the complainants, as members of these churches, were entitled.

This Formula provides the series of judicatories, as set forth in the bill of complaint, and Lochman confirms their existence to the extent of the local synods.

The inquiry remains, whether this synodical connection was indissoluble without the consent of all the parties on both sides ; or was separable by the act of a majority of those entitled to a voice in the government of the two churches, against the wishes of the minority, and without the consent of the other constituent members of the synod.

The decision of the Chancellor in the German Reformed Church case, *Gable* v. *Miller*, before cited, appears to establish that the attempt of the defendants to cast off the authority of the Hartwick Synod, was a departure from their duty. And the founders of the Franckean Synod seem to have entertained the same opinion of such a secession ; for they make it irregular for any minister or church to withdraw from the synod, without a regular dismission therefrom. (Article 6th, section 2d.)

I prefer, however, to rest my conclusion on the more important points relating to the faith and doctrine of these churches.

On these points, the defendants are convicted of a violation

of their trust. It is true, they called witnesses to prove that there was no difference in the preaching and teaching of Mr. Wieting in these churches from that pursued by his predecessors. So in *Gable* v. *Miller,* it was said that the Lutheran clergymen employed in that Reformed Church, instructed the church and people from the Heidelberg Catechism. The Chancellor, in his very learned and conclusive judgment in that case, effectually exposed the fallacy of this ground of defence.(*a*)

The courts in their jurisdiction over these religious trusts, do not interfere with the right which every man has to interpret the word of God according to his view of its plain import. They fetter no man's conscience, they bind no one to the dogmas of a creed, ancient or modern. The defendants by the decree which I am required to make, are not restrained from believing or rejecting, as much or as little, of the Augsburgh Confession of Faith, as they deem reasonable or proper. If they consider it antiquated, obsolete, or contrary to Scripture, they are at entire liberty to preach and to hear accordingly. But the law does not permit them to use the property of others, to sustain their views. They are trustees of this fund; and neither justice or honesty will tolerate them in taking the fund given by others, (their ancestors it may be, but given for the support of the doctrines of that Confession,) and using it to attack and destroy those doctrines.

FIFTHLY. It remains for me to inquire whether the complainants are entitled to any relief in this suit, by reason of the defendants breach of trust, and the nature and extent of such relief.

The section of the Revised Statutes which excludes religious corporations from the provisions therein enacted in the Article relative to *Proceedings against Corporations in Equity,* (2 R. S. 466, § 57,) does not divest this court of its common law jurisdiction over the subject of charities. The doubt which was raised in regard to the existence of the jurisdiction

(*a*) See his argument as now reported in 10 Paige, 645, 646.

of the court of chancery over charities prior to the statute of Charitable Uses, 43 Elizabeth, ch. 4, by the dictum of Lord Loughborough, in the *Attorney-General* v. *Bowyer*, (3 Ves. Jr. 726,) has been most effectually dispelled by subsequent investigations and decisions. The publications of the English Record Commission, have thrown a flood of light upon this question. In the *Calendars of the Proceedings in Chancery in the reign of Queen Elizabeth, containing also examples of proceedings in that court from the time of Richard 2d,* the instances of bills filed for relief in such cases are numerous. Two of these in the reign of Henry 6th, (who died in 1460,) are to be found in vol. 1st, page lvi. and lvii. and two in Edward 4th, in vol. 1st, page lxii, and vol. 2d, page xliv. And distributed throughout the three volumes, there are nearly fifty bills filed for relief, relative to charitable uses during the reign of Elizabeth, before the passage of the Act of 43 Eliz. in relation to that subject. See them from vol. 1st, page 81, (a charity which was before the same court again after the lapse of 260 years, in 1 Mylne and Keen's R. 376;) to vol. 3, page 319. There are also several reported cases of bills and decrees respecting charities made before the 43d Elizabeth. See *Messenger* v. *Mayor &c. of Gloucester*, (Tothill, 58, in 36 to 38th Henry 8th.) *Parrott* v. *Paulet*, (Carey, 103; 20 Eliz.;) *Elmer* v. *Scott*, (24 Eliz.; *Practice of the Court of Chancery Unfolded, or Choice Cases in Chancery*, 155;) and several cases contained in *Duke's Charitable Uses*, pages 131, 136, 163, 360, 361. Of the numerous opinions and decisions on the point, conflicting with that of Lord Loughborough, I will refer to Lord Hardwicke in *Attorney General* v. *Brereton*, (2 Ves. Sen. 425,) and in *The Same* v. *Middleton*, (2 ibid. 327; Lord Northington in *The Same* v. *Tancred*, (1 Eden's R. 10;) Lord Wilmot, in *The Same* v. *Downing*, (Wilmot's Opinions, 24;) Sir John Leach in *The Same* v. *Brentwood School*, (1 M. & K. 376;) Lord Redesdale, in *Corporation of Ludlow* v. *Greenhouse*, (1 Bligh, 61;) and finally, to the express decision of the House of Lords, and the concurring opinions of Lords Redesdale, Eldon, and Lyndhurst, in *Attorney General* v. *Mayor of Dublin*, (1 Bligh, 347.) And see *Orphan Asylum* v. *M'Cartee*, (9 Cowen, 440, per Jones,

Chancellor;) *Dutch Church* v. *Mott*, (7 Paige's R. 77, per Walworth, Chancellor;) and *Vidal* v. *Girard's Executors, in Supreme Court of U. S., January Term*, 1844, *per Curiam.*(a)

Our first statute enabling churches and religious societies to become bodies corporate, passed April 6th, 1784, (1 *Greenleaf's Laws, N. Y.* 71,) sets forth in a preamble the evils to remedy which it was enacted ; and some of these would be greater than they were before, if equity retained no jurisdiction over the trusts vested in such corporations.

In *Lawyer* v. *Cipperly*, (7 Paige's R. 281,) the Chancellor virtually assents to the power of this court to correct a breach of trust like the one in question, by removing the trustees from their office.

In his recent decree in *Gable* v. *Miller*, heretofore cited, he sustained the bill on similar grounds, and declared that the complainants who had been elected trustees, but by a minority of the church, were the true and legitimate board of trustees, and that the defendants who had introduced Lutheran ministers into a German Reformed Church, and were chosen trustees by a majority of the congregation, who approved that course, should deliver up the property in controversy to the complainants and no longer intermeddle with the same. The decree also provided for an account of the rents and income of the church property.

In the case of *Lady Hewley's Charity*, the Vice-Chancellor of England made a decree to the effect that the defendants be removed from being trustees of the charities, and referring it to a master to appoint proper persons to be trustees in their room and to take an account of the rents and profits of the charity estates received by the defendants. (9 Clark & Fin. 373 ; 11 Simons, 592 ; 7 Lond. Jur. Rep. 783.)

This decree, as I have already mentioned, was affirmed by the

(a) This case is now reported in 2 Howard's U. S. Rep. 196; and Judge Story in his opinion says, there is no longer any doubt on the subject. The very able, elaborate, and profound argument of Horace Binney Esq., in the Girard Will Case, exhausts the learning on the subject of charities; and the bar has reason to regret that it was not more fully reported by Mr. Howard.

Chancellor and the House of Lords. In that case it is however to be observed, that the charities were not vested in any corporate body ; and the trustees therefore in respect of removal, stood upon the same footing as the ordinary trustees of an estate. My only difficulty on this head, is in reference to the mode and limitations of the selection of new trustees, where regularly the choice of trustees is vested in the *cestui que trusts*, and to be exercised by an election, and on this point the views of the respective counsel are solicited on settling the decree. The decree will of course prevent any further perversion of the trust, even if any of the defendants, or their adherents, should continue in office, and so far there is no difficulty. But the trusts were designed to be active, and they should be vested in persons who will apply the property with diligence and fidelity to the pious uses for which it was bestowed. This may be secured by directing an election of trustees in the place of the defendants who are removed, by the respective congregations, under the direction of a master, excluding from such election those who have adhered to the defendants and the Franckean Synod. Or it may be competent to have a master of the court select trustees to officiate until the termination of the current year, and a regular election by the churches. And the decree may direct the trustees to employ a pastor who adheres to the Augsburgh Confession and the Hartwick Synod.

There must be a decree, removing from the office of trustees the defendants who held that office when the bill was filed, declaring that their offices are vacant, and that the complainant, Marcus Brown, is a trustee of St. John's Church at Durlach. There must be a new appointment of trustees, and the defendants and their successors, and those claiming under them in the respective churches, must deliver up to Brown and the new trustees, all the real and personal estate of the two churches, and the books, papers, and records of the same. And they are to account for the rents, income, and profits of the property since the commencement of this suit. The defendants must be perpetually enjoined from interfering with the property, except in accordance with the decree, and from using or appropriating it for any different purpose.

The decree will declare that the temporalities in question are held by the two corporations in trust for the support of divine worship by an Evangelical Lutheran Church, and for the teaching of the doctrines of the Augsburgh Confession of Faith, and such other standards as were held and recognized by the Lutheran Church in this country, in the year 1799, and in connection with the Hartwick Synod of the Evangelical Lutheran Church, with such other provisions on this subject as will carry out the decision of the court.

The defendants must be charged with the costs of the suit.

---

The following decree was entered.

This cause having been duly brought to a hearing on the pleadings and proofs therein, and Samuel Stevens having been heard on the part of the complainants, and Henry Hamilton and Marcus T. Reynolds on the part of the defendants, and due deliberation being thereupon had, it is ordered, adjudged, and decreed, and this court, by virtue of the power and authority therein vested, doth order, adjudge, and decree, that the two church edifices or meeting houses mentioned in the bill of complaint in this cause, as having been erected and built by the members of the two religious societies in the bill mentioned, one of which was subsequently known by the corporate name of "The Evangelical Lutheran Congregation of St. John's Church at Durlach, in Sharon," and the other of which was then a religious corporation, known by the corporate name of "The Ministers and Trustees of the Lutheran Church in Rhinebeck," in the county of Schoharie and state of New-York, were so erected and built by the members of said churches or congregations, as places of divine worship, by an Evangelical Lutheran Church, according to the principles, doctrines, and tenets of said church, as established, expressed, and declared in and by the Augsburgh Confession of Faith, and for the purpose of having the faith and doctrines of the said Evangelical Lutheran Church, as expressed and declared in and by that confession, and no different faith or doctrine preached, taught, and inculcated therein, and that the real and personal estate mentioned in the said bill of complaint, as belonging to the said churches or congregations, and by them held in common, were obtained, bestowed, and given by the members of said churches, or congregations, and by other persons, for the sole and only purpose of having the same appropriated and applied to the support and maintenance of the preaching, teaching, and inculcating, in said church edifices, and to the members of said churches or congregations, the doctrines, tenets, and principles of the said Evangelical Lutheran Church, as established and declared in and by the said Augsburgh Confession of Faith, and that all and singular the said two church edifices, with their appurtenances, and the other temporalities of said two churches or congregations, ever since the incorporation of said churches or congregations, as men-

566 CASES IN CHANCERY.

Kniskern *v.* The Lutheran Churches of St. John's and St. Peter's, and others.

tioned in the said bill of complaint, have been and still are held by the said two corporations herein before mentioned, *in trust* for the support of divine worship by an Evangelical Lutheran Church, and for the preaching, teaching, and inculcating the doctrines, tenets, and principles of such church, as established and declared in and by the said Augsburgh Confession of Faith, in said church edifices, and to the members and adherents of said churches or congregations; and for no different purpose whatever. And it is further ordered, adjudged, and decreed, that the declaration of faith established and promulgated by the Franckean Synod, and adopted by the defendants in this cause as their rule or standard of faith, and by them sought to be preached, taught, and inculcated in said two churches, and to the members thereof, as the true rule or standard of faith for said churches or congregations, is essentially different from the rule or standard of faith and doctrine established and declared by the said Augsburgh Confession of Faith, which was accepted and received by the members of the said two churches or congregations as their standard of faith and doctrine at the time of the erection of the said two church edifices, and the endowment of the said two societies or corporations before mentioned; and that the use by the said defendants of the said two church edifices, and the other temporalities belonging to said two churches or congregations, for the purpose of preaching, teaching, and supporting the doctrines and tenets established and promulgated by the said Franckean Synod, as their Declaration, or Confession of Faith, was a *diversion* of the said two churches and church property, from the purposes and objects for which they were originally intended, and a perversion of the same to the support and maintenance of a rule or standard of faith and doctrine essentially different from and fundamentally at variance with the rule or standard of faith and doctrine of the Evangelical Lutheran Church, established and declared by the said Augsburgh Confession of Faith; and that such *diversion* and *perversion* by the said defendants, of the temporalities of the said two churches or congregations, was and is a violation of the trust under and by virtue of which said temporalities were held, as herein before specified and declared, and a breach of duty on the part of the said defendants, as trustees thereof. And it is further ordered, adjudged, and decreed, that the act of the said defendants, in severing the said two churches or congregations from their connection with the Hartwick Synod, and uniting them to the said Franckean Synod, as in the said bill of complaint mentioned, was wholly illegal and void, and the connection of said two churches or congregations with the said Franckean Synod is hereby dissolved. And it is further ordered, adjudged, and decreed, that Michael Marcley, John C. Shultz, and Marcus Borst, three of the defendants in the said bill of complaint named, who were the trustees of the said church or congregation, known by the corporate name of "The Ministers and Trustees of the Lutheran Church in Rhinebeck," and that John Wise and Asaph Roberts, two of the defendants in the said bill of complaint named, who were two of the trustees of the said church or congregation known by the corporate name of "The Evangelical Lutheran Congregation of St. John's Church at Durlach, in Sharon," at the time of filing the bill of complaint in this cause, be and they hereby are removed from the office of trustees so held by them respectively, and the offices so held by them are hereby decreed and declared to be vacated by the said last named defendants. And it is further ordered, adjudged, and decreed, that the said defendant, Philip Wieting, and the other defendants in the said bill of

complaint named as adhering to him and the said Franckean Synod, and their successors, and those claiming under them, deliver up to the trustees elected, or to be elected and chosen, and who shall be reported by the master, as hereinafter provided, all and singular, the church edifices, and real and personal estate and effects of the said two churches, or congregations and corporations, and the books, papers, and the records thereof. And it is further ordered, adjudged and decreed, that the said defendants render a just and true account of the yearly value of the use, rents, income and profits of the said real and personal estate of the said two churches or congregations so diverted by them, as hereinbefore stated, from the time of such *diversion* down to the time they shall deliver over the possession of the same to the trustees elected, or to be elected and chosen, and reported as hereinafter provided, and pay the sum reported upon such account, with legal interest thereon, to said trustees, for the use of said two churches, or congregations and corporations respectively; and for the purpose of ascertaining the yearly value of the use, rents, income and profits of the said real and personal estate, and the amount due therefor; it is hereby referred to one of the masters of this court, residing in any county in this state, to take and state an account thereof; and in taking and stating such account, the said master is to charge interest as shall be just; and on the coming in and confirmation of said master's report, the amount reported to be due for the use, rents and income of the said property, together with interest thereon from the date of the said report, may be collected from the said defendants (except the said corporations) by execution, according to the course and practice of this court; and it being suggested to the court, that the complainants, and the other members of the said two churches and congregations, who adhered with them to the Hartwick Synod, and the said Augsburgh Confession of Faith, have kept up a corporate organization in the said two churches, and have elected trustees thereof from year to year, until the present time; it is thereupon further ordered, adjudged and decreed, that it be referred to one of the masters of this court, residing in any county in this state, to inquire and ascertain whether the said complainants, together with those adhering with them, as aforesaid, have kept up such corporate organization in the said two churches, and have elected trustees of the said two corporations, from year to year until the present time, or otherwise, so that at the present time there are such trustees, representing the said complainants, and those adhering with them, as aforesaid, in such churches and corporations, or either of them, and that the said master report thereon to this court without delay; and if he finds such existing organization, that he set forth and declare in his report who are the trustees of the said respective corporations at the date of his report, under or in pursuance thereof; and upon the confirmation of his report, the said persons therein reported as being trustees, shall be from thenceforth deemed to be the only lawful trustees of the said two corporations respectively, and as such entitled to the possession, custody and control of the said church edifices, and of all the real and personal estate of the said two corporations. And it is further ordered and decreed, that if the said master shall find that there are no trustees of the said two corporations chosen under such organization, who are in office, and representing the said complainants and their adherents, as aforesaid, then the said master shall cause an election of such trustees to be held in the said churches respectively, giving such previous notice of the time and place of holding the same as is prescribed by the statute relative to religious incorporations and elec-

568       CASES IN CHANCERY.

Kniskern v. The Lutheran Churches of St. John's and St. Peter's, and others.

tions therein, (as far as such notice is practicable,) and the said master shall preside at and superintend such election, in the said respective churches, and shall report thereon, with the names of the trustees, then and there chosen, to this court without delay ; and upon the confirmation of his report thereof, the persons therein reported as having been elected such trustees, shall be, and they are hereby adjudged and declared to be the lawful trustees of the said churches and corporations respectively, and entitled to possess, keep and control the said church edifices, and all the estate, real and personal, of the said two corporations, in the same manner as if they had been duly elected at the last preceding annual election, in the said two churches, according to law. And it is further ordered, adjudged and decreed, that the said defendants, (except the said corporations,) and all other members of the said two churches or congregations, who adhere to the Franckean Synod and the declaration of faith established and declared by that synod, be and they hereby are, and each of them is, perpetually enjoined and restrained from intermeddling, or in any manner, interfering with the temporalities of the said two churches or congregations, and from using, or in any manner appropriating the same, or any part thereof, for any purpose or object whatever, except in accordance with the provisions of this decree, and also from hindering, delaying or preventing the said complainants, and the other members of the said two churches who adhere to the Augsburgh Confession of Faith and the Hartwick Synod, in the free use and enjoyment of the said two church edifices, in the said bill of complaint mentioned, for the purpose of divine worship, according to the doctrine and faith of the Evangelical Lutheran Church as established and declared by the said Augsburgh Confession of Faith, and preaching and teaching the doctrines, tenets and principles of that confession therein. And it is further ordered, adjudged and decreed, that the said defendants, in the said bill of complaint named, except the said two corporations, pay to the complainants, or their solicitors, their costs of this suit to be taxed, and that they, the said complainants, have execution therefor, &c.

And that the said complainants be at liberty to apply for such further order and directions in the execution of this decree, as they may be advised.